PETITION FOR WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. 2254

Prisoner's name:        DAVID MILLER, JR.
Prisoner's number:      DOC No. J08118
Place of Confinement:   UNION CORRECTIONAL INSTITUTION
                        Raiford, Florida

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DAVID MILLER, JR.,

    Petitioner,

v.                                  CASE NO. 3:17-cv-932-BJD-JBT

MARK S. INCH,
    Secretary, Florida
    Department of Corrections,

    Respondent,

and

ASHLEY MOODY,
    Attorney General,

    Additional Respondent.
_____/

<u>PETITION</u>

1.  **Name and location of court which entered the judgment of conviction under attack and state court case number(s):**

    Duval County Circuit Court of the Fourth Judicial Circuit, Case No. 97-6680.

2.  **Date of judgments and convictions:**

    Miller was found guilty on June 26, 1998. The jury, by a vote of 7-5, recommended a death sentence on July 7, 1998. Thereafter, on July 24, 1998, the trial judge sentenced Miller to death.

3.  **Length of sentence:**

Sentence of death.

**4.   Sentencing judge:**

Honorable L. Haldane

**5.   Nature of offense or offenses for which you were convicted:**

First-degree murder, aggravated battery.

**6.   What was your plea?**

Not guilty plea.

**7.   Type of trial:**

Jury trial.

**8.   Did you testify at trial?**

Yes.

**9.   Did you appeal from the judgment of the conviction?**

Yes.

**10.  If you did appeal, answer the following:**

A)   Name of court: Florida Supreme Court.

B)   Result: Miller's convictions and sentences were affirmed on direct appeal. *Miller v. State*, 770 So. 2d 1144 (Fla. 2000).

C)   Date of result: August 31, 2000, rehearing denied October 24, 2000.

**If you filed a second appeal or filed a petition for certiorari in the Florida Supreme Court or the United Supreme Court, give details:**

No second appeal or petition for certiorari was filed.

**11.  Did you file any post-conviction motions under either Florida Rule of Criminal Procedure 3.800 or 3.850 with the state trial court or any other post-conviction motions or**

petitions for writ of habeas corpus with the state trial
court or state appellate court to this judgment and
conviction?

   Yes.

12.  **If you did file any matters within the realm of question 11,
     answer the following as to each motion or petition.**

        **A) The type of motion/ petition filed; B) Date
        motion/petition filed; C) Name of court; D) Result; E)
        Date of Result**

   A)   Rule 3.851 Motion.

   B)   September 27, 2001. The State moved for summary denial
        on October 26, 2001, on the basis that the motion was
        insufficiently pled.  On January, 23, 2002, the trial
        court granted the State's motion for summary denial and
        granted Miller additional time for the filing of an
        amended motion.  The parties stipulated to an order
        holding that the amended motion would relate back to
        October 2, 2001.

   C)   Duval County Circuit Court of the Fourth Judicial
        Circuit.

   D)   Denied.

   E)   April 22, 2004.

13.  **If your motion or petition described in paragraph 12 was
     denied, did you file an appeal of that denial with the
     appropriate state appellate court?**

        Appeal of 3.851 denial taken appropriately to the
        Florida Supreme Court.

     **As to each motion or petition indicate:**

        **A) Name of court where appeal filed; B) Date appeal
        filed; C) Result; D) Date of Result**

   A)   3.851 denial appealed to the Florida Supreme Court.

B)   Notice of appeal for the 3.851 denial filed on or about May 24, 2004, initial brief filed March 17, 2005.

C)   The Florida Supreme Court affirmed the denial of relief.

D)   March 23, 2006.  *Miller v. State*, 926 So. 2d 1243 (Fla. 2006), mandate issued April 13, 2006.

**If you filed a second appeal or filed a petition for certiorari in the Florida Supreme Court or the United Supreme Court, give details:**

No petition for certiorari was filed in the United States Supreme Court.

14.  **If you did file any other matters within the realm of question 11, answer the following as to each motion or petition.**

> **A) The type of motion/petition filed; B) Date motion/petition filed; C) Name of court; D) Result; E) Date of Result.**

A petition for writ of habeas corpus was filed on March 17, 2005, in the Florida Supreme Court.  The petition was denied on March 23, 2006. *Miller v. State*, 926 So. 2d 1243 (Fla. 2006).

A second petition for writ of habeas corpus was filed on June 28, 2017, in the Florida Supreme Court.  The petition was denied on January 31, 2018.  *Miller v. State,* 237 So. 3d 921 (Fla. 2018), rehearing stricken on February 26, 2018, certiorari denied on October 29, 2018.

4

## PRELIMINARY MATTERS

### I.   Introduction

David Miller, through counsel, petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Miller is a death-sentenced Florida prisoner incarcerated at the Union Correctional Institution.  Respondent Mark S. Inch is the Secretary of the Florida Department of Corrections and, in that capacity, is responsible for Miller's custody and for carrying out an execution warrant.

Miller has been on Florida's death row for 20 years, but his case has never been before a federal court.  This Court's August 24, 2017, appointment of the Capital Habeas Unit ("CHU") of the Office of the Federal Public Defender for the Northern District of Florida, is the first time that Miller has ever had federal legal representation.

Based on the claims below, and for the reasons that will be addressed in Miller's forthcoming memorandum of law, Miller's custody on Florida's death row is unconstitutional, and relief should be granted under § 2254.

### II.  Request for Leave to File a Memorandum of Law

Miller requests leave to file a memorandum of law addressing the merits of his § 2254 claims and related procedural issues

including timeliness and exhaustion.  This petition, like all
§ 2254 petitions, is a fact pleading governed by the Federal Rules
of Civil Procedure.  *See Mayle v. Felix*, 545 U.S. 644, 670 (2005);
*Hittson v. GDCP Warden*, 759 F.3d 1210, 1265 (11th Cir. 2014).  As
such, the petition sets forth Miller's claims for relief and facts
supporting those claims, but does not contain Miller's complete
legal arguments, which are more appropriately presented in a
separate memorandum.

Allowing Miller to file a substantive memorandum of law is
consistent with Rule 2(c) of the Rules Governing Section 2254
Cases, which requires habeas petitions to "specify all the
available to the petitioner" and to "state the facts supporting
each ground," but does not require legal arguments supporting the
claims to be included within the pleading itself.  As the Eleventh
Circuit has recognized, Rule 2(c) simply requires "fact pleading .
. . as authorized under Federal Rule of Civil Procedure 8(a)."
*Hittson*, 759 F.3d at 1265; *see also Bell Atlantic v. Twombly*, 550
U.S. 544, 570 (2007) (explaining that federal civil pleadings need
only contain "enough facts to state a claim to relief that is
plausible on its face").

Courts routinely allow § 2254 petitioners to file separate
memoranda of law in support of their pleadings, including in the
Middle District of Florida.  *See, e.g.*, *Cooper v. Secretary, Dep't*

*of Corrs.*, No. 8:08-cv-5-T-27MAP, 2011 WL 795812, at *1 (M.D. Fla. 2011) (considering § 2254 petition and separate memorandum of law). In a capital case in the Northern District, Judge Hinkle explicitly rejected the suggestion that a § 2254 petitioner should have included all of his legal arguments within his petition. *Hernandez v. Jones*, No. 3:15-cv-428, ECF No. 10 (N.D. Fla. 2015) (Hinkle, J.) ("The respondent asserts that any legal argument should have been included in, or submitted simultaneously with, the petition itself . . . . It makes sense, though, to allow a petitioner to file a memorandum of law and to give the petitioner a reasonable period in which to do so."). Indeed, allowing separate legal memoranda is particularly important in capital cases, where legal arguments can be particularly complex, and often must address voluminous factual records developed during lengthy trial and state post-conviction proceedings.

Consistent with this precedent, this Court should grant leave for Miller to file a memorandum of law in support of the claims in this petition.

## III. Timeliness

Although Miller's petition is being filed beyond the Antiterrorism and Effective Death Penalty Act (AEDPA)'s one-year statute of limitations, the petition should be deemed timely and reviewed on the merits. Miller's convictions and sentence of death

were affirmed by the Florida Supreme Court on August 31, 2000. *Miller v. State*, 770 So. 2d 1144 (Fla. 2000). Rehearing was denied on October 24, 2000. Miller did not file a petition for writ of certiorari in the United States Supreme Court. His death sentence became final on January 22, 2001, when the time for seeking certiorari expired.

Under the AEDPA, Miller's federal habeas petition was initially due one year later, on January 22, 2002. *See* 28 U.S.C. § 2244 (d)(1). On September 27, 2001, Miller's state collateral counsel filed a motion for post-conviction relief in the circuit court. The State moved for summary denial on October 26, 2001, on the basis that Miller's motion was insufficiently pled (PCR. 93-99). On January, 23, 2002, the trial court granted the State's motion for summary denial and granted Miller additional time for the filing of an amended motion (PCR. 156-57). The parties stipulated to an order holding that the amended motion would relate back to October 2, 2001 (PCR. 157). At this juncture, Miller's AEDPA clock was tolled with 112 days remaining on it. *See* 28 U.S.C. § 2244(d)(2).

Subsequent to an evidentiary hearing, the trial court entered an order denying relief on April 23, 2004 (PCR. 841-1177). The Florida Supreme Court affirmed on March 23, 2006. *Miller v. State*,

926 So. 2d 1243 (Fla. 2006).  The court's mandate issued on April 13, 2006.

The remaining time on Miller's clock expired on August 3, 2006, without any federal habeas petition being filed on his behalf.  This petition is being filed twelve years later, on January 30, 2019.[1]

Despite the aforementioned circumstances, and for reasons that Miller will discuss in more detail in his memorandum of law, Miller submits that his petition should not be dismissed as time-barred. Although the statutory limitations period for an initial § 2254 proceeding expired prior to Miller's claims being filed in the instant petition, that limitations period is not jurisdictional, and Miller submits that a recognized exception, equitable tolling, is pertinent here. *See Holland v. Florida*, 560 U.S. 631 (2010) (holding that one-year statute of limitations for federal habeas claims may be tolled in appropriate circumstances for non-statutory, equitable reasons).

Equitable tolling is flexible and decided on a "case-by-case" basis.  *Id.* at 649-50.  In deciding whether to apply equitable tolling, this Court is required to "exercise judgment in light of

---

[1]     The only other substantive pleading filed on Miller's behalf in any court during this time frame was a 2017 state habeas petition addressing *Hurst v. Florida*, 136 S.Ct. 616 (2016)*,* and *Hurst v. State*, 202 So. 3d 20 (Fla. 2016).

prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case." *Id.* at 654.

The CHU's investigation of Miller's case so far indicates that equitable tolling is appropriate. One indication that equitable tolling is warranted stems from the fact that Miller has significant mental health issues which impact his ability to communicate with counsel. Miller has been diagnosed with a number of disorders throughout his life, including a mixed personality disorder with features of schizoid personality, schizophrenia, and brain damage. A recent mental health examination confirms that Miller has paranoid schizophrenia, with a history of pervasive hallucinations and delusions dating back to at least the early 1980s. As is typical in schizophrenia and schizotypal disorders, Miller suffers from a language disorder. He, like many individuals with schizophrenia, often does not want to communicate. When forced to do so, Miller does not communicate well. It is likely that Miller would have acquiesced to what his attorneys wanted him to do, simply to end the interaction and return to his solitude. This tendency would be particularly pronounced under stress. At Miller's best, he is low-functioning, and in many ways presents with symptoms appearing similar to a severe form of autism. He is paranoid and withdrawn. The rest of the time, he presents with

active schizophrenia and psychosis in the form of delusions and
hallucinations.   These  symptoms  would  have  made  effective
communication virtually impossible between Miller and his defense
counsel.

As Miller will explain in more detail in his memorandum of
law, courts have widely recognized the availability of equitable
tolling due to extraordinary circumstances where the defendant
suffered some form of mental incapacity.  *See, e.g.*, *Bolarinwa v.
Williams*, 593 F.3d 226, 231 (2d Cir. 2010); *Nara v. Frank*, 264 F.3d
310, 320 (3d Cir. 2001); *Fisher v. Johnson*, 174 F.3d 710 (5th Cir.
1999); *Laws v. Lamarque*, 351 F.3d 919, 923 (9th Cir. 2013); *Hunter
v. Ferrell*, 587 F.3d 1304, 1308 (11th Cir. 2009).

Additionally, in light of the number of years by which
Miller's petition has been filed beyond the AEDPA's one-year
deadline, the CHU submits that there are equitable tolling
arguments based on serious deficiencies in the state post-
conviction representation.   Both  abandonment  and  attorney
misconduct qualify as a basis for equitable tolling.  *Brown v.
Secretary*, No. 17-10027, 2018 WL 4932715 (11th Cir. Oct. 11, 2018).

Based on this evidence, and other evidence that may be
uncovered during a complete investigation by counsel, the CHU
submits that it can demonstrate that § 2244(d)'s limitations period

11

should be equitably tolled and that Miller's § 2254 claims should be reviewed on the merits.

Miller has valid arguments to present in response to any specific affirmative procedural defenses Respondent may raise regarding claims in this petition, including timeliness. Miller will present these arguments at the proper time—namely, after Respondent has raised any affirmative defenses with particularity. It would be premature for Miller to attempt to respond to specific affirmative procedural defenses that Respondent has not yet asserted. Such a process would unfairly shift the burden of raising affirmative defenses to Miller and would result in an inefficient use of judicial resources, as Respondent would likely still raise some arguments that Miller did not anticipate, and Miller would need to respond to such.

## IV.  Evidentiary Hearing

As will be described further in Miller's memorandum of law, a federal evidentiary hearing on his § 2254 claims is permissible and appropriate. *See* 28 U.S.C. § 2254(e)(1)-(2). To the extent that a factual basis for one or more of Miller's claims was not developed in state court, a federal evidentiary hearing is not prohibited. With respect to claims that were not fully addressed and adjudicated by the state courts on the merits, a federal hearing is permissible. *See Cullen v. Pinholster*, 131 S.Ct. 1388,

1398 (2011) (explaining that a federal evidentiary hearing is permissible when the state court did not adjudicate the claim on the merits); *see also Williams v. Alabama*, 791 F.3d 1267, 1273, 1276-77 (11th Cir. 2015) (remanding for evidentiary hearing on § 2254 claim after determining that state court did not adjudicate the claim on the merits). In addition, to the extent that the record for a non-merits-adjudicated claim was not fully developed in state court, Miller was not at fault because he made reasonable attempts, in light of the information available at the time, to investigate and pursue his claims in state court. An evidentiary hearing will enable Miller to prove this petition's factual allegations, which will entitle Miller to federal habeas relief. *See Williams v. Taylor*, 529 U.S. 420, 432 (2000).

To the extent that any claims were fully addressed and adjudicated by the state courts on the merits, a federal hearing is nonetheless permissible because, among other reasons, (1) the state courts' rejection of the claim assumed the truth of Miller's facts, (2) the state courts' rejection of the claim rested on an antecedent unreasonable application of federal law, and/or (3) the lack of factual record is the fault of the state court. *See Pinholster*, 131 S. Ct. at 1412 (Breyer, J., concurring) ("If the federal habeas court finds that the state-court decision fails [Section 2254(d)]'s test (or if [Section 2254(d)] does not apply),

13

then an [evidentiary] hearing may be needed."); *see also Madison v. Comm'r*, 761 F.3d 1240, 1249-50 (11th Cir. 2014) ("Nothing in *Pinholster*, or any other principle of habeas corpus, bars a District Court from conducting an evidentiary hearing where . . . (1) the federal claim was adjudicated on the merits in state court; (2) there is a determination based only on the state court record that the petitioner has cleared the § 2254(d) hurdle; and (3) the habeas petitioner tried, but was not given the opportunity to develop the factual bases of the claim in state court within the meaning of 28 U.S.C. § 2254(e)(2).").

## V.    Basis for Relief Under § 2254

Miller's state custody and death sentence violate the United States Constitution.  Under § 2254, Miller is entitled to federal habeas corpus relief from his state custody and death sentence. *See* 28 U.S.C. § 2254(a).

To the extent that the Florida courts adjudicated Miller's federal constitutional claims on the merits, those decisions were: (1) contrary to and/or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; and/or (2) based on an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(1)-(2).

To the extent that the Florida courts rendered non-merits decisions on Miller's claims, those decisions were erroneous as a

matter of federal law, involved improper procedural bars, or can be overcome by Miller's showing of cause and prejudice and/or a miscarriage of justice, as Miller will describe in reply to any affirmative defenses Respondent may assert.  Finally, as Miller will explain in reply to any timeliness, waiver, or procedural bar defenses that Respondent might raise, he has valid arguments of ineffective assistance of state post-conviction counsel to overcome such defenses.  See *Martinez v. Ryan*, 132 S.Ct. 1309 (2012); *Trevino v. Thaler*, 133 S.Ct. 1911 (2013); *Christeson v. Roper*, 135 S.Ct. 891 (2015); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9 (1992).

All facts, allegations, and claims set forth in this petition and the other submissions made in this litigation are incorporated into each of the individual claims and allegations pleaded below.

## STATEMENT OF THE FACTS[2]

### A.    TRIAL

On March 5, 1997, Albert Floyd lived on the street with his girlfriend, Linda Fullwood (T. 268-71).  They slept on a concrete floor under a covered doorway behind an Episcopal Church bookstore

---

[2]    Citations in this petition are as follows: References to the trial record are designated as "T.____".  References to the direct appeal record are designated as "R.____".  References to the post-conviction evidentiary hearing record are designated as "PCT.____".  References to the post-conviction record on appeal are designated as "PCR.____".  All other references are self-explanatory or otherwise explained herewith.

building in Jacksonville (T. 270, 273).  As was routine, Floyd
awoke at 6:00 a.m. to catch a bus to his job in telemarketing sales
(T. 270).  He returned from work around 7:00 p.m. (T. 270).  Upon
his return, Floyd and Fullwood talked and had something to eat (T.
271).  They shared three 16-ounce cans of beer (T. 291-92).
Fullwood said they pooled their funds and purchased a $10 rock of
crack cocaine which they smoked (T. 271-72, 291-93).  Fullwood and
Floyd went behind the church building to sleep at around 11:00 to
11:30 p.m. (T. 272).  They had blankets and quilts to use (T. 273).
Floyd always positioned himself toward the outside, and Fullwood
slept closer to the building (T. 273).  During the night, Fullwood
awoke to find a man beating Floyd with a pipe or stick (T. 274).
Floyd was still asleep, and he never moved from that position (T.
297).  Fullwood screamed and verbally confronted the man, asking
him why he was hitting Floyd (T. 274).  The man turned and began
hitting her in the head, arm, and side (T. 274-75).  Fullwood could
not identify the man, but described him as a black man wearing
light colored clothes (T. 275-76).

Jimmy Hall was walking along Duval Street about 3:00 a.m. when
he heard someone yelling, "Stop! Stop!  Why are you doing this?"
(T. 305-06).  Hall ran behind the church building where he saw a
man beating two people with a pipe (T. 305-06, 308-09).  The two
people had been sleeping and were still under covers (T. 306-07).

16

Hall walked to within 10 or 15 feet and saw the man swing the pipe
three times, striking the woman twice and the man once (T. 308-09,
326-27).   Hall could see blood sling off of the pipe onto the
ceiling and walls of the covered doorway area (T. 318-19).   The
pipe was four or five feet long with a bent end (T. 315).   The man
used both hands to swing the pipe, and he was hitting with the bent
end (T. 315).   Hall yelled at the man to stop (T. 308).   The man
turned and started walking toward Hall, but he then ran away around
the building (T. 309).   Although the man took the pipe with him, he
discarded it, and Hall heard the pipe hit a hard surface (T. 319-
20).

Hall went to aid Fullwood, who was standing up (T. 309).   The
man was still laying down, covered in blood, and he did not move
(T. 310).   Fullwood asked Hall to go to the Y.M.C.A. across the
street and ask someone to call the police (T. 309).   Fullwood
walked to the street to wait for the police (T. 276).   Officer John
Merritt arrived within a few minutes (T. 276, 310, 332).   Fullwood
suffered a concussion, a broken arm, two broken fingers and several
fractured ribs (T. 278-79).   Floyd died from his injuries which
consisted of three blows to the head (T. 339-50).

Dr. Bonifacio Floro performed the autopsy on Floyd (T. 33943).
Dr. Floro found three lacerations to the head which produced a
wound fracturing the skull and penetrating into the brain (T. 348-

17

51).  The wounds were consistent with blows from a pipe (T. 351).
According to Dr. Floro, any one of the blows would have produced
unconsciousness (T. 351).  These injuries caused Floyd's death (T.
352).

Detective Reddish found the pipe on the roof of the church
building during his investigation (T. 365-70).  He had a crime
scene technician, Raymond Godbee, retrieve the pipe and carry it to
the crime lab (T. 375-78).  Frank Depreso, a forensic serologist,
found the presence of human blood on the bent end of the pipe (T.
385-86).  There was no way to determine the age of the blood stain
(T. 386).  Carol Herring, a latent fingerprint analyst, was unable
to develop any usable prints on the pipe (T. 393-99).

Two and one half months after the homicide, David Miller
approached a police officer in Baton Rouge, Louisiana, and told him
he had killed someone in Jacksonville and wanted to confess (T.
417).  Detective Willie Vick spoke to Miller at the police
Department (T. 417-18).  After Vick advised Miller of his rights,
Miller told the detective that he had beaten a black man to death
and had also beaten a woman while trying to rob the man (T.
418-20).  The man and woman were sleeping (T. 420-21).  Miller said
he intended to knock the man unconscious with a five to six foot
long pipe which was curved at the end (T. 420-21).  The woman who
was also under the blanket woke up and started screaming (T.

18

420-21).  Miller said he struck her with the pipe (T. 420-21).
After another man came up and interrupted Miller; he stopped
striking the woman and fled (T. 420-21).

Detective Vick telephoned Detective Reddish in Jacksonville,
who proceeded to question Miller by phone (T. 425, 511-22).  Miller
again related the circumstances of the homicide, stating that he
was high on drugs and alcohol that night, and he wanted money to
buy more drugs or alcohol to maintain his high (T. 513).

Detective Reddish asked Detective Vick to obtain a statement
from Miller (T. 523).  Vick conducted a full videotaped interview
of Miller about the homicide (T. 425-91).  Miller related that he
contacted the police because he believed that the victim had a
large network of friends and wealthy family who were looking for
Miller and tracking him down so that they could kill him (T. 438-
39). His conscience was bothering him (T. 439).  He "felt like, if
I stayed free, people were going to kill me." (T. 439).  He
realized that what he had done was wrong and he wanted to apologize
to the victim's family (T. 482-83).  Additionally, he felt as if
the victim had family looking for him and he felt death was near
(T. 481-83).

In his interview, Miller stated that he "did not intend to
cause a killing"–he was just scared (T. 441). On the night of the
homicide he had been drinking and smoking crack cocaine (T.

19

450-51).  He told the detectives he drank three or four quarts and
smoked a dime rock of cocaine (T. 450-51).  Miller said he was
inebriated (T. 445, 450).  He began looking for more money or
alcohol (T. 441, 445).  In a park, Miller picked up a pipe which
was about six feet long and had a dent in it (T. 441).  He walked
behind a building which was near the Sulzbacher homeless center
where he saw a man sleeping under a blanket on a covered concrete
porch area (T. 442-45).  In order to avoid resistance to the
robbery, Miller decided to strike the man to see if he was going to
struggle and then go through the man's pockets (T. 446).  Miller
wanted to disable the man before taking money or alcohol from him
-- he did not intend to kill the man (T. 439, 440-41).  Miller "was
looking for a struggle.  I said, 'Here is my struggle.  I will
touch him with this and knock him out.  I don't remember the
struggling too much alone." (T. 484).  Miller was not certain that
the victim was human, only that he was homeless (T. 439-40).

When Miller struck the man on the head, a woman, who was also
sleeping under the blanket, awoke screaming (T. 446-47).  Miller
thought the man was alone (T. 445).  Miller struck the woman,
trying to knock her out (T. 447).  He thought he may have struck
the man again as well (T. 448).  As Miller struck the woman,
another man approached and verbally confronted him (T. 440,

451-53).  Miller walked away with the pipe which he dropped in a nearby open area (T. 453).

Miller further stated that he retrieved his bag and immediately changed clothes, since he thought the witness might remember what his clothes looked like (T. 454-57).  He then went to an overpass where the homeless often slept (T. 454).  For the first day he stayed there, without leaving except at night (T. 457).  The second day, Miller worked for a labor pool (T. 457-58).  Later, he was drinking beer with some other homeless men, and they talked about the man who had been killed (T. 458).  Until that time, Miller had hoped that he had merely knocked the man unconscious (T. 458).  On the third day after the homicide, Miller "said, 'Oh, my God.' And just took [his] money and left" Jacksonville (T. 480-81).  He left because he believed there were "power people that would be willing to do anything it takes" to harm him and he "could sense death coming upon me, and that's why I turned myself in."  (T. 481-82).  He began seeing faces and cars, and was convinced they were following him (T. 482).  He knew that he would be killed (T. 484).

Miller was transported back to Jacksonville, where Detective Reddish conducted another interview and had Miller show him the scene of the crime (T. 523-45).  Miller again related the circumstances of the homicide and walked the detectives through the events at the scene (T 523-45).  Miller explained that he decided

to strike the man to avoid any resistance to the robbery (T. 544).
He knew that some homeless people sleep with knives or guns, and he
chose to strike first to prevent giving the man the opportunity to
hurt him during the robbery (T. 544).

During the defense case, Miller testified, making several
bizarre statements which Prosecutor Bateh characterized as
"rambling dialogue" and fixating on getting his notepad to help him
remember (T. 578-80).[3]  The defense introduced his statement to
Detective Reddish that he had never been treated for mental illness
(T. 586-87).

During Miller's testimony, the defense played an audiotaped
statement Miller gave to Detective Reddish about the offense which
again detailed the circumstances of the homicide (T. 585-648).
Miller stated that on March 5, 1997, he worked at the labor pool
and then used his money to buy beer, liquor and crack cocaine (T.
575).  After drinking all the alcohol, 40 ounces of malt liquor,
and smoking the cocaine, Miller started walking (T. 576-77,

---

[3]    Miller testified that "the time slot that they have
scheduled on the [confession tapes] are a little different from
what I actually have conceived in my mind" (T. 576); "the reason
why I'm on the stand is-two points...There is one point I wanted
to argue-there is a couple points I want to argue" (T. 577); "I
perceived that-not the police but some organization possibly
related to the victim was following me trying to take my life"
(T. 583); "I was trying to explain to him that it was-that you
had to have been there, that the situation is not, 'Do this. Do
that'" (T. 653).

648-51).   He picked up the pipe to carry for protection (T. 576-
77).   The alcohol and cocaine had affected his judgment and he
would do things he would not normally do when under the influence
of drugs and alcohol (T. 579-82).  Miller said he never intended to
kill anyone (T. 582).  He said the thought about taking money from
the man did not come into his head until he was standing over him
with the pipe (T. 582).

On cross-examination, Miller said he probably hit the man to
rob him (T. 655).   However, Miller said he was operating "on a
mechanical mode" at the time of the crime due to his impaired
mental capacities (T. 652).  He started beating Linda Fullwood out
of instinct when she startled and confronted him (T. 655-58).  When
Jimmy Hall walked up, this caused Miller to realize what he was
doing, and he walked away (T. 655-58).

Miller explained that he turned himself in to the police
because he thought someone related to the victim was following him
(T. 583).   He also knew what he had done was wrong and his
conscience bothered him (T. 583-84). When Miller was excused from
the witness stand, he was distressed that he was not able to make
the points he had wished to make (T. 577, 656).

## B.   PENALTY PHASE

The State introduced judgments of conviction for two prior
violent felonies in aggravation (T. 824-26).   One was for the

aggravated battery committed contemporaneously with the homicide in this case (T. 824-26).  The second was a North Carolina judgment convicting Miller of second degree murder in 1986 (T. 824-26).

Additionally, Albert Floyd's wife, Gwendolyn Floyd, testified as the sole State witness to victim impact information (T. 826-29). She met Floyd and he assumed responsibility for raising her two small children and the son they later had together (T. 827).  She described Floyd as a kind, generous man who loved his children and worked hard to support them (T. 827-28).

Defense counsel presented the testimony of his mother, sister and brother in mitigation (T. 830, 862, 923).  They testified to Miller's family background and his difficulties with drugs and alcohol addiction (T. 830, 862, 923).  Further, Dr. Harry Krop testified about his psychological assessment of Miller (T. 893).

Yvonne Jordan, David Miller's mother, testified about David's childhood and his later difficulties with alcohol (T. 831-62). David was the second of four children (T. 831, 845).  His older sister, Valnice[4], suffered from schizophrenia and committed suicide with a firearm (T. 831-32, 845).  David had a close relationship with Valnice ("ain't nothing they wouldn't do for each other") and her death affected him (T. 834, 845).  Sharon and Leonard, two

---

[4]    Valnice's name is incorrectly spelled "Valnese" in the trial transcript.

other siblings, were two and four years younger than David (T.
850-51). David was also very close to a cousin and neighbor, Boyd
Howe, whose death also greatly affected him (T. 835-36, 925-26).
The children's father, David Miller, Sr., was an alcoholic and was
physically abusive to his wife and children (T. 839-41). He would
work all week, but on the weekend, he would drink heavily and fight
(T. 839-41). Jordan described one instance when he hit her with a
soda bottle causing an injury requiring stitches (T. 840). Miller
would severely discipline the children (sometimes "for no reason")
by beating them with a belt (T. 841). Jordan divorced the
children's father when David was about 13 years old, and she moved
the four children to her parents' home on a farm (T. 841-42). She
described the move as a positive one for her and the children (T.
853-56).

   After David graduated from high school, he joined the Navy (T.
846-47). When he returned from the Navy, he was a different person
(T. 847). David was drinking heavily (T. 847-49). He behaved
differently when drinking (T. 847-48). His mother did not allow
alcohol in her home, and she asked him to leave because of his
drinking and behavior (T. 848-49, 861-62). Rather than stop
drinking, David began living in boarding houses or on the street
(T. 848-49).

Sharon Barringer, David's sister, testified that she and David had a normal, loving brother-sister relationship growing up (T. 863). David was bright with mathematics and helped her with her homework (T. 863). She said their mother was the basic role model, and she did the best she could as a single mother of four (T. 863-64, 871-72). Their father was abusive to their mother and the children (T. 864-67). The children did not have a relationship with their father because he was an alcoholic and emotionally uninvolved with them (T. 864-65). He was not a role model (T. 864).

During one incident of their father's abuse, he grabbed their mother and choked her (T. 865). She managed to get away from him, but he chased after her (T. 865). Their mother had obtained a firearm; she shot it to keep him away from her, and she left in the car (T. 865). Sharon said her father was very angry, and made retaliatory threats against their mother (T. 865-66). The children called their mother and told her not to come home (T. 866). Their father then became angry at the children and beat them all with an electrical cord (T. 866). Sharon also described an incident when their father hit their mother with a soda bottle causing an injury requiring stitches and leaving a large scar (T. 865).

According to Sharon, drug and alcohol use changed David's personality and made him a different person (T. 872-73). He did

26

not have a drinking problem in high school (T. 869). After David
graduated, he joined the Navy (T. 871-72). Sharon noticed when
David returned home that he had changed (T. 871-72). David
developed a more aggressive personality and attitude (T. 873). He
had started drinking alcohol, and Sharon also suspected drug use as
well (T. 873). Sharon said at different times she talked to David
about his alcohol and drug use (T. 878-79). David is truthful to
a degree that harms him. When David would ask her for money and
she asked why he needed it, he would tell her he was going to buy
alcohol with it (T. 870-71). Sharon lamented that she had not made
the extra effort to counsel him more on this problem (T. 878-79).

Leonard Miller, David's brother, also testified about their
family background (T. 923). Leonard was very close to his brother
growing up (T. 925-26). David was family-oriented and on one
occasion risked his life trying to put out a house fire (T.
928-29). Their father was an alcoholic and abusive to all the
children, as well as Yvonne (T. 926-27). Leonard related one
incident when their father strapped their oldest sister, Valnice,
to a door and whipped her with an electrical cord (T. 927).
Sometime later when Leonard was in college, he was in the house
when Valnice committed suicide (T. 927).

Leonard further testified that after David joined the Navy, he
began drinking and his life changed (T. 930). Prior to David's

27

military service, David had "a lot of heart" and was a source of encouragement for Leonard (T. 929). He became more aggressive, resembling "a totally different person" (T. 930). His mother did not tolerate any drinking in her house, and David eventually left because of this conflict (T. 930-31).

Dr. Harry Krop, a clinical psychologist, testified about his examination and testing of David Miller (T. 893-98). Dr. Krop reviewed records from the time Miller first obtained psychiatric treatment due to hospitalization in 1983 after a suicide attempt (T. 895-98). Dr. Krop also reviewed the depositions and other information, including Miller's confession, about the homicide (T. 896). Finally, Dr. Krop performed various psychological tests which included a neuro-psychological test (T. 896-97).

Based on Miller's prior psychiatric history, involving three or four in-patient hospitalizations, and his own examination, Dr. Krop found Miller's primary diagnosis to be alcohol abuse and depression (T. 898-99). A second diagnosis was mixed personality disorder which had features of schizoid personality, which is like schizophrenia but not to the extent that the person loses contact with reality, and paranoia (T. 900-01). Miller's most consistent personality traits are avoidant, schizoid, and paranoid (T. 900). According to Dr. Krop, these people tend to be aloof, distant and to not fit in with others in society (T. 900-01). Miller was

cooperative but suspicious and hesitant (T. 919-20). Dr. Krop did not find Miller to suffer from anti-social personality disorder, since persons with this diagnosis do not have empathy or concern about others. Miller does not fit that description (T. 902-03).

Additionally, neuropsychological testing showed that Miller has impaired frontal lobe functioning (T. 905-06). The frontal lobe of the brain is the last part to develop, and it usually is formed when a person is five or six years-old (T. 906). This part of the brain controls inhibition and allows a person to stop and start certain behaviors (T. 906-07). Although the frontal lobe does not control a person's decision-making regarding certain behaviors, it does affect the person's ability to stop behaviors once they are started (T. 907). The person's impulse control is impaired (T. 907).

Miller's alcohol abuse was treated during his times of institutionalization, but when released into the community, Miller is again homeless and relapses. Miller's transience exacerbates his pre-existing schizoid traits, resulting in an isolated environment without treatment for his disorders or substance abuse (T. 908). Dr. Krop concluded that Miller's diagnosis of alcohol and drug abuse, frontal lobe defects and schizoid personality traits combined to create a seriously mentally disturbed individual

(T. 908-09).  Alcohol abuse combined with a personality disorder
made it difficult for Miller to control his behavior (T. 908-09).

Because of Miller's mental condition, he functions better when
he is in prison than on the streets.  He works well when there is
structure, and does not function well in its absence, as can be
seen in his past history of homelessness and alcohol abuse (T. 911-
12).

In the hours before the murders, Miller consumed approximately
four quarts of beer and smoked a dime's worth of crack cocaine (T.
914-15).  This is consistent with Miller's lifestyle of heavy
drinking (T. 915).  It is not unusual for people who drink heavily
to not see themselves as drunk (T. 916).  Not only is the influence
of alcohol significant, but also the chemical effects of the need
to keep drinking—of dependency on alcohol and drugs (T. 916-18).
The effects of dependency, withdrawal, and feeding one's addiction
has "as much of an influence as the actual chemical effects of the
alcohol" (T. 917-18).

David Miller testified in his own behalf (T. 935).  He stated
that his family was a loving and respectable family (T. 936).
However, he said one thing that greatly affected him was that his
mother and father never told him they loved him (T. 936).  Later,
he realized that his mother and father loved him (T. 936).  She

worked hard to raise four children (T. 936). Miller said he did not want to use his childhood as an excuse (T. 936).

Miller expressed his religious beliefs and that as a result of the Bible, he was ready to take responsibility for his actions (T. 936-37). He stated "I can accept anything any time anywhere today. Nothing really worries me" (T. 937). He apologized to Linda Fullwood and the family of Albert Floyd, and he asked for forgiveness (T. 937-38).

Pursuant to Florida's prior capital sentencing scheme, an advisory jury voted whether to recommend the death penalty to the judge, but did not make any of the findings of fact required to impose a death sentence under state law. *See Hurst v. Florida*, 136 S. Ct. 616 (2016) (describing Florida's prior scheme). The advisory jury voted to recommend death by a bare majority vote of 7 to 5. The judge then made the statutory findings of fact required for a death sentence. The judge found the following aggravators: 1) prior violent felony conviction; 2) the homicide was committed during an attempt to commit a robbery; 3) the homicide was committed for pecuniary gain (R. 365-66). The judge merged the second and third aggravators into one aggravating circumstance. The judge found no statutory mitigators, because "the attorneys concurred that the evidence submitted during trial did not give rise to any statutory mitigating factors" (R. 367).

The judge found the following nonstatutory mitigators: 1) the victim was rendered unconscious immediately and did not suffer; 2) Miller turned himself in to the police; 3) an alternative sentence for murder is life without possible release; 4) Miller exhibited remorse and apologized to the victim's family; 5) Miller cooperated with the police investigation; 6) Miller did not resist arrest; 7) Miller suffered emotional distress over the death of his sister and close cousin; 8) Miller has a frontal lobe deficit which affects inhibition and impulse control; 9) Miller would likely adapt well to long-term incarceration; 10) Miller was loved by his family and had performed good deeds; 11) Miller adjusted well while incarcerated. (R. 367-74).

## C.    Post-conviction PROCEEDINGS

During a post-conviction evidentiary hearing, Miller presented evidence in support of his claim that trial counsel rendered ineffective assistance.   Attorney Refik Eler testified at the hearing that he represented Miller at his trial (PCT. 1482). Eler stated that his ultimate goal in this case was to get a life recommendation from the jury (PCT. 1559).  He did not feel there was much of a guilt phase case (PCT. 1559).

Eler began to practice law in 1986 with the State Attorney's Office (PCT. 1483).  He stayed in county court for six to nine

32

months, then moved into the Special Prosecution Division specializing in economic crime (PCT. 1484). Eler did not prosecute any first-degree murder cases to trial. He served as second chair on one first-degree murder case, basically completing work assigned to him by the lead attorney (PCT. 1483). That case also did not go to trial (PCT. 1484).

Eler left the State Attorney's Office in 1989 to enter private practice. Eler has tried or co-tried six or seven cases where the death penalty was sought (PCT. 1485). He served as lead counsel for the penalty phase in roughly half of those cases (PCT. 1487).

Eler believed that a defense lawyer was responsible for investigating mitigation and molding it into a fashion that jurors could understand (PCT. 1489-90). Collecting records and talking to family members were the investigative means Eler generally used to gather mitigation information (PCT. 1490).

In Miller's case the Public Defender had done "a substantial amount" of the mitigation investigation, so Eler was "pretty fortunate" (PCT. 1490). Eler said he "came into the case pretty much almost ready to try the case in terms of guilt and/or penalty" (PCT. 1490-91). Eler "received the benefit" of prior counsel doing "a lot of the records searching and conducting" but knew he and is investigator were responsible for "the rest of the accumulation of it and the follow-up of that information" (PCT at 1491).

33

When investigating mental health issues, Eler testified that he seeks a confidential expert to determine competency, but "I'll pretty much defer to the mental health expert" for any follow-up (PCT. 1491). Dr. Harry Krop was already working on this case when Eler took over because he had been retained by the Public Defender (PCT. 1491). Eler believed that Dr. Krop was a leading expert in the areas of psychology and neuropsychology (PCT. 1492). Eler admitted that issues regarding competency "were really addressed with Mr. Chipperfield" and that Eler did not follow up regarding competency (PCT. 1493). Miller did not actively participate in his defense, and believed he needed to be punished. (PCT 1548).

Eler acknowledged that the decision about what evidence to present to a jury or the court is a decision that the attorney must make (PCT. 1499). However, Eler does not usually make recommendations to mental health experts. Eler presented the testimony of Dr. Krop during the penalty phase with regard to two areas: (1) to establish a nonstatutory mitigating factor of frontal lobe deficit and (2) to establish Miller's ability to adjust to long-term incarceration (PCT. 1493). Some evidence of drug and alcohol usage was testified to by Dr. Krop as well (PCT. 1493).

Eler acknowledged that using a mental health professional to develop mitigation is extremely important (PCT. 1497). A mental health professional can offer testimony as to the psychological

34

impact that dysfunctional familial acts have upon an individual (PCT. 1497). This opinion would be outside the scope of what the family members would be able to testify to (PCT. 1495).

Only three family members, Dr. Krop, and Miller testified at penalty phase (PCT. 1495). The family members testified briefly during the penalty phase about the dysfunctional family situation, with very limited testimony of childhood abuse and parental alcoholism (PCT. 1495). Dr. Krop did not testify about any psychological impact these events had on Miller. Eler believed that Dr. Krop interviewed Miller's family members (PCT. 1496). Dr. Krop had asked permission from the public defender to do this (PCT. 1496). Eler believed that Dr. Krop had the benefit of background materials on Miller and had talked with the family and Miller, but recalls no discussions with Dr. Krop about the effect of Miller's dysfunctional family (PCT. 1498-99). Eler felt that Dr. Krop would have been able to offer an expert opinion as to the psychological impact that the abusive childhood and dysfunctional family had on Miller (PCT. 1499).[5] Eler admitted that he, as the attorney, was the one responsible for deciding what mitigation evidence and expert testimony to present in court (PCT. 1499-1500).

---

[5]    Dr. Krop did not testify as to the psychological impact the events of childhood had on Miller.

Eler acknowledged that the sentencing order of the trial court referenced the death of one of Miller's siblings and the death of his cousin.  However, the order stated that an absence of testimony in either the guilt or penalty phase as to the emotional trauma suffered by Miller as a result of the deaths led to a determination that this mitigation evidence was entitled to little weight by the trial judge (PCT. 1502).  Likewise, very little evidence of childhood abuse and a dysfunctional family was presented as mitigation (PCT. 1503).  Eler agreed that he failed to present evidence relating to the psychological trauma suffered by Miller as a result of these abuses, though such evidence could have been developed through a mental health professional (PCT. 1503).  Eler acknowledged that this evidence would have been important for the jury and trial judge to hear (PCT. 1504). Eler's reason for not presenting this testimony was because he did not think that Dr. Krop told him that this was a feature he needed to bring out (PCT. 1504).

Some evidence was presented through Miller's mother, Yvonne Jordan, a sister, and a brother of Miller's history of drug and alcohol abuse (PCT. 1504).  Eler recalled that their testimony had been that Miller began using alcohol at age 18 or 19 while he was in the Navy, and that it made him more talkative (PCT. 1505).  Once again, Eler did not ask Dr. Krop to testify about the various

36

psychological and emotional ramifications of a substance abuse disorder and the long term effect it would have had on Miller and how such long-term addictions would have affected Miller's judgment on the night of the homicide (PCT. 1506). Eler only focused on Miller's drug/alcohol usage on the night of the incident. Eler did not try to present any evidence which would have established Miller's attempts at treatment and the systemic failures of those treatment programs (PCT. 1509).

No medical records relating to Miller's mental health were presented to the jury (PCT. 1509). Eler thought that some information in the records was detrimental to Miller and he did not want to admit that evidence to the jury (PCT. 1510). Eler agreed that the records contained much relevant mitigation evidence, and could not articulate what specific harm would have come from introducing the records (PCT. 1510-11).

Eler admitted to being familiar with the concept of motions in limine (PCT. 1568). He will usually file a motion in limine if he anticipates a problem with evidence (PCT. 1568). He does not usually anticipate potential areas of improper argument by the State that would necessitate a motion in limine (PCT. 1569). Eler did not seek a pretrial ruling from the court to determine what the court would have permitted the State to introduce as rebuttal evidence to the information contained in the medical records (PCT.

1513).  Eler could not remember what was in the records that he
thought was so bad that it justified excluding all the records; he
could recall only one item in the records that referred to one
instance of aggressive behavior by Miller during treatment.  This
consisted of a statement that Miller had pushed another patient
(PCT. 1513).

Eler believed that showing a defendant has had previous
involuntary hospitalizations due to mental health issues was
detrimental (PCT. 1514).  Eler thought evidence of mental illness
which required hospitalization would undercut an argument that
Miller was a good candidate for rehabilitation in prison (PCT.
1514).  In Eler's opinion the fact that a defendant had been
previously committed to a mental institution was something he would
never want a jury to hear (PCT. 1515).  When asked why a diagnosis
of alcohol dependence with psychological dependence, cocaine
dependence with psychological dependence, cannabis abuse, and
schizoid personality disorder three or four months before the
murder occurred was not relevant mitigation and how that evidence
would open the door to testimony that Miller pushed someone in the
mental hospital, Eler only responded that Dr. Krop considered these
things (PCT. 1516).  Eler acknowledged that he did not have Dr.
Krop testify about Miller's many contacts with mental health
agencies and his involuntary hospitalization for attempting to harm

himself and his brother three or four months prior to the homicide (PCT. 1517, 1519).  Eler did not have Dr. Krop testify about the life-long adult addiction to drugs and alcohol suffered by Miller and the psychological and emotional impact those addictions had on him (PCT. 1518).  Eler presented no evidence of the treatment that Miller had sought during his life (PCT. 1518).

Eler first claimed that he did not present all the above-referenced testimony because it would have been detrimental to Miller (PCT. 1521).  Eler could not offer a single negative point that Dr. Krop could have been cross-examined on if he had testified about what the alcohol and drug problems meant to Miller (PCT. 1521).  Eler finally acknowledged that "I'm not sure that would have been a bad thing" to have had Dr. Krop testify in this area (PCT. 1521).

Eler did not know if Dr. Krop evaluated Miller to determine the level and effect of the trauma he suffered as a result of the death of his sibling and cousin (PCT. 1516).  Eler did not present any testimony by Dr. Krop as to this issue; he only presented the fact that a sister and neighbor had died (PCT. 1516).  Eler could not point to any bad things that would have come out had Dr. Krop testified in this area (PCT. 1522).  Eler then claimed he did not present this testimony because he deferred to Dr. Krop (PCT. 1522).  Eler admitted that the lawyer asks the questions in court, not the

doctor (PCT. 1522).

Eler also did not have Dr. Krop testify as to the psychological impact childhood abuse and a dysfunctional family had on Miller (PCT. 1518). Eler chose not to follow up on any of the psychological testimony, despite having it available to him (PCT. 1519-20). While believing such evidence was detrimental, he did choose to present some very limited factual testimony about alcohol usage and childhood abuse only from family members.

Eler agreed that a defense attorney has the duty to exclude or minimize the aggravating circumstances the State relies upon (PCT. 1522). In this case, Miller had a previous conviction for second-degree murder in North Carolina (PCT. 1522). Eler recalled that Miller had pled guilty to that offense (PCT. 1522). Eler could not recall presenting any evidence or making any argument to the jury to mitigate this prior conviction other than the fact of the guilty plea (PCT. 1522-23).

Eler was familiar with the circumstances surrounding the prior second-degree murder conviction. He knew that Miller had been evaluated by two mental health professionals because of mental health issues in that previous case and the North Carolina judge made specific findings that mental problems significantly reduced Miller's culpability for that offense. (PCT. 1523, 1572). He did not present any evidence of the judicial findings made in North

Carolina which mitigated the prior conviction to the jury or trial court in this case (T. 1523, 1572).

Eler did not think that it was important to present evidence of the circumstances surrounding a prior conviction to the judge or jury (PCT. 1524). He acknowledged judicial opinions which talked about the need to mitigate prior felonies by showing the circumstances of what happened and make them not as serious as they might seem (PCT. 1524). Eler did not do it because he does not like to dwell on the negative and did not want to show that Miller already had "one bite at the apple." (PCT. 1524). Instead he chose to "gloss over" the circumstances (PCT. 1526). Eler agreed that everybody already knew that Miller had "one bite at the apple" because both the jury and trial court were going to be told of the conviction irrespective of whether or not evidence of the facts surrounding it were presented. Eler admitted that giving the jury and trial judge information about the circumstances surrounding the prior conviction would not have allowed otherwise inadmissible evidence to come before the jury (PCT. 1573). Eler further admitted that an unexplained prior conviction for second-degree murder was a significant aggravating circumstance (PCT. 1525). Eler also acknowledged that he knew the State was not planning to put on testimony about the underlying facts of that conviction because he had seen their witness list (PCT. 1526). Eler presented

nothing to mitigate the prior judgment for second-degree murder
(PCT. 1527).

Eler also did not present evidence of mental mitigation at the
time of the instant homicide (PCT. 1524). Eler did not look at the
psychological reports because he believed that Dr. Krop had, so he
did not present that evidence to the jury (PCT. 1525).

Eler was also questioned about why he did not object to
numerous arguments made by the State (PCT. 1527). Eler had no
independent recollection of the particular arguments and had not
reviewed the motion for post-conviction relief prior to testifying
(PCT. 1527). Eler did not quarrel with what the transcripts
reflected was argued by the State (PCT. 1528). He agreed that an
attorney in any case has the responsibility to preserve the errors
in the proceedings for appellate review (PCT. 1529). Eler agreed
that if an issue is not objected to at the trial level, it is
waived for appeal unless it rises to the level of fundamental error
(PCT. 1529). Eler acknowledged that appellate courts rarely find
fundamental error, even though he had not done much research into
fundamental error (PCT. 1563-64). He further agreed that it is
important to object to improper argument by the State in certain
instances (PCT. 1529-30). He does not object to argument over
small issues because he does not want the jury to dislike him. But
Eler did state that "If there's fundamental error, I'm going to

object whether the jury likes me or doesn't like me." (PCT. 1557).
Eler does not object to argument at times because he did not want
to lose his "bond" with the jury over small issues (PCT. 1533,
1558, 1567).  He acknowledged that there is a jury instruction that
deals with jurors not holding the objections of counsel against the
defendant (PCT. 1567).  Eler did not know if he ever asked for it
in this case (PCT. 1567).

Additionally, Eler testified that he does not believe in
objecting to things which he considers to be in the "gray" area
such as where a prosecutor's argument crosses the line of
acceptable argument, but is not fundamental error (PCT. 1563).
Eler acknowledged that many objectionable events happen during
trials that are reversible error if objected to, but will not rise
to the level of fundamental error (PCT. 1563-64).  When asked what
the attorney has to do in order to preserve reversible error, Eler
first stated he did not understand the question, but agreed that an
objection and motion for mistrial would be one way to preserve a
record (PCT. 1656).

In the instant case, Eler did not object to numerous arguments
by the State that Miller would have killed Fullwood but for the
intervention of Jimmy Hall because he did not feel the argument was
affecting the jury (PCT. 1530).  Eler did agree that having the
State argue that this would have been a double homicide but for the

43

actions of a third party was pretty bad (PCT. 1537).  He termed it
"a very zealous prosecution argument." (PCT. 1538).[6]    Upon
reviewing the argument, Eler thought that maybe he should have
objected (PCT. 1530, 1533).  Even Eler was willing to admit that
this argument did not help his case (PCT. 1533).  Eler also
acknowledged that cumulative error can be a factor and six times
was quite a bit (PCT. 1568).

Eler admitted that prosecutorial vouching for the credibility
of his witness is something that should be objected to (PCT. 1533).
When confronted with the prosecutor vouching for the credibility of
Jimmy Hall, Eler indicated confusion and was not sure if the
argument was improper (PCT. 1534).  Eler did not think that arguing
to the jury that a witness had told the truth was vouching for his
credibility (PCT. 1534).  Eler also admitted to being familiar with
case law which prohibited an attorney from stating to the jury
whether a witness is lying or telling the truth (PCT. 1535).

Eler agreed that it was not appropriate for the State to argue
the lack of sympathy for the victim as a means of attacking
mitigation (PCT. 1535).  When confronted with the State's closing
argument on this point, Eler admitted it was objectionable argument
for penalty phase (PCT. 1535, 1536).  He should have objected, but

---

[6]    The prosecutor actually made this argument on six different
occasions (PCT. 1538).

at the time he did not think it was significant (PCT. 1535, 1536). Eler sometimes does not object to these types of arguments because he "takes them and turns them around in his closing." (PCT. 1536). He hoped he did that in this case, but he did not remember actually doing so (PCT. 1536).

Debra Lee is a substance abuse counselor and social worker in Charlotte, North Carolina (PCT. 1586). She works for the Salisbury VA Medical Center (PCT. 1587). In 1994, she worked as an outreach counselor for homeless and chronically mentally ill veterans with the goal of helping them to gain access to needed health-care services (PCT. 1587). The VA provided funding for outreach activities to homeless shelters, camps, bridges, wherever homeless people congregate for the purpose of interviewing people in order to conduct an assessment that will lead to finding programs to assist them with health-care needs. This includes treatment for medical needs, substance abuse, and psychiatric treatment (PCT. 1588).

Lee testified that she worked with Miller for an 18-month period, beginning in 1994, in North Carolina (PCT. 1580). She met Miller in a day shelter and helped him secure treatment for substance abuse and alcoholism (PCT. 1589). During her contact with Miller they spoke at length about his family history, including his father's alcoholism, physical and sexual abuse, his

witnessing the rape of both of his sisters, and the eventual suicide of his sister and cousin (PCT. 1589).  Miller would become very upset when talking of these things, "as if he was reliving those events" (PCT. 1589).  It took almost a year before Miller agreed to treatment, which is not unusual among the chronically homeless (PCT. 1590).  He was skeptical of Lee at first, and spent a year watching her work with other people before allowing her to try to help him (PCT 1593).

Miller eventually agreed to be evaluated by a psychiatrist and medical doctors (PCT. 1590).  Initially, outpatient treatment was agreed upon for Miller due to some concerns about his level of commitment to treatment (PCT. 1590).  During this treatment Miller had difficulty maintaining sobriety (PCT. 1591).  After Miller demonstrated a commitment to treatment, the decision was  made to switch to inpatient treatment (PCT. 1597).  In the fall of 1996, Miller entered a 30-day inpatient treatment program (PCT. 1591, 1596).

Miller entered into a substance abuse unit (PCT. 1591).  Initially, he was treated with anti-anxiety medication (PCT. 1598).  During treatment Lee characterized Miller as quiet, with a tendency to isolate himself (PCT. 1592).  He did not like to talk about things that bothered him (PCT 1592).  Miller was depressed, paranoid about others' welfare, and very paranoid about what would

46

happen to him in the VA hospital (PCT. 1592). He was particularly "skeptical of systems" and believed institutions were hostile (PCT. 1592). He tried to isolate himself, such as hiding in dark rooms (PCT. 1596). Miller had a previous suicide attempt, so his self-isolation was cause for concern (PCT. 1596). He had some problems with groups in the beginning due to the pressure to open up in these settings, which led to increased depression and paranoid thoughts (PCT. 1600). In response to his increased depression, a program of more intensive one-on-one therapy was begun in part due to a concern that Miller could hurt himself (PCT. 1597). At one point there was some concern that Miller needed to be in an acute psychiatric unit, but the decision was eventually made to keep him at the substance abuse unit (PCT. 1597).

Miller displayed symptoms of post-traumatic stress disorder, and was diagnosed with schizoid personality disorder on November 22, 1996, as a result of his abusive childhood, his witnessing of the rapes of his sisters, his own sexual abuse, and the suicide of his sister (PCT. 1598-99).[7] Psychiatric staff believed stress was pushing him into a state of active schizophrenia (PCT. 1600). Dr.

---

[7]    The instant offenses occurred on March 17, 1997, four months later (PCT. 1601).

Satterfield was responsible for the diagnoses.[8]  During her entire contact with Miller, Lee did not see him act out (PCT. 1592). Miller shared his previous legal problems with Lee (PCT. 1593). Miller told her that he had been in an argument with someone at a rooming house and that he had shot the person (PCT. 1612).  He served seven years in prison and was released not too long before he sought help from Lee (PCT. 1612, 1621).

Lee found Miller to be very remorseful and extremely saddened by his actions (PCT. 1593).  She believed he was plagued by what had happened and he often expressed that he should be punished for it (PCT. 1612).  Miller's skepticism of systems and exposure to violence on the streets made him less able to recognize and accept offers of help (PCT 1606, 1609).

Miller had a history of abusing many substances, including hallucinogens such as Valium and Quaaludes, cocaine, marijuana, crack cocaine, and significant amounts of alcohol (PCT. 1593).

Lee was aware that Miller had a family history of mental illness, including schizophrenia, which Miller's treating providers suspected he suffered from (PCT. 1595).

Miller was discharged on his 30th day, November 27, 1996, with a referral to return to the mission he had been staying at prior to

---

[8]    Dr. Satterfield was not presented as a witness.

the inpatient program and to continue out-patient psychological
counseling (PCT. 1601). Miller wanted to go to a half-way house,
but that did not happen because there was no availability (PCT.
1602). Miller returned to the same environment he had been in
prior to treatment (PCT. 1602). A short time later he left town
(PCT. 1602).

Lee stated that a person with a discharge plan such as that
given to Miller, coupled with his history, has less than a three
percent chance of success (PCT. 1602). It is now well-recognized
that persons who return to the same environment do not fair well
(PCT. 1603). Today, Miller would have been placed in an aftercare
program with housing available for up to two years and other
support (PCT. 1603). Miller's only stable housing as an adult
occurred during the military or when he was incarcerated (PCT.
1603). The services provided to homeless persons, especially those
such as Miller, have evolved greatly since 1994-1996 (PCT. 1607).
Now, there are supportive services in the community that just did
not exist in 1996 (PCT. 1608). It would not be realistic to have
expected Miller to succeed once he was discharged in 1996 (PCT.
1622).

Lee was contacted by public defender Alan Chipperfield in this
case (PCT. 1604). It was her understanding that he represented
Miller (PCT. 1604). She spoke with him and his investigator (PCT.

1605).  She was not contacted by anyone else until a week before
the present November 2003 hearing, when she was asked to testify
(PCT. 1605).  She had never heard the name Refik Eler (PCT. 1605).

Dr. Joseph Chong Sang Wu is a physician at the University of
California, Irvine College of Medicine (PCT. 1624).  He is the
clinical director of the Brain Imaging Center and associate
professor in the Department of Psychiatry (PCT. 1624).  The primary
focus of the Brain Imaging Center is the administration and
interpretation of PET scans and PET scan studies of
neuropsychiatric disorders such as schizophrenia, Alzheimer's
dementia, Parkinson's disease, and traumatic brain injury (PCT.
1624).  Only 20-30 centers nationwide utilize PET scans for
neuropsychiatric purposes (PCT. 1625).  Dr. Wu is a preeminent
researcher in studies of PET scans involving cocaine addiction,
depression, and schizophrenia (PCT. 1626).  He conducts
pharmaceutical studies to test the effectiveness of antipsychotic
medications for treatment as well as treatments for cocaine
additions and depression (PCT. 1627).

According to Dr. Wu, an MRI scan looks at the brain structure
and determines if the shape of the brain structure is altered in
any way (PCT. 1630).  A PET scan looks at the function of the
brain.  You can have a portion of the brain that is structurally
intact but does not function (PCT. 1630).  An MRI scan of a cadaver

50

would show a perfectly normal brain shape, an intact brain, but a
PET scan would show no function (PCT. 1631). The PET scan shows the
level of brain function as measured by sugar metabolism (PCT.
1632). The more active a particular area of the brain is, the more
sugar that part of the brain consumes (PCT. 1633). These areas of
activity, or sugar metabolization, are color-coded on the PET scan
films - high activity areas are colored with hot colors such as
red; moderate areas of metabolism with yellow or green, and low
metabolism areas with blue (PCT. 1633). The mechanics of how PET
scans are obtained has been in use over 20 years and is a science
that is generally accepted in the scientific community (PCT.
1633-36).

PET scans help to corroborate neuropsychological test data
(PCT. 1637). Dr. Wu was provided with the results of psychological
tests that Dr. Krop performed on Miller (PCT. 1638). Dr. Krop
diagnosed frontal lobe problems (PCT. 1638). Dr. Wu's actual
evaluations of Miller corroborate that conclusion (PCT. 1638). The
PET scan of Miller showed a pattern of abnormal decrease in frontal
lobe activity, especially in the orbital frontal lobe area and in
the relative pattern of activity of the frontal lobe relative to
the occipital lobe (PCT. 1639). Miller's scan looked more like
that of a schizophrenic, also in line with Dr. Krop's diagnosis of
schizophrenic spectrum disorder (PCT. 1640). Dr. Wu's findings

were that Miller showed a significant decrease in the functioning of the frontal cortex of the brain, especially the orbital frontal cortex, a pattern of metabolic hyperfrontality with a decrease in the frontal occipital gradient, and metabolic decreases in the subcortical area (PCT. 1642). This was an abnormal brain with frontal lobe deficit (PCT. 1642). This determination is consistent with a schizophrenia spectrum disorder as identified by Dr. Krop and documented in the records of Miller (PCT. 1643).

Schizophrenic spectrum disorder is characterized by someone who has symptoms that are schizophrenia-like, but who may not necessarily meet the full-blown diagnosis under the DSM-IV-R for schizophrenia (PCT. 1644). This diagnosis would include behaviors such as being withdrawn, odd behaviors, paranoia, and poor social functioning (PCT. 1644-45). Miller's family history is also highly indicative of schizophrenia (PCT. 1645). Miller reported some auditory hallucinations, just not persistent enough for a full-blown diagnosis of schizophrenia (PCT. 1645).

Dr. Wu further testified that there is a correlation between childhood abuse and neurobiological vulnerability (PCT. 1646). If someone who has some sort of frontal lobe abnormality is subject to childhood abuse, the likelihood of aggression increases (PCT. 1646). Miller is an example of someone with a neurobiological vulnerability (PCT. 1647). There is an increased likelihood of

aggressive impulses, loss of judgment, and an inhibition of improper impulses in someone with frontal lobe lesions, such as Miller (PCT. 1647). The PET scan was done in 2002 (PCT. 1649). The homicide occurred in 1997 (PCT. 1649). Dr. Wu did not believe there was any change in Miller's brain between 1997 and 2002 (PCT. 1649).

Dr. Harry Krop, a psychologist and the director of Community Behavioral Services, focuses his practice on forensic psychiatry (PCT. 1691). Dr. Krop testified that he was retained as a mental health expert in this case by public defender Alan Chipperfield in 1997 (PCT. 1693). Chipperfield requested that Dr. Krop review competency and sanity as related to Miller and to do an analysis of his drug/alcohol intoxication and mental health problems on the day of the homicide (PCT. 1694). Chipperfield also suggested in a letter to Dr. Krop possible mitigating factors that he felt needed to be explored in the area of remorse, family situation, and prison record (PCT. 1695). Dr. Krop was sent some information by Chipperfield after the public defender investigator had interviewed certain family members (PCT. 1695). Chipperfield also provided Dr. Krop with a list of records he felt were important, which included school records, military records, prison classification records, VA records, and psychiatric records (PCT. 1695). Chipperfield provided a copy of Miller's confession, as well as other

information relating to the homicide (PCT. 1695).  Dr. Krop did not
have the benefit of a PET scan in 1997 (PCT. 1696).

Dr. Krop had since received a copy of Dr. Wu's report and a
report from a Dr. Holder (PCT. 1697).  He was familiar with Dr.
Wu's findings, which were consistent with the abnormalities that
Dr. Krop had detected in his neuropsychological testing of Miller
in 1997 (PCT. 1696-97).  Dr. Krop's 1997 diagnosis was also
consistent with earlier diagnoses (PCT. 1697).

Dr. Krop had reviewed his records regarding the time he spent
consulting with Eler (PCT. 1698).  His records reflected one half-
hour consultation on July 6, 1998, during Miller's trial (PCT.
1698).  Dr. Krop testified in Miller's trial on July 7, 1998 (PCT.
1698).  He might have spoken to Eler for a few additional minutes
before he testified, but remembered no other contact with Eler
(PCT. 1698).

Dr. Krop did not recall speaking to Eler about possible
mitigation (PCT. 1698).  He believed he provided a report of his
findings, which included concerns about the dysfunctional family,
cognitive defects in the frontal lobe, and the results of
psychological testing to either Chipperfield or Eler (PCT. 1700).
Dr. Krop did not recall having any discussion with Eler wherein he
advised him to refrain from presenting certain areas of mitigation
(PCT. 1700).  He did not create a situation where Eler would have

deferred to his opinion about what should or should not be presented (PCT. 1700-01).

Dr. Krop stated that in 1997 he had clearly identified a long-standing history of drug and alcohol abuse by Miller (PCT. 1701). Miller's substance abuse contributed to his psychiatric problems, led to depression, and ultimately led to hospitalization (PCT. 1702). Dr. Krop believed these facts would support a mitigating factor that has been utilized in other cases he has been involved with (PCT. 1702). Dr. Krop felt that he had enough information in 1997 that he could have testified as to the psychological effects the addictions had on Miller (PCT. 1702-03). Dr. Krop could have testified as to how the severe personality disorder Miller suffered interacted with his addictions and cognitive defects. He could have testified as to how these factors impacted on Miller's judgment making ability, impulse control, and so forth had he been been asked the appropriate questions by Eler (PCT. 1703).

Dr. Krop could have also testified about adjustment disorders that Miller had faced which led to a life of homelessness (PCT. 1704). The combination of mental health issues Miller faced would not be conducive to voluntarily seeking treatment (PCT. 1704). It would not be likely that Miller, given his diagnosis, would seek out-patient treatment on his own following his discharge from the

30 day treatment program unless he had significant support and efforts expended by others to ensure he continued treatment (PCT. 1714).

It was Dr. Krop's opinion that the 30-day treatment program Miller entered into shortly before the instant offense was not sufficient to address his problems (PCT. 1713). Individuals who suffer from the long-standing mental health issues that Miller suffers from usually require long and extensive out-patient treatment, which would necessarily include medication and psychotherapy on an on-going basis (PCT. 1713).

Dr. Krop testified at the evidentiary hearing that Miller reported to him significant emotional deprivation in his childhood and significant physical abuse by an alcoholic father (PCT. 1705). Miller believed his father was capable of killing him and his mother (PCT. 1705). Her victimization caused her to be a very negative person who verbally and mentally abused Miller (PCT. 1706). Miller was constantly told he was not wanted and would never amount to anything (PCT. 1706). Dr. Krop interviewed three family members, including Mrs. Miller, for the purpose of developing additional information about the circumstances of Miller's youth (PCT. 1706). Dr. Krop was surprised that he was not asked by Eler to address his findings in these areas in his testimony, especially after he had brought this area of mitigation

56

to the attention of Chipperfield in his initial letter to defense counsel (PCT. 1707).

Dr. Krop testified that Miller also spoke with him about the suicide of his schizophrenic sister and cousin (PCT. 1707). The death of his sister was especially traumatic because Miller was closest to her (PCT. 1708).

Additionally, Miller talked with Dr. Krop about experiencing sexual abuse and witnessing the rape of his sisters by two male cousins (PCT. 1708). When Miller told his father what he had witnessed, he was accused of lying and was beaten (PCT. 1708). As a result of his father's actions, Miller became increasingly suspicious (PCT. 1708).

According to Dr. Krop, medical records reflect that Miller received little out-patient mental health treatment (PCT. 1709). Miller did receive an extensive evaluation at the Dorothea Dix Hospital when he was in acute crisis in 1983 and there were medical records from 1986, the time of the North Carolina second-degree murder (PCT. 1709). All medical records Dr. Krop reviewed substantiated a long-standing history of mental health problems (PCT. 1709).

Miller was court-ordered into the Dorothea Dix Hospital in 1983 (PCT. 1710). The psychiatric reports diagnosed Miller with adjustment disorder, alcohol abuse, and mixed personality disorder

with avoidance, schizoid, and borderline features (PCT. 1711). The
evaluator in 1983 directed the North Carolina trial court to
potentially mitigating factors present in that episode, which
include the history of alcohol abuse, Miller's intoxication at the
time of that offense, and a history of emotional problems
associated with an underlying personality disorder (PCT. 1712).
These findings were consistent with Dr. Krop's current findings
(PCT. 1712). The findings indicated that Miller's alcohol
intoxication and emotional/personality disorder, taken together,
"most probably impaired this patient's ability to appreciate the
criminality of his conduct at the time of the alleged offenses and
to conform his behavior to the requirements of law" (PCT. 1712).

Dr. Krop felt that Miller's admission to a VA hospital in 1996
several months before the instant homicide was significant in
confirming the continuing mental health difficulties that Miller
had suffered from for years (PCT. 1710).

Dr. Krop testified at the penalty phase of Miller's trial
(PCT. 1725). He was able to provide only a cursory explanation for
the basis of his opinion under the questions proposed to him by
Eler (PCT. 1725). Dr. Krop opined that a cursory reference to a
particular record is significantly different from being asked to
describe the details of the record that is pertinent to the
diagnosis or testimony (PCT. 1726). It is important to get into

the substance of the material contained in the records and to develop significant facts which support his opinion and give the jury the proper insight into the defendant (PCT. 1726). Dr. Krop's testimony at the evidentiary hearing was significantly different from that at trial (PCT. 1726). For example, at trial Dr. Krop was not asked any questions about Miller's psychiatric records, anything which related to the 1983 offense, or Miller's perceptions of the dysfunctional family environment and its effect on him (PCT. 1726).

While Dr. Krop did not find that Miller suffered from a "major mental illness", he explained that this is a term of art (PCT. 1727). Dr. Krop firmly believed that Miller has serious psychological problems and serious emotional problems and that Miller was operating under those problems at the time of the instant homicide in 1997 (PCT. 1727).

The prosecution presented the testimony of Dr. Lawrence E. Holder, a clinican at Shands Hospital and a supervisor in the administration of PET scans (PCT. 1730). During the period of time that Dr. Holder was training and at the time he became board certified in nuclear medicine, he received no training relating to PET scans (PCT. 1751). He had been a clinical professor of radiology for two years at Shands (PCT. 1733). His areas of research focused on radio nuclide bone imaging in orthopedic sports

medicine and trauma, RSD, and tumor imaging (PCT. 1751, 1752-53). He is not published in the area of PET scans and has not published any materials related to the brain (PCT. 1754). Dr. Holder has no specialized training in the area of psychiatry (PCT. 1755). He focuses on the diagnosis of medical conditions as a determinate of treatment (PCT. 1738). Dr. Holder has only done PET scan reviews for five or fewer years since PET scans have only been around clinically for three or so years (PCT. 1756). He primarily does examinations ordered by medical doctors as opposed to psychiatric testing (PCT. 1739). Dr. Holder has testified before in civil cases, but never in a criminal case (PCT. 1738).

The use of a PET scan is a subset of nuclear medicine (PCT. 1735). Dr. Holder reviewed the PET scans of Miller and the report of Dr. Wu (PCT. 1741). He also very briefly reviewed some trial testimony (PCT. 1742). In Dr. Holder's opinion, Miller's PET scans were of adequate technical quality (PCT. 1743). Dr. Holder found no focal cortical abnormalities and no non-cortical abnormalities (PCT. 1744). He opined that the PET scan was normal (PCT. 1744). Dr. Holder admitted that there is debate in the medical community as to what constitutes "normal" v. "abnormal" (PCT. 1748). Dr. Holder did not find any abnormality in the frontal lobe area (PCT. 1745). He admitted that the images in Defense Exhibit 6 (those of Miller and a control image) were different (PCT. 1760).

Dr. Holder did not disagree with the results of the neuropsychological tests performed by Dr. Krop (PCT. 1757-58).

Dr. Holder has never utilized a visual vigilance test, as was used by Dr. Wu in this case (PCT. 1746). He believed the increased glucose activity observed in Miller's scan was consistent with a visual stimuli taking place (PCT. 1746).

Dr. Wu was recalled by the defense (PCT. 1764). Dr. Wu believed that the differing opinion reached by Dr. Holder was due to his unfamiliarity with the visual vigilance test coupled with his lack of experience in reviewing scans of both normal and schizophrenic patients during the performance of those tasks (PCT. 1764). Dr. Wu noted that the use of the visual vigilance test and his conclusions regarding the results of that test in the instant case were supported by peer reviewed literature (which included 50 articles that he personally authored) specifically addressing schizophrenia as compared with normal responses (PCT. 1765). Dr. Wu felt that experience with this application of the PET scan is important when analyzing the test that should be used and the type of pathology being assessed (PCT. 1765). While Dr. Holder has many interests, he does not have a special interest or any experience in the area of PET scans of the brain involving neuropsychiatric illness (PCT. 1766).

## GROUNDS FOR RELIEF

### GROUND I

**MILLER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF HIS FEDERAL CONSTITUTIONAL RIGHTS.**

Miller's trial counsel failed to present significant, available evidence of mitigating circumstances to the jury during the penalty phase of his trial. Counsel's objectively unreasonable inaction, whether by reason of ignorance or neglect, prejudiced his client. Counsel's ineffectiveness violated Miller's federal constitutional rights. *See Strickland v. Washington*, 466 U.S. 668 (1984). To the extent that the Florida Supreme Court adjudicated this claim on the merits, its decision was contrary to or at a minimum involved an unreasonable application of clearly established federal law, as Miller will discuss further in his memorandum of law. As will also be discussed further in the memorandum of law, state post-conviction counsel's ineffectiveness should not curtail this Court's review of trial counsel's ineffectiveness.

All other facts and allegations in this petition are incorporated into the below facts relating to ineffectiveness.

**I.     Exhausted Ineffective Assistance of Counsel Issues**

**A.     DEFICIENT PERFORMANCE**

Miller's trial attorney, Refik Eler, testified at the post-conviction evidentiary to his opinion that he was "pretty fortunate" that the public defender's office, which had originally represented Miller, had done a substantial amount of the mitigation investigation (PCT. 1490).

The public defender's office did in fact retain Dr. Krop (PCT. 1491).  Indeed, the public defender had outlined for Dr. Krop some areas of potential investigation and procured numerous records of Miller for him (PCT. 1695).  Dr. Krop had written a letter back to the public defender requesting additional interviews with family members and offering a very preliminary opinion on certain mitigation. PC Exhibit 1/A at Vol. II, Section 8.[9]  Dr. Krop did speak with some lay witnesses in the family, and an initial contact had been made with Debra Lee, a counselor who treated Miller in 1994,  by the public defender (PCT. 1604-05).  Unfortunately, that was all the investigation that ever took place in this case.

Eler failed to complete the investigation, speak with lay

---

[9]     In his letter to Chipperfield, Dr. Krop stated, "Should the State continue to seek the death penalty in this case, I would need to see Mr. Miller again and review additional materials when they are available.  I would also like to interview family members and would appreciate your assistance in coordinating these interviews." PC Exhibit 1/A at Vol. II, Section 8.

witnesses, or confer with his mental health expert prior to trial.
Dr. Krop's records reflected only a one-half hour consultation on
July 6, 1998, during Miller's trial (PCT. 1698).[10]  Dr. Krop may
have spoken to Eler for a few additional minutes before he
testified (PCT. 1698).  Dr. Krop did not recall speaking to Eler
about possible mitigation (PCT. 1698).

     Had Eler conducted a reasonable investigation of his own by
effectively completing the preparation of the penalty phase, he
would have discovered vital mitigating evidence.  Instead, because
of his deficient performance, Eler failed to present evidence
relating to the psychological trauma suffered by Miller as a result
of the abuses he suffered, though such evidence could have been
developed through a mental health professional (PCT. 1503).  Eler
acknowledged that this evidence would have been important for the
jury and trial judge to hear (PCT. 1504).  Eler's reason for not
presenting this testimony was not strategic–it was because he did
not think that Dr. Krop told him that this was a feature he needed
to bring out (PCT. 1504).

     Eler also did not ask Dr. Krop to testify about the various
psychological and emotional ramifications of a substance abuse
disorder and the long term effect it would have had on Miller and

_____

[10]    Dr. Krop testified in Miller's trial on July 7, 1998 (PCT.
1698).

how such long-term addictions would have affected Miller's judgment
on the night of the homicide (PCT. 1506). Eler only focused on
Miller's drug/alcohol usage on the night of the incident. Eler did
not try to present any evidence which would have established
Miller's attempts at treatment and the systemic failures of those
treatment programs (PCT. 1509).

Eler first claimed that he did not present the aforementioned
testimony because it would have been detrimental to Miller (PCT.
1521). Yet, Eler could not offer a single negative point that Dr.
Krop could have been cross-examined on if he had testified about
what the alcohol and drug problems meant to Miller (PCT. 1521).
Eler finally acknowledged that, "I'm not sure that would have been
a bad thing" to have had Dr. Krop testify in this area (PCT. 1521).

Moreover, no medical records relating to Miller's mental
health were presented to the jury (PCT. 1509). Eler agreed that
the records contained much relevant mitigation evidence (PCT.
1511). However, Eler unreasonably believed that showing a
defendant has had previous involuntary hospitalizations due to
mental health issues was detrimental (PCT. 1514). Eler thought
evidence of mental illness which required hospitalization would
undercut an argument that Miller was a good candidate for
rehabilitation in prison (PCT. 1514). In Eler's opinion, the fact
that a defendant had been previously committed to a mental

institution was something he would never want a jury to hear (PCT. 1515).   When asked why a diagnosis of alcohol dependence with psychological dependence, cocaine dependence with psychological dependence, cannabis abuse, and schizoid personality disorder three or four months before the murder occurred was not relevant mitigation and how that evidence would open the door to testimony that Miller pushed someone in a mental hospital, Eler only responded that Dr. Krop considered these things (PCT. 1516).

Eler further acknowledged that he did not know if Dr. Krop evaluated Miller to determine the level and effect of the trauma he suffered as a result of the death of his sibling and cousin (PCT. 1516).   Eler did not present any testimony by Dr. Krop as to this issue; he only presented the fact that a sister and neighbor had died (PCT. 1516).   Eler could not point to any bad things that would have come out had Dr. Krop testified in this area (PCT. 1522).   Eler then claimed he did not present this testimony because he deferred to Dr. Krop (PCT. 1522).   Eler admitted that the lawyer asks the questions in court, not the doctor (PCT. 1522).

Eler also did not have Dr. Krop testify as to the psychological impact childhood abuse and a dysfunctional family had on Miller (PCT. 1518).   Eler chose not to follow up on any of the psychological testimony, despite having it available to him (PCT. 1519-20).   While believing such evidence was detrimental, Eler did

choose to present some very limited factual testimony about alcohol usage and childhood abuse only from family members.

Finally, Eler testified that he did not present evidence of mental mitigation at the time of the instant homicide (PCT. 1524). Eler did not look at the psychological reports because he believed that Dr. Krop had, so he did not present this evidence to the jury (PCT. 1525).

## B.   PREJUDICE

Miller was prejudiced by trial counsel's unreasonably deficient performance during the penalty phase, as evidenced by the existence of significant mitigation that could have and should have been uncovered.   This evidence reflects that, but for trial counsel's deficiencies at the penalty phase, there is a reasonable probability of a different result in Miller's case.

During his post-conviction evidentiary hearing and since, significant mitigation evidence has been uncovered that would have been presented by any reasonable trial counsel.   For instance, Debra Lee is a substance abuse counselor and social worker in Charlotte, North Carolina (PCT. 1586).   She works for the Salisbury VA Medical Center (PCT. 1587).   In 1994, she worked as an outreach counselor for homeless and chronically mentally ill veterans with the goal of helping them to gain access to needed health-care services (PCT. 1587).   The VA provided funding for outreach

activities to homeless shelters, camps, bridges, wherever homeless people congregate for the purpose of interviewing people in order to conduct an assessment that will lead to finding programs to assist them with health-care needs. This includes treatment for medical needs, substance abuse, and psychiatric treatment (PCT. 1588).

Lee testified that she worked with Miller for an 18 month period, beginning in 1994, in North Carolina (PCT. 1580). She met Miller in a day shelter and helped him secure treatment for substance abuse and alcoholism (PCT. 1589). During her contact with Miller they spoke at length about his family history, including his father's alcoholism, physical and sexual abuse, his witnessing the rape of both of his sisters, and the eventual suicide of his sister and cousin (PCT. 1589). Miller would become very upset when talking of these things (PCT. 1589). It took almost a year before Miller agreed to treatment, which is not unusual among the chronically homeless (PCT. 1590).

Miller eventually agreed to be evaluated by a psychiatrist and medical doctors (PCT. 1590). Initially, outpatient treatment was agreed upon for Miller due to some concerns about his level of commitment to treatment (PCT. 1590). During this treatment Miller had difficulty maintaining sobriety (PCT. 1591). After Miller demonstrated a commitment to treatment, the decision was made to

68

switch to inpatient treatment (PCT. 1597). In the fall of 1996,
Miller entered a 30 day inpatient treatment program (PCT. 1591,
1596)

Miller entered into a substance abuse unit (PCT. 1591). During
treatment Lee characterized Miller as quiet, with a tendency to
isolate himself (PCT. 1592). Miller was depressed and very
paranoid about what would happen to him in the VA hospital (PCT.
1592). Miller had a previous suicide attempt, so his
self-isolation was cause for concern (PCT. 1596). He had some
problems with groups in the beginning due to the pressure to open
up in these settings, which led to increased depression (PCT.
1600). In response to his increased depression, a program of more
intensive one-on-one therapy was begun in part for a concern that
Miller could hurt himself (PCT. 1597). At one point there was some
concern that Miller needed to be in an acute psychiatric unit, but
the decision was eventually made to keep him at the substance abuse
unit (PCT. 1597).

Miller was diagnosed with schizoid personality disorder on
November 22, 1996, as a result of his abusive childhood, his
witnessing of the rapes of his sisters, his own sexual abuse, and
the suicide of his sister (PCT. 1599).[11] During her entire contact

---

[11]    The instant offenses occurred on March 17, 1997, four
(continued...)

with Miller, Lee did not see him act out (PCT. 1592).  Miller
shared his previous legal problems with Lee (PCT. 1593).  Miller
told her that he had been in an argument with someone at a rooming
house and that he had shot the person (PCT. 1612).  He served seven
years in prison and was released not too long before he sought help
from Lee (PCT. 1612, 1621).

Lee found Miller to be very remorseful and extremely saddened
by his actions (PCT. 1593).  She believed he was plagued by what
had happened and he often expressed that he should be punished for
it (PCT. 1612).

Miller had a history of abusing many substances, including
hallucinogens such as Valium and Quaaludes, cocaine, marijuana,
crack cocaine, and significant amounts of alcohol (PCT. 1593).

Lee was aware that Miller had a family history of mental
illness, including schizophrenia (PCT. 1595).  There was a question
of concern as to whether Miller also suffered from this (PCT.
1595).

Miller was discharged on his 30th day, November 27, 1996, with
a referral to return to the mission he had been staying at prior to
the inpatient program and to continue out-patient psychological
counseling (PCT. 1601).  Miller wanted to go to a half-way house,

---

[11](...continued)
months later (PCT. 1601).

but that did not happen because there were not any beds available
(PCT. 1602).  Miller returned to the same environment he had been
in prior to treatment (PCT. 1602).  A short time later he left town
(PCT. 1602).

Lee stated that a person with a discharge plan such as that
given to Miller, coupled with his history, has less than a three
percent chance of success (PCT. 1602).  It is now well-recognized
that persons who return to the same environment do not fare well
(PCT. 1603).  Today, Miller would have been placed in an aftercare
program with housing available for up to two years and other
support (PCT. 1603).  Miller's only stable housing as an adult
occurred during the military or when he was incarcerated (PCT.
1603).  The services provided to homeless persons, especially those
such as Miller, have evolved greatly since 1994-1996 (PCT. 1607).
Now, there are supportive services in the community that just did
not exist in 1996 (PCT. 1608).  It would not be realistic to have
expected Miller to succeed once he was discharged in 1996 (PCT.
1622).

Lee was contacted by public defender Alan Chipperfield in this
case (PCT. 1604).  It was her understanding that he represented
Miller (PCT. 1604).  She spoke with him and his investigator (PCT.
1605).  She was not contacted by anyone else until a week before
this hearing, when she was asked to testify (PCT. 1605).  She had

never heard the name Refik Eler (PCT. 1605).

Dr. Joseph Chong Sang Wu is a physician at the University of California, Irvin College of Medicine (PCT. 1624). He is the clinical director of the Brain Imaging Center and associate professor in the Department of Psychiatry (PCT. 1624). The primary focus of the Brain Imaging Center is the administration and interpretation of PET scans and PET scan studies of neuropsychiatric disorders such as schizophrenia, Alzheimer's dementia, Parkinson's disease, and traumatic brain injury (PCT. 1624). Only 20-30 centers nationwide utilize PET scans for neuropsychiatric purposes (PCT. 1625). Dr. Wu is a preeminent researcher in studies of PET scans involving cocaine addiction, depression, and schizophrenia (PCT. 1626). He conducts pharmaceutical studies to test the effectiveness of antipsychotic medications for treatment as well as treatments for cocaine additions and depression (PCT. 1627).

According to Dr. Wu, an MRI scan looks at the brain structure and determines if the shape of the brain structure is altered in any way (PCT. 1630). A PET scan looks at the function of the brain. You can have a portion of the brain that is structurally intact but does not function (PCT. 1630). An MRI scan of a cadaver would show a perfectly normal brain shape, an intact brain, but a PET scan would show no function (PCT. 1631). The PET scan shows the

level of brain function as measured by sugar metabolism (PCT.
1632).  The more active a particular area of the brain is the more
sugar that part of the brain consumes (PCT. 1633).  These areas of
activity, or sugar metabolization, are color-coded on the PET scan
films - high activity areas are colored with hot colors such as
red; moderate areas of metabolism with yellow or green, and low
metabolism areas with blue (PCT. 1633).  The mechanics of how PET
scans are obtained has been in use over 20 years and is a science
that is generally accepted in the scientific community (PCT.
1633-36).

PET scans help to corroborate neuropsychological test data
(PCT. 1637).  Dr. Wu was provided with the results of psychological
tests that Dr. Krop performed on Miller (PCT. 1638).  Dr. Krop
diagnosed frontal lobe problems (PCT. 1638).  Dr. Wu's actual
evaluations of Miller corroborate that conclusion (PCT. 1638).  The
PET scan of Miller showed a pattern of abnormal decrease in frontal
lobe activity, especially in the orbital frontal lobe area and in
the relative pattern of activity of the frontal lobe relative to
the occipital lobe (PCT. 1639).  Miller's scan looked more like
that of a schizophrenic, also in line with Dr. Krop's diagnosis of
schizophrenic spectrum disorder (PCT. 1640).  Dr. Wu's findings
were that Miller showed a significant decrease in the functioning
of the frontal cortex of the brain, especially the orbital frontal

cortex, a pattern of metabolic hyperfrontality with a decrease in
the frontal occipital gradient, and metabolic decreases in the
subcortical area (PCT. 1642). This was an abnormal brain with
frontal lobe deficit (PCT. 1642). This determination is consistent
with a schizophrenia spectrum disorder as identified by Dr. Krop
and documented in the records of Miller (PCT. 1643).

Schizophrenic spectrum disorder is characterized by someone
who has symptoms that are schizophrenia-like, but who does not
necessarily meet the full-blown diagnosis under the DSM-IV-R for
schizophrenia (PCT. 1644). This diagnosis would include behaviors
such as being withdrawn, odd behaviors, paranoia, and poor social
functioning (PCT. 1644-45). Miller's family history is also highly
indicative of schizophrenia (PCT. 1645). Miller reported some
auditory hallucinations, just not persistent enough for a
full-blown diagnosis of schizophrenia (PCT. 1645).

Dr. Wu further testified that there is a correlation between
childhood abuse and neurobiological vulnerability (PCT. 1646). If
someone who has some sort of frontal lobe abnormality is subject to
childhood abuse, the likelihood of aggression increases (PCT.
1646). Miller is an example of someone with a neurobiological
vulnerability (PCT. 1647). There is an increased likelihood of
aggressive impulses, loss of judgment, and an inhibition of
improper impulses in someone with frontal lobe lesions, such as

Miller (PCT. 1647).  The instant PET scan was done in 2002 (PCT. 1649).  The homicide occurred in 1997 (PCT. 1649).  Dr. Wu did not believe there was any change in Miller's brain between 1997 and 2002 (PCT. 1649).

Dr. Harry Krop, a psychologist and the director of Community Behavioral Services, focuses his practice on forensic psychiatry (PCT. 1691).  Dr. Krop testified that he was retained as a mental health expert in this case by public defender Alan Chipperfield in 1997 (PCT. 1693).  Chipperfield requested that Dr. Krop review competency and sanity as related to Miller and to do an analysis of his drug/alcohol intoxication and mental health problems on the day of the homicide (PCT. 1694).  Chipperfield also suggested in a letter to Dr. Krop possible mitigating factors that he felt needed to be explored in the area of remorse, family situation, and prison record (PCT. 1695).  Dr. Krop was sent some information by Chipperfield after the public defender investigator had interviewed some family members (PCT. 1695).  Chipperfield also provided Dr. Krop with a list of records he felt were important, which included school records, military records, prison classification records, VA records, and psychiatric records (PCT. 1695).  Chipperfield provided a copy of Miller's confession, as well as other information relating to the homicide (PCT. 1695).  Dr. Krop did not have the benefit of a PET scan in 1997 (PCT. 1696).

75

Dr. Krop had since received a copy of Dr. Wu's report and a report from a Dr. Holder (PCT. 1697). He was familiar with Dr. Wu's findings, which were consistent with the abnormalities that Dr. Krop had detected in his neuropsychological testing of Miller in 1997 (PCT. 1696-97). Dr. Krop's 1997 diagnosis was also consistent with earlier diagnoses (PCT. 1697).

Dr. Krop believed he provided a report of his findings, which included concerns about the dysfunctional family, cognitive defects in the frontal lobe, and the results of psychological testing to either Chipperfield or Eler (PCT. 1700). Dr. Krop did not recall having any discussion with Eler wherein he advised him to refrain from presenting certain areas of mitigation (PCT. 1700). He did not create a situation where Eler would have deferred to his opinion about what should or should not be presented (PCT. 1700-01).

Dr. Krop stated that in 1997 he had clearly identified a long-standing history of drug and alcohol abuse by Miller (PCT. 1701). Miller's substance abuse contributed to his psychiatric problems, led to depression, and ultimately led to hospitalization (PCT. 1702). Dr. Krop believed that these facts would support a mitigating factor that has been utilized in other cases he has been involved in (PCT. 1702). Dr. Krop felt that he had enough information in 1997 that he could have testified as to the

psychological effects the addictions had on Miller (PCT. 1702-03).
Dr. Krop could have testified as to how the severe personality
disorder Miller suffered interacted with his addictions and
cognitive defects. He could have testified as to how these factors
impacted on Miller's judgment making ability, impulse control, and
so forth had he been been asked the appropriate questions by Eler
(PCT. 1703).

Dr. Krop could have also testified about adjustment disorders
that Miller had faced which led to a life of homelessness (PCT.
1704). The combination of mental health issues Miller faced would
not usually be conducive to the seeking of voluntary treatment
(PCT. 1704). It would not be likely that Miller, given his
diagnosis, would seek out-patient treatment on his own following
his discharge from the 30 day treatment program unless he had
significant support and efforts expended by others to ensure he
continued treatment (PCT. 1714).

It was Dr. Krop's opinion that the 30-day treatment program
that Miller entered into shortly before the instant offense was not
sufficient to address his problems (PCT. 1713). Individuals who
suffer from the long-standing mental health issues that Miller
suffers from usually require long and extensive out-patient
treatment, which would necessarily include medication and
psychotherapy on an on-going basis (PCT. 1713).

Dr. Krop testified at the evidentiary hearing that Miller
reported to him significant emotional deprivation in his childhood
and significant physical abuse by an alcoholic father (PCT. 1705).
Miller believed his father was capable of killing his mother (PCT.
1705). Her victimization caused her to be a very negative person
who verbally and mentally abused Miller (PCT. 1706). Dr. Krop
interviewed three family members, including Mrs. Miller, for the
purpose of developing additional information about the
circumstances of Miller's youth (PCT. 1706). Dr. Krop was
surprised that he was not asked by Eler to address his findings in
these areas in his testimony, especially after he had brought this
area of mitigation to the attention of Chipperfield in his initial
letter to defense counsel (PCT. 1707).

Dr. Krop testified that Miller also spoke with him about the
suicide of his sister and cousin (PCT. 1707). The death of his
sister was especially traumatic because Miller was closest to her
(PCT. 1708).

Additionally, Miller talked with Dr. Krop about witnessing the
rape of his sisters by two male cousins (PCT. 1708). When Miller
told his father what he had witnessed, he was accused of lying and
was beaten (PCT. 1708).

According to Dr. Krop, medical records reflected that Miller
received little out-patient mental health treatment (PCT. 1709).

Miller did receive an extensive evaluation at the Dorothea Dix
Hospital when he was in acute crisis in 1983 and there were medical
records from 1986, the time of the North Carolina second-degree
murder (PCT. 1709).   All medical records Dr. Krop reviewed
substantiated a long-standing history of mental health problems
(PCT. 1709).

Miller was court-ordered into the Dorothea Dix Hospital in
1983 (PCT. 1710).  The psychiatric reports diagnosed Miller with
adjustment disorder, alcohol abuse, and mixed personality disorder
with avoidance, schizoid, and borderline features (PCT. 1711).  The
evaluator in 1983 directed the North Carolina trial court to
potentially mitigating factors present in that episode, which
include the history of alcohol abuse, Miller's intoxication at the
time of that offense, and a history of emotional problems
associated with an underlying personality disorder (PCT. 1712).
These findings were consistent with Dr. Krop's current findings
(PCT. 1712).

Dr. Krop felt that Miller's admission to a VA hospital in 1996
several months before the instant homicide was significant in
confirming the continuing mental health difficulties that Miller
had suffered from for years (PCT. 1710).

Dr. Krop testified at the penalty phase of Miller's trial
(PCT. 1725).  He was able to provide only a cursory explanation for

the basis of his opinion under the questions proposed to him by
Eler (PCT. 1725). Dr. Krop opined that a cursory reference to a
particular record is significantly different from being asked to
describe the details of the record that is pertinent to the
diagnosis or testimony (PCT. 1726). It is important to get into
the substance of the material contained in the records and to
develop significant facts which support his opinion and give the
jury the proper insight into the defendant (PCT. 1726). Dr.
Krop's testimony at the evidentiary hearing was significantly
different from that at trial (PCT. 1726). For example, at trial
Dr. Krop was not asked any questions about Miller's psychiatric
records, anything which related to the 1983 offense, or Miller's
perceptions of the dysfunctional family environment and its effect
on him (PCT. 1726).

While Dr. Krop did not find that Miller suffered from a "major
mental illness", he explained that this is a term of art (PCT.
1727). Dr. Krop firmly believed that Miller has serious
psychological problems and serious emotional problems and those
were operating at the time of the instant homicide in 1997 (PCT.
1727).

## C. CONCLUSION

Miller was prejudiced as a result of his trial counsel's
failure to adequately investigate and prepare. Miller's jury heard

only a fraction of the available mitigating evidence regarding Miller's upbringing, mental illness, and brain damage. Even so, his jury rendered a death verdict by the barest of margins: 7 to 5. Had Miller's jury been presented with the poignant, powerful mitigation available at trial, there is a reasonable probability that the outcome of Miller's sentencing proceedings would have been different, and at least one juror would have been compelled to recommend life imprisonment over death.

The Florida Supreme Court's decision rejecting Miller's ineffectiveness claim on state post-conviction review was contrary to or at a minimum involved an unreasonable application of clearly established federal law, as well as an unreasonable determination of the facts. *See* 28 U.S.C. 2254(d). The Florida Supreme Court's justification for denying Miller's claim in state court–that "counsel was aware of Miller's childhood, his substance abuse problems, and his mental health issues"–fundamentally misapplies the holdings of the cases it cites. *See, e.g., Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003). Trial counsel being put on notice of red flags in a defendant's history is not an excuse for counsel's failure to follow up on those red flags–quite the opposite. Similarly, it is counsel's duty to bring investigative leads to their mental health expert–not the other way around. Finally, counsel is not permitted to ignore a wealth of

mitigating evidence simply because they fear encountering information that could be seen as a "double-edged sword." *See, e.g., Porter v. McCollum*, 558 U.S. 30 (2009)*; Rompilla v. Beard*, 545 U.S. 374 (2005); *Williams v. Taylor*, 529 U.S. 362.

## II. Analysis of Unexhausted Ineffective Assistance of Counsel Issues Pursuant to *Martinez v. Ryan*

As will be explored further in Miller's memorandum of law, state prisoner may obtain federal habeas corpus review of a procedurally defaulted trial counsel ineffectiveness claim by showing cause for the default and prejudice from a violation of federal law. Cause for the default may be established by demonstrating that post-conviction counsel was ineffective under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Martinez v. Ryan*, 566 U.S. 1 (2012).

Particularly in a capital case, post-conviction counsel's ineffectiveness in failing to develop a sufficient record in state court should not curtail federal review. Miller has valid arguments to make that counsel's ineffective failure to develop the record should not preclude a federal evidentiary hearing or expansion of the record. *See Martinez*, 566 U.S. 1; *Trevino*, 569 U.S. 413; *Christeson*, 135 S. Ct. 891; *Tamayo-Reyes*, 504 U.S. 1.

Here, Miller's ineffective assistance of trial counsel claim is not procedurally defaulted because it was presented to the state

courts and decided by the Florida Supreme Court on the merits. To the extent that Miller's initial collateral review counsel failed to adequately develop the record in support of this claim, that ineffectiveness should not confine this Court's review to the state-court record that resulted from collateral counsel's ineffectiveness. Instead, the court should consider the additional evidence below in analyzing Miller's ineffective assistance of trial counsel claim. To the extent Respondent may raise procedural defenses to specific aspects of Miller's ineffectiveness claim, Miller will respond to such defenses when they are raised with specificity by Respondent.

## A.   FAMILY HISTORY

Trial counsel ineffectively failed to present, and post-conviction counsel ineffectively failed to develop the record regarding, Miller's family history.

One of the greatest predictors of an individual's likelihood to develop schizophrenia is a family history of the disease. Miller's sister, Valnice, suffered from paranoid schizophrenia, possible schizotypal personality disorder, and her condition manifested with marked similarities to Miller's.

Valnice had auditory and visual hallucinations, showed looseness of associations, disorganized and concrete thinking, sleep problems, fearfulness, and delusions. She avoided eye

contact.    She   had   a   history   of   psychotic   episodes   and
hospitalizations.  She suffered from religious preoccupations and
delusions.  She believed people toward whom she had misbehaved in
the distant past were going to kill or assault her.

Valnice could only perform menial jobs, but was unable to hold
down any job for long.  Although she lived with her mother, Valnice
considered incarceration preferable to living with her mother, so
she attempted to steal from her mother, stating "I wanted to go to
jail to get some rest for my nerves."

Additionally, Valnice's medical records indicate that her
maternal aunt and great-aunt also had psychiatric conditions.  Her
medical records from 1982 indicate a dysfunctional family history,
and state that her brother David is described by the family as
"crazy" and "different."   Other medical records indicate that
Yvonne Miller is "a very hostile woman" who is "very superficial"
and "berates" her children.

**B.   DR. GOLDEN**

Collateral counsel also failed to present the testimony of Dr.
Charles Golden, Ph.D., at the post-conviction evidentiary hearing.
Dr. Golden interviewed Miller on January 23, 2002, reviewed prior
records, and prepared a report of his findings on March 20, 2003.
Miller's post-conviction attorneys listed Dr. Golden as a witness
for Miller's evidentiary hearing.  Yet, inexplicably, he was never

called to testify; nor was his report ever introduced as evidence.

Had Miller's counsel called Dr. Golden or introduced his report, the court would have learned that Miller "sees the world as a hostile and dangerous place which he has no idea how to handle." Golden Report at 4. He is anxious, constricted, defensive, and displays "an excessive amount of affective detachment." *Id.* He has "tunnel vision" and does not take in relevant information from his environment. He avoids the complexities of stimuli around him. Individuals with this condition "often have high levels of fear and anxiety and will turn to drugs and alcohol as self-treatment." *Id.* (internal quotations omitted).

Dr. Golden's results are consistent with schizoid and schizophrenic disorders, and suggest that Miller is "unable to deal with emotional stimuli and may be easily overwhelmed." *Id.* He removes himself from group situations because they are unrewarding and may misinterpret the social environment. Miller cannot understand how or why other people behave the way they do. He "therefore has a detachment from the real world and tends to engage in a world of fantasy." *Id.*

Miller suffers from significant impairment in his ability to perceive and think, particularly with regard to analytic skills moderated by the anterior areas of the brain. *Id.* at 5. These impairments are particularly pronounced in situations where stress

and emotional stimuli are involved.  He has poor reality ties and
he "is unable to perceive the world as other people do, leading to
multiple misunderstandings with others." *Id.*  He has significant
distortion in his way of responding to situations.  *Id.*  He
obsesses over processing information and focuses on small or
irrelevant details "rather than seeing the whole picture, leading
him to inappropriate conclusions." *Id.*

Miller's impaired perception of reality extends to his self-
image.  His perception of himself is, like his other perceptions,
"based as much on imaginary as real experiences." *Id.*  This leads
to negative feelings of self-worth, immaturity, and limited self-
awareness, and it serves negatively in decision-making and problem-
solving activity.  *Id.*  It is difficult for Miller to deal with
everyday requirements, and he feels overwhelmed by interpersonal
demands.  Consistent with these findings, Miller shows substantial
indications of depression.  *Id.*

Dr. Golden's review of prior mental health evaluations
indicated that Miller has a "poor self-concept, lability, and
dysphoria." *Id.* at 6.  He worries excessively, is introspective,
withdrawn, and hypersensitive.  He struggles to control his anger
and has a lack of adequate defenses for normal interpersonal
interactions.  *Id.*  All of this is consistent with a diagnosis of
schizophrenia and schizoid disorder.  *Id.* at 6-7.  There is

evidence that Miller was dissociating at the time he committed the prior murder. *Id.* at 7.

Prior records indicate that Miller suffers from significant brain damage, both organic and exacerbated. His brain dysfunction is likely lifelong. *Id.* at 7. His organic brain damage caused emotional disorders in conjunction with his childhood upbringing. *Id.* Miller's adult life centered around drug and alcohol abuse. His test results indicate a frontal lobe brain injury. He cannot process information from his environment in an accurate or conventional manner. *Id.* Miller's idiosyncratic perceptions of the environment result in odd and eccentric behavior, and this is exacerbated by his addictions to drugs and alcohol. *Id.*

Miller is substantially impaired in both cognitive and social skills. His "deficits have caused difficulties in vast areas of his life such as in vocational, social, and interpersonal settings." These findings were validated by the results of a PET scan. *Id.*

## C.  DR. HERKOV

Clinical psychologist Dr. Herkov was retained by CCRC-N on February 1, 2002, and he conducted an interview with Miller as far as record review and attorney consultation throughout 2002. Nevertheless, he was never presented as a witness at Miller's post-conviction evidentiary hearing, and no report regarding his

findings was ever introduced.  Undersigned counsel consulted with Dr. Herkov, as well as Miller's post-conviction legal defense team. Neither Dr. Herkov nor Miller's post-conviction defense team can think of a reason why Dr. Herkov was not called as a witness at Miller's evidentiary hearing.

**D.    DR. SATTERFIELD**

Undersigned counsel have spoken with Dr. Arthur Satterfield, M.D., who acted as Miller's psychiatrist during his 1996 inpatient treatment.  Dr. Satterfield had never been contacted by any of Miller's prior counsel.  Dr. Satterfield stated that at the time of Miller's inpatient treatment, he was not aware of Miller's family history of schizophrenia or history of auditory hallucinations and delusions.  Dr. Satterfield stated that, had he been aware of these details, he would likely have diagnosed Miller with full-blown schizophrenia.

**E.    DR. REGNIER**

Undersigned counsel's own retained clinical psychologist, Dr. Eddy Regnier, M.S.W., M.A., Ph.D., has conducted an evaluation of Miller and independent record review, and his findings are consistent with other evidence in Miller's case demonstrating that Miller suffers from schizophrenia.  All testing methods and conclusions formulated by Dr. Regnier were available prior to Miller's trial and post-conviction proceedings.  There is no

evidence of malingering.

Miller has a family history of schizophrenia, including his sister, Valnice, who was diagnosed with the disease prior to taking her own life. Anecdotes from Miller's family members suggest Miller's father was also schizophrenic, suffering from religious delusions and institutionalized after disappearing, nude, into a local forest with only a bible. Another of Miller's relatives was institutionalized for decades after drowning his children in a well as a result of hearing the voice of God tell him to do so. Yet another of Miller's family members is currently incarcerated, and was found incompetent during his appeals process due to severe delusions. Family history of schizophrenia is considered the strongest predictor that an individual will himself develop the disease.

Additionally, Miller suffered from numerous adverse childhood experiences ("ACEs"), which are highly correlated with the development of psychiatric illness, including schizoid and schizophrenic diseases. Miller's ACEs include his parents' severe mental health problems, substance abuse issues, and extreme violence toward their children. Miller's history, both anecdotal and record-based, indicates physical and emotional abuse from both parents, alternated with neglect. Love was not expressed, nor holidays celebrated. Miller witnessed the rape of his sister, and

89

may have been sexually abused himself. Beatings were common, occurring at least weekly, and the children were forced to strip naked prior to beatings. The children were beaten all over their bodies, including on their genitals. Sometimes, the children were tied down for beatings, or the beatings were coupled with death threats. Miller's parents threatened them with axes and pointed guns at him. Miller's safe place became the woods — he would hide there for hours, alone. Miller's father doled out beatings with sticks, electrical cords, and even a crowbar.

Consistent with Miller's family history is his troubled academic and employment history. As a child, Miller was shuffled among approximately five schools. He was dismissed from one elementary school due to his low academic performance. Another time, he was forced to change schools due to racial bussing. Still another time, he was transferred from one school to another due to his race. And, another time, he was sent to an all-white school where he failed to thrive. After school, Miller joined the Navy, but received an administrative discharge for being a burden to the command. After his discharge, he was only able to find menial jobs such as dishwashing or putting rebar into concrete. He could not financially support himself, and became transient.

Miller is socially withdrawn and unable to make sustained eye contact. He is aloof, behaviorally introversive, and shy. He

speaks softly, and reports voluntarily isolating himself in his cell for extended periods of time. He displayed an odd demeanor with grandiose delusions of God taking up residence in his head. He reported auditory hallucinations beginning when he was very young, and was religiously preoccupied. He appeared depressed, but denied it. His affect was flat and his judgment seemed poor. He is easily emotionally fatigued, including by normal environmental stimuli. He suffers from cognitive and perceptual distortions.

Miller reported committing the murder in a blackout state (fugue) after drinking and using multiple drugs including crack cocaine. He has a long substance abuse history including crack cocaine, alcohol, Quaaludes, Valium, and Thorazine. Miller's substance abuse appears to be a form of self-medication — drugs and alcohol act as antianxiety agents. He gravitated toward anything sedating, which is consistent with individuals suffering from post-traumatic stress disorder (PTSD). It is also common among individuals with schizophrenia, whose senses are often overstimulated by everyday experiences, such as the feeling of textures, temperature, light, sound, and smells.

Miller suffers from religious delusions and hallucinations, which began long prior to the crime. Miller reported hearing voices as a child, and gave detailed examples from as far back as the early 1980s.

Daily life for Miller is uneventful, with long periods of passivity and solitude. He struggles with feelings of meaninglessness. He appears indifferent to social surroundings and avoids introspection, but this does not mean he does not have deep feelings — only that he is unable to manage his emotions and is disengaged from the subtleties of emotional life. His thought processes are unfocused, especially in relation to the more intimate aspects of social and personal relations. He is guarded and tries to prevent negative thoughts. He is self-conscious and struggles to express warmth. He constantly, but quietly, worries.

Miller functions best in institutional settings. He prefers simple, repetitive, and dependent life patterns in which he can avoid self-assertion, abdicate autonomous responsibilities, and ignore normal social relationships and conventional aspirations. He is disengaged from social life and uninterested in the rewards of an active social life. Miller is caught in a vicious cycle where, by significantly restricting his social and emotional involvements, he has perpetuated preexisting feelings of depression and isolation.

Miller exhibits odd and eccentric behaviors, including with food. Typically a model inmate, Miller has occasionally been written up for episodes in which he becomes paranoid and believes something to be wrong with his food. Miller simply describes these

times as not acting like himself.  His self-esteem is low.  He is self-belittling and believes himself to be weak and ineffectual. At the same time, he resents what he believes are unreasonable expectations others have placed upon him.  This is consistent with schizophrenia — he cannot function in everyday situations and social interactions, and is baffled by the concept that this comes naturally for most people.

The psychological evaluation indicates that Miller may have been insane at the time of his crime, and was likely incompetent during the period leading up to his trial and throughout his appeals process.[12]  Miller experiences periods of altered mental status characterized by delusions, religious preoccupations, and auditory hallucinations that impact his capacity to understand the consequences of his actions.  He appears, by reason of mental

---

[12]    Dr. Krop evaluated Miller in October and November of 1997, and made a cursory competency finding without full record review. Despite the numerous and continuous red flags detailed above that Miller was not competent to stand trial, no further inquiry was conducted regarding his competency.  If trial counsel had adequately investigated, he would have seen that Miller was not competent to stand trial or questioned his competency enough to require an evaluation.  Miller had voluminous medical records diagnosing him with multiple psychiatric and neuropsychiatric disorders (most if which not all predate his crime and trial). Additionally, Miller's family history was rife with biological risk factors for schizophrenia and psychosis.  Further, counsel was on notice that Miller had a longstanding drug and alcohol history, and that drugs impact brain chemistry long after physical withdrawal is complete.

infirmity, disease, or defect, unable to understand the nature and quality of his acts and their consequences.  His failure to meaningfully participate in his own defense is a response to delusional ideas and the result of auditory hallucinations.

As is typical in schizophrenia and schizotypal disorders, Miller suffers from a language disorder.  He, like many individuals with schizophrenia, often does not want to communicate.  When forced to do so, Miller does not communicate well.  It is likely that Miller would have acquiesced to what his attorneys wanted him to do, simply to end the interaction and return to his solitude. This tendency would be particularly pronounced under stress.  At Miller's best, he is low-functioning, and in many ways present with symptoms appearing similar to a severe form of autism.  He is paranoid and withdrawn.  The rest of the time, he presents with active schizophrenia and psychosis in the form of delusions and hallucinations.

**F.    CONCLUSION**

Collateral counsel raising an ineffective assistance of counsel claim in an initial-review collateral proceeding is obligated under *Martinez* to provide effective representation within the meaning of *Strickland* in investigating, presenting, and litigating the ineffectiveness of trial counsel.  Miller's state post-conviction counsel did not fulfill that obligation, to

Miller's prejudice.

This Court should consider the full record presented in support of this petition in deciding whether Miller's federal constitutional rights were violated by reason of ineffective assistance of counsel. To the extent Respondent raises any procedural defense with respect to specific aspects of Miller's ineffectiveness claim, Miller will respond to such affirmative defenses if and when they are raised.

**Exhaustion of Ground I in state courts:**

1) **Did you raise Ground I in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground I in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Section I of Ground I was raised and presented to the state courts. Collateral counsel failed to present Section II to the state courts.
   a) **If your answer is "yes", then state:**

      i. **Date motion filed:** September 17, 2001, stricken on January 8, 2002. A new 3.851 motion was filed on March 11, 2002, and both parties stipulated that the March 11, 2002 motion related back to October 2, 2001.

      ii. **Whether you received an evidentiary hearing:** Yes.

      iii. **Result:** Denied.

      iv. **Date of Result:** April 22, 2004.

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes

     i.   **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why**: N/A.

    ii.   **Date appeal filed, result of appeal, date of result**: Notice of appeal filed on or about May 24, 2004.  The Florida Supreme Court affirmed the denial of relief. *Miller v. State*, 926 So. 2d 1243 (Fla. 2006), mandate issued April 13, 2006.

3)    **Have you raised Ground I in any other petition, application, or motion filed in the state courts of Florida?** No.

GROUND II

**MILLER'S FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN TRIAL COUNSEL WAS INEFFECTIVE UNDER *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984) BY FAILING TO OFFER EVIDENCE TO MINIMIZE THE AGGRAVATING FACTOR OF PRIOR VIOLENT FELONY ARISING FROM MILLER'S PRIOR CONVICTION FOR SECOND DEGREE MURDER.**

In the penalty phase, the State relied upon Mr. Miller's North Carolina conviction for second degree murder to provide the basis for the establishment of the aggravating circumstance of prior violent felony.  The State offered into evidence only the judgment and sentence for this conviction.  No additional testimony as to the underlying facts of this conviction and subsequent sentence were introduced as evidence before the jury or trial court.

In sentencing Miller to death, the trial court paid particular attention to this conviction:

    The defendant's prior conviction for murder is most appalling and has been given great weight.  The court cannot imagine a greater aggravating factor unless it pertains to the method of the prior murder or the nature

96

of the victim.  This second murder by the defendant
occurred approximately four years from the date of the
defendant's early release from prison after serving a
mere seven years of his twenty-five year sentence.  The
Supreme Court of Florida has previously held that the
death sentence is appropriate, not mandatory, but
appropriate, in cases wherein one of the aggravating
factors proven is the defendant's prior conviction for
murder.

(PCR. 374-75) (citations omitted).[13]

Despite having readily available evidence, trial counsel

failed to present evidence that would have mitigated or neutralized

the weight of the prior violent felony conviction.  Records from

Dorothea Dix Hospital, where Miller was admitted pursuant to court

order for evaluation prior to trial, would have shed light on

Miller's mental state as well as the circumstances of the crime (PC

Ex. 1/A, Vol. II, Section 4).  According to the records, "This is

the first Dorothea Dix Hospital admission for this 26 year old,

black, single, male patient admitted on court order from Forsyth

County for evaluation of his capacity to proceed on current charges

of murder.  This patient has a history of outpatient treatment at

the Reynolds Mental Health Center and a history of one previous

hospitalization to that program in 1983."

As to the facts of the crime, the mental health records state:

---

[13]   The trial court had earlier assigned this aggravating factor
great weight in the sentencing order.

> Contacts with the patient's attorney describe this
> patient's current charges to be related to an incident
> that occurred at a rooming house where this patient
> lived.  The victim is another resident of the house.
> Reportedly, the victim and the patient had a brief
> discussion.  He went upstairs to sleep, saw the gun, and
> reportedly went downstairs and shot the victim.  No
> apparent history of conflict with the victim had been
> obtained.    The patient has previous history of
> psychiatric treatment with marks across his arms for
> previous suicide attempts.  This patient reportedly
> called the police from a public phone and walked along
> the street, stopping a policeman, and saying "I think
> you're looking for me."  The patient was reported to have
> stated at the time of his arrest that he hoped God would
> forgive him for shooting him.

(PC Ex. 1/A, Vol. II, Section 4)

While finding Miller competent to proceed to trial despite

then-trial counsel's belief that Miller was , the forensic

psychiatrist, Dr. Patricio Lara, diagnosed Miller with the

following mental illnesses: Axis I - Adjustment disorder with mixed

disturbance of emotions and conduct, alcohol abuse by history; Axis

II - Personality disorder, mixed, with avoidant schizoid paranoid

and borderline features (PC Ex. 1/A, Vol. II, Section 4).  As to

mitigating factors, Dr. Lara stated:

> If this case proceeds to the second phase for capital
> sentencing, the mitigating factors are (1) This patient
> presents history of alcohol intoxication at the time of
> the commission of his alleged offense and history of
> emotional problems associated with an underlying
> personality disorder. These two conditions combined **most
> probably impaired this patient's ability to appreciate
> the criminality of his conduct at the time of his alleged
> offenses and to conform his behavior to the requirements
> of the law.**

98

(PC Ex. 1/A, Vol. II, Section 4)(emphasis added).  Dr Lara also recommended further treatment:

> Mr. Miller presents evidence of depressive symptoms with anxiety, irritability, and withdrawn features.  Hi condition may further effect his abilities to cope with current stressful life situations.  We recommend this patient to be considered for psychiatric treatment prior and during the period of his trial in order to assist him in the handling of this particularly difficult situation. We recommend contacts with the local mental health center for this purpose.

(PC Ex. 1/A, Vol. II, Section 4).

While at Dorothea Dix Hospital, Miller was referred by Dr. Lara to the psychology department for psychological testing (PC Ex. 1/A, Vol. II, Section 4).  Amongst the findings made by the psychologist were the following:

> Mr. Miller was cooperative with the MMPI and his validity scales suggest that he feels badly, and is admitting to personal and emotional difficulties. Persons with this validity configuration are described as having a poor self-concept, labile, and dysphonic.  His clinical scales suggest someone who is an excessive worrier, introspective, withdrawn and hypersensitive. Persons with similar profiles are characterized as ruminative and overideational.  Such persons harbor chronic feelings of insecurity, inadequacy and inferiority. Passivity and passive-dependent traits are usually present.  Problems are often encountered in situations that demand strength, anger, or originality. These persons exhibit a lack of defense patterns which leaves them nervous around others and causes difficulty in forming interpersonal relationships.  This difficulty usually leads to withdrawal, isolation, and introversion. Persons with this profile are also said to have rich fantasy lives, especially about sexual matters. Diagnoses of schizoid personality and schizophrenia are the most common for this profile type. Mr. Miller's MMPI

also suggest impulsivity, restlessness, and irritability.
His projective data is supportive of the MMPI findings,
suggesting poor reality ties, introversion, and a desire
to minimize environmental contact.  Also suggested were
evasiveness,    defensiveness,    and    psychological
deterioration.  Negativism also appears to be present as
well as poor impulse controls and hostile acting-out
tendencies.   Finally,  he may tend to withdraw from
reality  using  fantasy  to  satisfy  need  which  his
environment does not meet.

(PC Ex. 1/A, Vol. II, Section 4).

While initially charged with first degree murder, Miller

ultimately pled guilty to second degree murder (R. 365).  In its

sentencing order, the court found as a mitigating circumstance that

Mr. Miller was suffering from a mental condition that, while

insufficient to constitute a defense, significantly reduced his

culpability for the offense (moved into evidence at T. 818-25).

Further, the court found as a mitigating circumstance that an early

stage of the criminal process, Miller voluntarily acknowledged

wrong doing in connection with the offense to a law enforcement

officer (moved into evidence at T. 818-25).

Due to trial counsel Eler's failure to explain and mitigate

the prior conviction, Miller was significantly prejudiced at trial.

Eler acknowledged that he believed the single most important factor

in the jury recommendation was the prior North Carolina conviction.

This  factor  was  certainly  the  most  important  sentencing

consideration to the trial judge as reflected in the sentencing

memorandum.  If the jury had knowledge of the underlying facts of
the conviction and Miller's mental state and conditions, especially
the findings of the North Carolina judge that Miller acted with
diminished capacity due to his mental illness, it is probable that
the sentencing recommendation would have been different.  Given
that death was recommended by a vote of 7-5, the slimmest of
margins, it is more than probable that the same jury would have
rendered a life recommendation.

The Florida Supreme Court's decision rejecting Miller's
ineffectiveness claim on state post-conviction review was contrary
to or at a minimum involved an unreasonable application of clearly
established federal law, as well as an unreasonable determination
of the facts.  *See* 28 U.S.C. 2254(d).  The Florida Supreme Court's
holding that trial counsel was reasonable in their failure to
present evidence challenging the prior violent felony (second
degree murder) aggravator because trial counsel wanted to "gloss
over" the conviction flies in the face of well-established United
States Supreme Court case law.  *See, e.g., Rompilla v. Beard*, 545
U.S. 374 (2005).  Additionally, it was an unreasonable
determination of facts as reflected in the state court record.  It
was far more harmful for a jury to only hear that Miller had a
previous murder conviction, than to hear that Miller, as a product
of his mental illness, appeared unable to conform his conduct to

law or appreciate the criminality of his actions at the time. Instead of hearing evidence that would have reinforced the current defense theory that Miller was extremely mentally ill and therefore less culpable, the jury was left with the inaccurate impression that Miller was inherently violent.

All other facts and allegations in this petition are incorporated into Ground II.

**Exhaustion of Ground II in state courts:**

1) **Did you raise Ground II in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground II in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes.

   a) **If your answer is "yes", then state:**

      i. **Date motion filed:** September 17, 2001, stricken on January 8, 2002. A new 3.851 motion was filed on March 11, 2002, and both parties stipulated that the March 11, 2002 motion related back to October 2, 2001.

      ii. **Whether you received an evidentiary hearing:** Yes.

      iii. **Result:** Denied.
      iv. **Date of Result:** April 22, 2004.

   b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes.

      i. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

      ii. **Date appeal filed, result of appeal, date of**

> **result:** Notice of appeal filed on or about May 24,
> 2004.  The Florida Supreme Court affirmed the
> denial of relief. *Miller v. State*, 926 So. 2d 1243
> (Fla. 2006), mandate issued April 13, 2006.

3)    **Have you raised Ground II in any other petition, application,
      or motion filed in the state courts of Florida?** No.


### GROUND III

**TRIAL COUNSEL WAS INEFFECTIVE UNDER *STRICKLAND V.
WASHINGTON*, 466 U.S. 668 (1984) IN FAILING TO OBJECT TO
CLEARLY ERRONEOUS, IMPROPER AND PREJUDICIAL CLOSING
ARGUMENT BY THE STATE.  APPELLATE COUNSEL WAS INEFFECTIVE
IN FAILING TO RAISE THIS ISSUE ON APPEAL. THIS VIOLATED
MILLER'S FEDERAL CONSTITUTIONAL RIGHTS.**

During closing arguments at the guilt phase, the prosecutor

improperly argued to the jury that this case would have been a

double-homicide because Miller would have killed Fullwood but for

the actions of a third-party:

> He starts trying to kill Linda Fullwood, and he would
> have continued to try to kill Linda Fullwood except for
> Jimmy Hall arriving at the scene.
>
> * * *
>
> I would submit to you that, if Jimmy Hall had not come up
> when he did come up responding to the cries of Linda
> Fullwood, from the evidence that you've heard, what do
> you suppose the defendant would have done?
>
> * * *
>
> From the evidence that you heard, if Jimmy Hall had not
> come up, what do you suppose the defendant would have
> done?

He would have completed that robbery. He would have
beaten Linda Fullwood until she had stopped crying out –
may very well have killed her in an attempt to silence
her – and would have taken that property. He would have
completed his robbery.

But I submit to you that, if Jimmy Hall had not responded
– frankly it was the courage of Jimmy Hall to respond to
the cries for help to go back behind that building to
save Linda Fullwood's life.

* * *

Linda Fullwood woke up. He didn't stop at that. He was
going to kill her – I submit to you – until Jimmy Hall
came up. Then, when Jimmy Hall came up, the defendant
fled.

* * *

He had the courage to go back there, and he was the one
who saw the defendant and stopped that defendant from his
robbery attempt and stopped him from possibly committing
a second murder on Linda Fullwood in his attempt to
commit his robbery.

(T. 698, 703, 704, 710, 716-17).

The prosecutor also improperly vouched for the credibility of

his witness, Jimmy Hall:

You heard from Jimmy Hall. Now, I'm not here to tell you
that Jimmy Hall is the kind of guy that you want to move
in next door to you or that you want to date your
daughter.

He's a convicted felon, and he admitted that to you. But
he's come here, and he's told you the truth.

(T. 716). Whether Hall was telling the truth or not was an

ultimate issue solely within the jury's purview and such an

argument made by the State was improper.

104

Finally, during the penalty phase closing, the prosecutor urged the jury to reject as a mitigating factor the positive family relationships that Miller had:

> The defendant didn't care that Albert Floyd had a wife. He didn't care that Albert Floyd had children. He didn't care that Albert Floyd had grandchildren. He didn't care that he had family and friends who loved and cared for him. He didn't care. Now he wants you to care for him. He wants you to recommend a life sentence for him.
>
> * * *
>
> The defendant wants you to only hear that there are people who love and care for the defendant. He wants you to hear and focus on his life, his family, his problems, doesn't really want you to hear about Albert Floyd, that he had a wife, children, grandchildren. Wants you to forget that he was a hard working man who worked to support his family. Doesn't want you to think about the people who loved and cared for Albert Floyd.

(T. 946, 966). Not only was this argument improper as detracting the jurors from their proper function as fact finders relating to aggravating and mitigating circumstances, but also the argument was an improper appeal to the sympathies of the jurors for the victim.

Miller submits that trial counsel's performance fell below an objective standard of reasonableness under *Strickland v. Washington*, 466 U.S. 668 (1984), when he failed to ensure by proper objection that either a mistrial was granted or appellate review would be possible for these repeated instances of prosecutorial misconduct. Moreover, each of the objectionable and prejudicial arguments made by the prosecutor in this case constituted

fundamental error.  There is no strategy which would justify the
omission of this argument on direct appeal by Miller's appellate
counsel.  Habeas relief is warranted.

The Florida Supreme Court's decision rejecting Miller's
ineffectiveness claim on state post-conviction review was contrary
to or at a minimum involved an unreasonable application of clearly
established federal law, as well as an unreasonable determination
of the facts, particularly when viewed in conjunction with the
facts as laid out in Ground II.  *See* 28 U.S.C. 2254(d).

All other facts and allegations in this petition are
incorporated into Ground III.

**Exhaustion of Ground III in state courts:**

1) **Did you raise Ground III in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground IV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes.

   a) **If your answer is "yes", then state:**

      i. **Date motion filed:** September 17, 2001, stricken on January 8, 2002.  A new 3.851 motion was filed on March 11, 2002, and both parties stipulated that the March 11, 2002 motion related back to October 2, 2001.

      ii. **Whether you received an evidentiary hearing:** No.

      iii. **Result:** Denied.
      iv. **Date of Result:** April 22, 2004.

    **b)** **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes.

        **i.** **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

        **ii.** **Date appeal filed, result of appeal, date of result:** Notice of appeal filed on or about May 24, 2004. The Florida Supreme Court affirmed the denial of relief. *Miller v. State*, 926 So. 2d 1243 (Fla. 2006), mandate issued April 13, 2006.

**3)** **Have you raised Ground III in any other petition, application, or motion filed in the state courts of Florida?** Yes. The ineffective assistance of appellate counsel portion of Ground III was raised in a petition for writ of habeas corpus which was filed on March 17, 2005 in the Florida Supreme Court. The petition was denied. *Miller v. State*, 926 So. 2d 1243 (Fla. 2006), mandate issued April 13, 2006.

### GROUND IV

**MILLER'S FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE JURY IN THE PENALTY PHASE WAS IMPROPERLY MINIMIZED AND DENIGRATED IN VIOLATION OF *CALDWELL v. MISSISSIPPI*, 472 U.S. 320 (1985).**

Throughout Miller's trial, the jury was repeatedly told that its penalty phase determination was merely advisory:

The law calls them – well, listen to the additional evidence and then the jury will make a recommendation to the judge. Then the judge takes that sentencing recommendation and he has to give it great weight, and then he'll make the final sentencing decision.

\* \* \*

Now, at this point it is important for you to understand that the judge can impose a death sentence no matter what the jury recommends and he can impose a life sentence

even if the jury recommends a death sentence, but you must also realize this; whatever the jury recommends the judge must give that great weight.

* * *

...the only proper recommendation is a recommendation of death for you to make to this judge so that this judge has some guidance as to what sentence to impose.

* * *

After hearing such aggravating and mitigating circumstances and the arguments of the attorneys, the jury will then make an advisory sentencing recommendation to the court as to whether David Miller should be sentenced to death or life imprisonment without the possibility of parole.

(T. 5, 126, 127, 968; see also T. 985-90).

By repeatedly advising the jury that their verdict is only advisory and a recommendation, and with the jury being told that the decision as to sentence rests solely with the court, Miller's jury was not adequately and correctly informed as to their role in the Florida sentencing process. The jury instructions suggested that the decision of deciding the appropriateness of a death sentence rests with the court and not them. These instructions minimized the jury's sense of responsibility for determining the appropriateness of a death sentence.

The Florida Supreme Court's decision rejecting Miller's claim of error on post-conviction review was contrary to or at a minimum involved an unreasonable application of clearly established federal

law, as well as an unreasonable determination of the facts. *See* 28 U.S.C. 2254(d).

All other facts and allegations in this petition are incorporated into Ground IV.

**Exhaustion of Ground IV in state courts:**

1) **Did you raise Ground IV in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground IV in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** Yes.

    a) **If your answer is "yes", then state:**

        i. **Date motion filed:** September 17, 2001, stricken on January 8, 2002. A new 3.851 motion was filed on March 11, 2002, and both parties stipulated that the March 11, 2002 motion related back to October 2, 2001.

        ii. **Whether you received an evidentiary hearing:** Not on this claim.

        iii. **Result:** Denied.

        iv. **Date of Result:** April 22, 2004.

    b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** Yes.

        i. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

        ii. **Date appeal filed, result of appeal, date of result:** Notice of appeal filed on or about May 24, 2004. The Florida Supreme Court affirmed the denial of relief. *Miller v. State*, 926 So. 2d 1243 (Fla. 2006), mandate issued April 13, 2006.

3)    **Have you raised Ground IV in any other petition, application, or motion filed in the state courts of Florida?** No.

### GROUND V

**MILLER'S FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN THE STATE COURT ERRED IN FAILING TO FIND MITIGATING CIRCUMSTANCES ESTABLISHED BY THE EVIDENCE.**

In the instant case, evidence was presented by Miller that he suffered an abusive home environment during his early childhood. This evidence included the fact that Miller's father was an alcoholic and was physically abusive to his wife and children (T. 839-41, 864-67, 926-27).  During one incident of abuse, Miller's father grabbed his mother and choked her (T. 865).  She managed to get away from him, but he chased after her (T. 865).  Miller's mother escaped after shooting a firearm to keep his father away from her (T. 865).  Unfortunately, Miller's father turned his anger toward the children, beating them all with an electrical cord (T. 866).

Other incidents of abuse included Miller's mother being hit with a soda bottle and the children being beaten with belts  (T. 841, 865).  The children did not have a relationship with their father because he was an alcoholic and emotionally uninvolved with them (T. 864-65).

Additionally, Miller presented evidence that he suffered from

long term drug and alcohol abuse.  Miller appeared to be a
different person after he returned from the Navy (T. 847, 871-72,
930).  His drug and alcohol use changed his personality and made
him a different person (T. 847-49, 872-73).  Dr. Krop found
Miller's primary diagnosis to be alcohol abuse and depression (T.
898-99).

After hearing the testimony concerning childhood abuse as well
as drug and alcohol abuse, the trial court rejected each as a
mitigating circumstance.  With regard to the former, the trial
court stated:

> (7)  The defendant has an abusive childhood and the
> defendant's father was an alcoholic.
>
> While these two mitigating factors were listed
> separately by defendant they shall be considered as one
> by the court since they are so related.
>
> Defendant's mother, brother and sister all testified
> regarding defendant's early childhood when the father was
> still in the home.  The father apparently did abuse
> alcohol and on a few occasions he was abusive primarily
> to defendant's mother and sometimes to the children
> including defendant.  The father was out of the home by
> the time defendant reached his thirteenth birthday.  The
> defendant was raised in the home of his maternal
> grandparents.  Their home was apparently filled with much
> love and support.  However, defendant's brother and
> sister have been law abiding citizens and have earned
> professional careers even though they were raised in the
> same environment as the defendant.  Defendant's sister is
> a law enforcement officer with the city of Durham, North
> Carolina.  Defendant's mother indicated the defendant was
> bright and creative and that he was regularly taken to
> church and Sunday School.  In fact, the witnesses
> described a very close, loving and supportive family.

> Although there is some aspects of the defendant's family
> background that may provide slight mitigation, the
> totality of the defendant's family background is not
> mitigating, thus the court has not considered it as such
> and given it no weight in determining the sentence to be
> imposed.

(R. 369-70).

   With regard to Miller's drug and alcohol abuse, the trial

court stated:

> (9) The defendant had an alcohol and/or drug problem.
>
> It was shown that defendant did abuse alcohol and drugs
> during the course of his adult life. His family tried to
> offer the defendant assistance. He was asked to leave
> his mother's home because of his unwillingness to seek
> help and give up his use of alcohol and drugs. However,
> while the defendant admitted to using drugs and alcohol
> on the night of this homicide, there is no convincing
> evidence that defendant was intoxicated or under the
> influence of drugs or alcohol at the time of this
> attempted robbery and murder. It is apparent that the
> defendant, notwithstanding the offer of help from his
> family, intentionally chose his life on the street,
> including the use of drugs and alcohol. Therefore, the
> court does not consider this as a mitigating factor and
> shall not give it any weight in the consideration of the
> sentence to be imposed.

(R. 370-71).

   Miller submits that the trial court erroneously failed to

consider valid mitigation, resulting in a fundamentally unfair

trial and violating his right to due process under the Fourteenth

Amendment. As a result, the sentencing process was skewed and his

death sentence is unconstitutional. Habeas relief is warranted.

   The Florida Supreme Court's decision rejecting Miller's claim

on direct appeal review was contrary to or at a minimum involved an
unreasonable application of clearly established federal law, as
well as an unreasonable determination of the facts.  *See* 28 U.S.C.
2254(d).  Where evidence is sufficient to support mitigation,
Miller's trial judge violated his federal Constitutional rights by
failing to consider that mitigation.  *See Parker v. Dugger*, 498
U.S. 308 (1991); Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett
v. Ohio, 438 U.S. 586 (1978)(plurality opinion).

To the extent that this Court finds it was reasonable to find
no error in upholding the trial court's rejection of these
mitigators, Miller submits that trial counsel was ineffective for
failing to fully investigate and present evidence regarding
Miller's abusive childhood background, mental illness, and
substance abuse.  *See supra* Claim One.

All other facts and allegations in this petition are
incorporated into Ground V.

**Exhaustion of Ground V in state courts:**

**1)    Did you raise Ground V in the Florida Supreme Court on a
direct appeal of your conviction?** Yes.

**2)    After your conviction, did you raise Ground V in the state
circuit court that sentenced you by filing a motion under
Florida Rule of Criminal Procedure 3.850?** No.

   **a)  If your answer is "yes", then state:**

      **i.  Date motion filed:** N/A.

    **ii. Whether you received an evidentiary
hearing:** N/A.

    **iii. Result:** N/A.

    **iv. Date of Result:** N/A.

b)    **If your Rule 3.850 Motion was denied, did you file an
appeal of that denial with the Supreme Court of Florida?**
N/A.

    **i.  If you failed to appeal the denial of your Rule
3.850 motion, explain briefly why:** N/A.

    **ii.  Date appeal filed, result of appeal, date of
result:** N/A.

3)    **Have you raised Ground V in any other petition, application,
or motion filed in the state courts of Florida?** No.

### GROUND VI

**MILLER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BY FLORIDA'S
PRIOR CAPITAL SENTENCING SCHEME, WHICH DENIED HIM A JURY
DETERMINATION OF EACH OF THE FACTS NECESSARY TO IMPOSE A
DEATH SENTENCE UNDER STATE LAW, AND WHICH FAILED TO
REQUIRE JURY UNANIMITY TO IMPOSE A DEATH SENTENCE.**

Miller's death sentence violates the dictates of *Hurst v.
Florida*, 136 S.Ct. 616 (2016), and *Hurst v. State*, 202 So. 3d 20
(Fla. 2016). In *Hurst v. Florida*, the United States Supreme Court
held that Florida's capital sentencing scheme violated the Sixth
Amendment because it required the judge, not the jury, to make the
findings of fact necessary to impose the death penalty under
Florida law. 136 S.Ct. at 620-22. Those findings included: 1) the
aggravating factors that were proven beyond a reasonable doubt; 2)

114

whether those aggravators were "sufficient" to justify the death
penalty; and 3) whether those aggravators outweighed the
mitigation. Florida's unconstitutional scheme, however, had an
advisory jury render a generalized recommendation for life or death
by a majority vote, without specifying the factual basis for the
recommendation, and then empowered the sentencing judge alone,
notwithstanding the jury's recommendation, to conduct the required
fact-finding. *Id*. at 622. The Court held that the jury, not the
judge, must make the findings of fact required to impose the death
penalty. *Id*.

In *Hurst v. State*, the Florida Supreme Court explained that
the Eighth Amendment also requires unanimous jury fact-finding as
to 1) which aggravating factors were proven; 2) whether those
aggravators were sufficient to impose the death penalty; and 3)
whether those aggravators outweighed the mitigation. 202 So. 3d at
53-59. Each of those determinations are elements that must be
found by a jury unanimously and beyond a reasonable doubt. *Id*. at
57. In addition to rendering unanimous findings on each of those
elements, the Florida Supreme Court explained that the jury must
unanimously recommend the death penalty before a death sentence may
be imposed. *Hurst*, 202 So. 3d at 57 ("[B]efore the trial judge may
consider imposing a sentence of death, the jury in a capital case
must unanimously and expressly find all the aggravating factors

115

that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death."). The Florida Supreme Court cautioned that, even if the jury unanimously found that each of the elements required to impose the death penalty was satisfied, the jury was not required to recommend the death penalty. *Id*. at 57-58 ("We equally emphasize that . . . we did not intend to diminish or impair the jury's right to recommend a sentence of life even if it finds the aggravating factors were proven, were sufficient to impose death, and that they outweigh the mitigating circumstances.").

Miller's jury was never asked to make unanimous findings as to any of the elements required to impose a death sentence under Florida law. Instead, after being instructed that its verdict was advisory, and that the ultimate responsibility for imposing a death sentence rested with the judge, *supra* Claim IV, Miller's jury rendered a non-unanimous, generalized advisory recommendation to impose the death penalty. The record does not reveal whether the jurors unanimously agreed that any particular aggravating factor was proven beyond a reasonable doubt, or unanimously agreed that those aggravators were sufficient to impose the death penalty, or unanimously agreed that those aggravators outweighed the

116

mitigation.  However, the record is clear that Miller's jurors were
not unanimous as to whether the death penalty should even be
recommended to the court.  Indeed, they rendered a death verdict by
the slimmest possible margin: 7 to 5.  Miller's death sentence
violates the Sixth and Eighth Amendments to the United States
Constitution.

The Florida Supreme Court's *Hurst* retroactivity cutoff, drawn
at *Ring v. Arizona*, 536 U.S. 584 (2002) has allowed for the
arbitrary and capricious application of Florida's death penalty, in
violation of the Eighth Amendment, and denied Miller–a pre-*Ring*
prisoner–the equal protection of the laws, in violation of the
Eighth Amendment.

The Florida Supreme Court's decision rejecting Miller's claim
on state habeas review was contrary to or at a minimum involved an
unreasonable application of clearly established federal law, as
well as an unreasonable determination of the facts.  *See* 28 U.S.C.
2254(d).  The Florida Supreme Court's opinion denying *Hurst* relief
in Miller's case involved no merits review of his federal
Constitutional claims, and simply stated that because Miller's
sentence of death became final in 2001, *Hurst* did not apply
retroactively.  *Miller v. State,* 237 So. 3d 921 (Fla. 2018),
rehearing stricken February 26, 2018, certiorari denied October 29,
2018.

Although there is a general rebuttable presumption that when a federal claim is not discussed in a state court's decision, it was nonetheless rejected by the state court on the merits, that presumption is rebutted here by the Florida Supreme Court's erroneous belief that its state-law retroactivity cutoff is not subject to federal constitutional scrutiny. In its opinion in Miller's case specifically, like its opinions in approximately 100 similar pre-*Ring* cases, the Florida Supreme Court did not reference federal law at all, even though Miller's arguments focused almost exclusively on the Eighth and Fourteenth Amendments. When Miller filed a motion for rehearing imploring the Florida Supreme Court to address his federal constitutional arguments, the Florida Supreme Court continued to refuse to discuss federal law. Thus, there was no adjudication on the merits.

Even if this Court concludes that the Florida Supreme Court *did* decide Miller's Eighth and Fourteenth Amendment claims on the merits, the Court should still grant Miller federal habeas relief under *Hurst* because the Florida Supreme Court's decision was contrary to, or involved an unreasonable application of, clearly established federal law within the meaning of 2254(d). Although the United States Supreme Court has clearly articulated the relevant Eighth and Fourteenth Amendment standards, the Florida Supreme Court has contravened or, at a minimum unreasonably

118

applied, those standards with respect to its *Hurst* retroactivity
cutoff.  This is particularly harmful in Miller's case, where he
received a death sentence by the barest margin (7 to 5).  It is
also particularly harmful in Miller's case because Miller's death
sentence became final shortly before the cutoff drawn by the
Florida Supreme Court at *Ring*, and after *Apprendi v. New Jersey*,
523 U.S. 224 (1998), which was the foundation for both *Ring* and
*Hurst*.  Additionally, there is a *Caldwell* error inherent in every
*Hurst* error, which provides an additional Eighth Amendment basis
for Miller's assertion that the *Hurst* retroactivity cutoff denied
relief in a manner resulting in arbitrary application of the death
penalty.  *See supra* Claim IV.

All other facts and allegations in this petition are
incorporated into Ground VI.

**Exhaustion of Ground VI in state courts:**

1)    **Did you raise Ground VI in the Florida Supreme Court on a
      direct appeal of your conviction?** No.

2)    **After your conviction, did you raise Ground VI in the state
      circuit court that sentenced you by filing a motion under
      Florida Rule of Criminal Procedure 3.850?** No, but Miller's
      post-conviction counsel did challenge his sentence under
      *Apprendi v. New Jersey*, 120 S. Ct. 2348 (2000) in his 3.850
      motion.

      a)  **If your answer is "yes", then state:**

          I.  **Date motion filed:** N/A.

119

       **ii. Whether you received an evidentiary hearing:** N/A.

       **iii. Result:** N/A.

       **iv. Date of Result:** N/A.

   **b)** **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A.

       **I.** **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

       **ii.** **Date appeal filed, result of appeal, date of result:** N/A.

**3)** **Have you raised Ground VI in any other petition, application, or motion filed in the state courts of Florida?** Yes. Ground VI was raised in a petition for writ of habeas corpus that was filed on June 28, 2017 in the Florida Supreme Court. The petition was denied on January 31, 2018. *Miller v. State,* 237 So. 3d 921 (Fla. 2018), rehearing stricken February 26, 2018, certiorari denied October 29, 2018.

. . . .

**15.** **Have you previously filed any petitions, applications, or motions with respect to your judgment and conviction in any federal court?** No.

**16.** **If your answer to 16 was "yes," give the following information: 1) Name of court; 2) Nature of proceedings and date action filed; 3) Grounds raised.** N/A.

**17.** **Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?** No.

**18.** **If you have previously filed a petition for writ of habeas corpus related to this conviction and sentence in federal court, you must first move in the appropriate court of appeal for an order authorizing the federal district court to consider the application. Have you filed such a motion?** N/A.

19. **Give the name and address, if known, of each attorney who represented you in the following stages of judgment attacked herein:**

   a) **At preliminary hearing:**

   Public Defender's Office for the Fourth Judicial Circuit.

   b) **At arraignment and plea:**

   Same

   c) **At trial:**

   Refik Eler.

   d) **At sentencing:**

   Same.

   e) **On appeal:**

   Nancy A. Daniels and W.C. McLain.

   f) **In any post-conviction proceeding:**
   Capital Collateral Representative kna/ Capital Collateral Regional Counsel; Heidi Brewer, Robert A. Norgard, Registry counsel.

   g) **On appeal from any adverse ruling in post-conviction proceeding:**

   Robert A. Norgard, Registry counsel.

20. **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?** Yes.

21. **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No, death.

   a) **If so, give name and location of court which imposed sentence to be served in the future:** N/A.

121

b)    **Date and length of sentence to be served in the future**: N/A.

c)    **Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?** N/A.

### GROUND VII

**MILLER'S CONVICTION AND DEATH SENTENCE VIOLATE THE FEDERAL CONSTITUTION BECAUSE HE WAS NOT COMPETENT TO STAND TRIAL.**

Miller's state conviction and death sentence violate the federal Constitution because Miller was not competent at the time of his trial. As the facts above demonstrate, Miller's psychiatric disorders, especially when coupled with his brain damage and trauma history, rendered him incompetent to be tried for capital murder. Due to his incompetency during all critical stages of his trial and appeals process, Miller's continued confinement on death row violates the Fifth, Sixth, Eighth, and Fourteenth Amendments. Additionally, undersigned counsel have consulted with Dr. Krop, who asserts that he was unaware of the full range of information regarding Miller's auditory hallucinations, religious preoccupation, and delusions as assessed by Dr. Regnier. Dr. Krop stated that had he been aware of these facts, he would certainly have had concerns that Miller was incompetent to proceed, and would have recommended a renewed competency evaluation.

Criminal proceedings against an incompetent defendant violate due process. *Drope v. Missouri*, 420 U.S. 162, 171 (1975). This due process right cannot be waived. *Pate v. Robinson*, 383 U.S. 375, 384 (1966).

At the time of Miller's trial, he did not have the capacity to consult with his counsel with a reasonable degree of understanding, and he did not have a rational and factual understanding of the legal proceedings to which he was subjected. *Dusky v. United States*, 362 U.S. 402 (1960).

The evidence presented by Miller, taken as a whole, demonstrates his incompetency by a preponderance of the evidence. *James v. Singletary*, 957 F.2d 1562 (11th Cir. 1992).

To the extent that the State argues procedural default of this claim, Miller asserts that post-conviction counsel's failure to raise this claim during state court litigation amounts to cause for overcoming procedural default, and the error was prejudicial to Miller.

All other facts and allegations in this petition are incorporated into Ground VII.

**Exhaustion of Ground VII in state courts:**

1)  **Did you raise Ground VII in the Florida Supreme Court on a direct appeal of your conviction?** No.

2)  **After your conviction, did you raise Ground VII in the state circuit court that sentenced you by filing a motion under**

Florida Rule of Criminal Procedure 3.850? No.

a)  If your answer is "yes", then state:

    I.  Date motion filed: N/A.

    ii. Whether you received an evidentiary
       hearing: N/A.

    iii. Result: N/A.

    iv. Date of Result: N/A.

b)  If your Rule 3.850 Motion was denied, did you file an
    appeal of that denial with the Supreme Court of Florida?
    N/A.

    I.  If you failed to appeal the denial of your Rule
       3.850 motion, explain briefly why: N/A.

    ii. Date appeal filed, result of appeal, date of
       result: N/A.

3)  Have you raised Ground VII in any other petition, application,
or motion filed in the state courts of Florida? No.

. . . .

15. Have you previously filed any petitions, applications, or
motions with respect to your judgment and conviction in any
federal court?  No.

16. If your answer to 16 was "yes," give the following
information: 1) Name of court; 2) Nature of proceedings and
date action filed; 3) Grounds raised.  N/A.

17. Do you have any petition or appeal now pending in any court,
either state or federal, as to the judgment under attack? No.

18. If you have previously filed a petition for writ of habeas
corpus related to this conviction and sentence in federal
court, you must first move in the appropriate court of appeal
for an order authorizing the federal district court to

consider the application.  Have you filed such a motion?  N/A.

19. **Give the name and address, if known, of each attorney who represented you in the following stages of judgment attacked herein:**

   a)  **At preliminary hearing:**

   Public Defender's Office for the Fourth Judicial Circuit.

   b)  **At arraignment and plea:**

   Same

   c)  **At trial:**

   Refik Eler.

   d)  **At sentencing:**

   Same.

   e)  **On appeal:**

   Nancy A. Daniels and W.C. McLain.

   f)  **In any post-conviction proceeding:**
   Capital Collateral Representative kna/ Capital Collateral Regional Counsel; Heidi Brewer, Robert A. Norgard, Registry counsel.

   g)  **On appeal from any adverse ruling in post-conviction proceeding:**

   Robert A. Norgard, Registry counsel.

20. **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?**  Yes.

21. **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No, death.

   a)  **If so, give name and location of court which imposed**

125

**sentence to be served in the future**: N/A.

b) **Date and length of sentence to be served in the future**: N/A.

c) **Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?** N/A.

### GROUND VIII

**MILLER'S FEDERAL CONSTITUTIONAL RIGHTS WERE VIOLATED WHEN TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE UNDER *STRICKLAND V. WASHINGTON*, 466 U.S. 668 (1984) IN FAILING TO INVESTIGATE AND PRESENT EVIDENCE THAT MILLER WAS INCOMPETENT AT THE TIME OF HIS TRIAL.**

Miller's state conviction and death sentence violate the federal Constitution because defense counsel failed to investigate and present evidence that Miller was not competent to stand trial. This violated Miller's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

Trial counsel's failure prejudiced Miller. Once a genuine doubt has been raised as to a defendant's competency, the court must conduct a competency hearing. *Pate v. Robinson*, 383 U.S. 375 (1966). The defendant cannot waive the hearing.

Dr. Krop evaluated Miller in October and November of 1997, and made a cursory competency finding without full record review. Despite the numerous and continuous red flags that Miller was not competent to stand trail, no further inquiry was conducted regarding his competency. Trial counsel failed to raise the issue

126

of Miller's incompetency to the court.  Counsel was obligated to investigate Miller's competency by retaining an expert to conduct a competency assessment of Miller or by requesting that the court appoint an expert for such purpose.  *Agan v. Singletary*, 12 F.3d 1012 (11th Cir. 1994).

Dr. Krop's 1997 evaluation–at prior attorney Chipperfield's request–does not absolve trial counsel's failure to investigate red flags of Miller's incompetency closer to the time of trial.  Any finding that Miller was competent in October of 1997 does not mean Miller was competent several months later at the time of his trial.  *Drope v. Mississippi*, 420 U.S. 162 (1975).  Additionally, undersigned counsel have consulted with Dr. Krop, who asserts that he was unaware of the full range of information regarding Miller's auditory hallucinations, religious preoccupation, and delusions as assessed by Dr. Regnier.  Dr. Krop stated that had he been aware of these facts, he would certainly have had concerns that Miller was incompetent to proceed, and would have recommended a renewed competency evaluation.

If trial counsel had competently investigated, they would have seen that Miller was not competent to stand trial, or they would have questioned his competency enough to require an evaluation.  Miller had voluminous medical records diagnosing him with multiple psychiatric and neuropsychiatric disorders (most if which not all

predate his crime and trial). Miller's family history was rife with biological risk factors for schizophrenia and psychosis. Further, counsel was on notice that Miller had a longstanding drug and alcohol history, and that drugs impact brain chemistry long after physical withdrawal is complete. There is a reasonable probability that a timely and adequate assessment would have concluded Miller was not competent to stand trial. *Alexander v. Dugger*, 841 F.2d 371, 375 (11th Cir. 1988).

Trial counsel's representation fell below an objective level of reasonableness and, but for counsel's deficient performance, there is a reasonable likelihood that an evaluation would have found him incompetent. *Strickland v. Washington*, 466 U.S. 688 (1984).

Had trial counsel conducted a reasonable investigation, including investigating Miller's mental health and trauma history, they would have uncovered readily available evidence detailed above that Miller was not competent to proceed with his trial. Miller's conviction and sentence therefore cannot withstand constititional scrutiny.

To the extent that Respondent argues procedural default of this claim, Miller asserts that post-conviction counsel's failure to raise this claim during initial collateral review amounts to cause for overcoming procedural default, and the error was

prejudicial to Miller.

All other facts and allegations in this petition are incorporated into Ground VIII.

**Exhaustion of Ground VIII in state courts:**

1) **Did you raise Ground VIII in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground VIII in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

    a) **If your answer is "yes", then state:**

        I. **Date motion filed:** N/A.

        ii. **Whether you received an evidentiary hearing:** N/A.

        iii. **Result:** N/A.

        iv. **Date of Result:** N/A.

    b) **If your Rule 3.850 Motion was denied, did you file an appeal of that denial with the Supreme Court of Florida?** N/A.

        I. **If you failed to appeal the denial of your Rule 3.850 motion, explain briefly why:** N/A.

        ii. **Date appeal filed, result of appeal, date of result:** N/A.

3) **Have you raised Ground VIII in any other petition, application, or motion filed in the state courts of Florida?** No.

. . . .

15. **Have you previously filed any petitions, applications, or motions with respect to your judgment and conviction in any**

**federal court?**  No.

16. **If your answer to 16 was "yes," give the following
    information: 1) Name of court; 2) Nature of proceedings and
    date action filed; 3) Grounds raised.**  N/A.

17. **Do you have any petition or appeal now pending in any court,
    either state or federal, as to the judgment under attack?** No.

18. **If you have previously filed a petition for writ of habeas
    corpus related to this conviction and sentence in federal
    court, you must first move in the appropriate court of appeal
    for an order authorizing the federal district court to
    consider the application. Have you filed such a motion?** N/A.

19. **Give the name and address, if known, of each attorney who
    represented you in the following stages of judgment attacked
    herein:**

    a)   **At preliminary hearing:**

         Public Defender's Office for the Fourth Judicial Circuit.

    b)   **At arraignment and plea:**

         Same

    c)   **At trial:**

         Refik Eler.

    d)   **At sentencing:**

         Same.

    e)   **On appeal:**

         Nancy A. Daniels and W.C. McLain.

    f)   **In any post-conviction proceeding:**
         Capital Collateral Representative kna/ Capital Collateral
         Regional Counsel; Heidi Brewer, Robert A. Norgard,
         Registry counsel.

     **g)**    **On appeal from any adverse ruling in post-conviction proceeding:**

     Robert A. Norgard, Registry counsel.

**20.**  **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?** Yes.

**21.**  **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No, death.

     **a)**   **If so, give name and location of court which imposed sentence to be served in the future:** N/A.

     **b)**   **Date and length of sentence to be served in the future:** N/A.

     **c)**   **Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?** N/A.

### GROUND IX

**THE CUMULATIVE EFFECT OF THE FEDERAL CONSTITUTIONAL ERRORS BY THE STATE COURTS UNDERMINE THE RELIABILITY OF MILLER'S CONVICTION AND DEATH SENTENCE UNDER THE EIGHTH AMENDMENT.**

The cumulative effect of the federal constitutional errors by the state courts, including those described above, undermine the reliability of Miller's conviction and death sentences, in violation of the Eighth Amendment. As a result of the errors, which had a substantial and injurious effect on determining the outcome of the proceedings, Miller's death sentence is not legitimate and does not carry the societal appearance of legitimacy

131

required for the death penalty. *See, e.g., Gardner v. Florida*, 430 U.S. 349, 357-58 (1977); *Beck v. Alabama*, 477 U.S. 625, 637 (1980); *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

Each claim in this petition individually warrants relief. However, even if the Court does not grant relief on any individual claim, it should consider the errors in the case cumulatively and grant relief on that basis. Considered cumulatively, the federal constitutional errors in Miller's case had a prejudicial effect on the outcome. But for the errors, Miller would not be on death row.

To the extent that Respondent argues procedural default of this claim, Miller asserts that post-conviction counsel's failure to raise this claim during initial collateral review amounts to cause for overcoming procedural default, and the error was prejudicial to Miller.

All other facts and allegations in this petition are incorporated into Ground IX.

**Exhaustion of Ground IX in state courts:**

1) **Did you raise Ground IX in the Florida Supreme Court on a direct appeal of your conviction?** No.

2) **After your conviction, did you raise Ground IX in the state circuit court that sentenced you by filing a motion under Florida Rule of Criminal Procedure 3.850?** No.

   a) **If your answer is "yes", then state:**

      I. **Date motion filed:** N/A.

       ii. **Whether you received an evidentiary
hearing**: N/A.

       iii. **Result**: N/A.

       iv. **Date of Result**: N/A.

  b)   **If your Rule 3.850 Motion was denied, did you file an
appeal of that denial with the Supreme Court of Florida?**
N/A.

     I.   **If you failed to appeal the denial of your Rule
3.850 motion, explain briefly why**: N/A.

     ii.  **Date appeal filed, result of appeal, date of
result**: N/A.

3)   **Have you raised Ground IX in any other petition, application,
or motion filed in the state courts of Florida?** No.

            . . . .

15.  **Have you previously filed any petitions, applications, or
motions with respect to your judgment and conviction in any
federal court?** No.

16.  **If your answer to 16 was "yes," give the following
information: 1) Name of court; 2) Nature of proceedings and
date action filed; 3) Grounds raised.** N/A.

17.  **Do you have any petition or appeal now pending in any court,
either state or federal, as to the judgment under attack?** No.

18.  **If you have previously filed a petition for writ of habeas
corpus related to this conviction and sentence in federal
court, you must first move in the appropriate court of appeal
for an order authorizing the federal district court to
consider the application. Have you filed such a motion?** N/A.

19.  **Give the name and address, if known, of each attorney who
represented you in the following stages of judgment attacked
herein:**

    **a)**   **At preliminary hearing:**

        Public Defender's Office for the Fourth Judicial Circuit.

    **b)**   **At arraignment and plea:**

        Same

    **c)**   **At trial:**

        Refik Eler.

    **d)**   **At sentencing:**

        Same.

    **e)**   **On appeal:**

        Nancy A. Daniels and W.C. McLain.

    **f)**   **In any post-conviction proceeding:**
        Capital Collateral Representative kna/ Capital Collateral
        Regional Counsel; Heidi Brewer, Robert A. Norgard,
        Registry counsel.

    **g)**   **On appeal from any adverse ruling in post-conviction proceeding:**

        Robert A. Norgard, Registry counsel.

**20.**  **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?**  Yes.

**21.**  **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?**  No, death.

    **a)**   **If so, give name and location of court which imposed sentence to be served in the future:** N/A.

    **b)**   **Date and length of sentence to be served in the future:** N/A.

134

**c)    Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?** N/A.

**CONCLUSION**

For the reasons stated herein, the judgements and sentences of Miller should be reversed.

Respectfully submitted,

/s/TERRI L. BACKHUS
TERRI L. BACKHUS
KATHERINE A. BLAIR
SEAN T. GUNN
Office of the Federal Public Defender
Northern District of Florida
Capital Habeas Unit
227 N. Bronough St., Ste. 4200
Tallahassee, Florida 32301-1300
(850) 942-8818
terri_backhus@fd.org

*Counsel for Petitioner*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that this filing was served on all parties through the CM/ECF system, in compliance with this Court's electronic filing rules.

/s/ TERRI L. BACKHUS
TERRI L. BACKHUS