UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DAVID MILLER, JR,

        Petitioner,

vs.                                  Case No. 3:17-cv-932-BJD-JBT

SECRETARY, FLORIDA DEPARTMENT
OF CORRECTIONS, et al.,

        Respondents.

_____

**ORDER**

**I.  Status**

    Petitioner David Miller, Jr., a Florida prisoner convicted and sentenced to death, filed a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 (Petition) (Doc. 15) and a Memorandum of Law (Memorandum) (Doc. 24).[1] Respondents, in their Response Brief to Petition for Writ of Habeas Corpus (Response) (Doc. 29), submit that the Petition is untimely filed and Petitioner must argue for equitable tolling, requiring that he demonstrate both that he

_____

[1] Generally, the Court references the page number assigned by the electronic filing system, unless otherwise indicated.

diligently pursued his federal habeas rights and extraordinary circumstances prevented his timely filing of a federal habeas petition.[2]   Response at 17-30. In Petitioner's Reply in Support of 28 U.S.C. § 2254 Petition (Reply) (Doc. 33), Petitioner claims equitable tolling is warranted.   Reply at 5-13.   The Court conducted a limited evidentiary hearing on October 21, 2021.[3]

As acknowledged by the parties, the Petition is untimely filed, filed well beyond the Antiterrorism and Effective Death Penalty Act (AEDPA) one-year statute of limitations.   Response at 10; Petition at 7.   See Order (Doc. 35) for the calculation of the relevant one-year period.[4]

---

[2]  The Court refers to the exhibits in the Appendix (Doc. 32) as "Ex."   The Court will, where applicable, refer to the Bates Stamp page numbers at the bottom of each page.   Otherwise the Court will refer to the page number on the document itself.

[3]  The Court refers to the evidentiary hearing transcript (Doc. 67) as "EH."   The Court will reference the page number found in the upper right-hand corner of each page of the transcript.

[4]  At the evidentiary hearing Respondents re-raised their contention that the 90-day period should be counted from August 31, 2000, resulting in their calculated date of November 29, 2000 as being the date the judgment and sentence became final ("AEDPA statute of limitations starts as the judgment and sentence became final when the 90 days for seeking certiorari review in the United States Supreme Court expired[.]").   See Response at 12 (Statute of Limitations Timing).   Respondents said, "we're probably disagreeing about the days remaining[,]" and "I've got the petition due June the 15th, 2006[.]" EH at 21. Respondents' calculation is incorrect.   The rules of the Supreme Court and the related Eleventh Circuit law provide: "if a movant does not timely file his petition, his conviction becomes final 90 days after the appellate court enters judgment on the appeal 'or, if a motion for rehearing is timely filed, within 90 days of the appellate court's denial of that motion.'" Warmus v. United States, 253 F. App'x 2, 4–5 (11th Cir. 2007) (per curiam) (quoting Close v. United States, 336 F.3d 1283, 1284–85 (11th Cir.2003) (quoting Clay v. United States, 537 U.S. 522, 525 (2003)) (citing Sup. Ct. R. 13.2).   See also Wilmore v. United States, No. 18-11653-J, 2018 WL 5295886, at *2 (11th Cir. 2018) (not reported in Fed. Rptr.) (noting the

## II.   Petition, Memorandum, & Response

Petitioner did not file his federal Petition (Doc. 15) until Wednesday, January 30, 2019, well past the expiration of the one-year limitation period.[5] The Petition filed on January 30, 2019 is untimely and due to be dismissed unless Petitioner can establish equitable tolling of the statute of limitations is warranted.   Petitioner submits that equitable tolling "is pertinent here." Petition at 9.   He contends his mental health issues impacted his ability to communicate with counsel, making effective communication virtually impossible.   Id. at 10-11.   He argues that courts have widely recognized that equitable tolling applies when a defendant suffers some form of mental incapacity (citing Bolarinwa v. Williams, 593 F.3d 226, 231 (2d Cir. 2010);

---

date of denial of rehearing and stating the statute of limitations for filing a section 2255 motion began to run 90 days later, when the conviction became final), cert. denied, 139 S. Ct. 833 (2019); Cullers v. Sec'y, Fla. Dep't of Corr., No. 3:09-cv-664-J-34MCR, 2010 WL 2103444, at *2 (M.D. Fla. May 25, 2010) (not reported in F.Supp.2d) (finding the petitioner's state-court conviction became final 90 days from when the appellate court denied the motion for rehearing).   Respondents do not contend the motion for rehearing was untimely filed.   This Court previously found Petitioner's conviction became final on January 22, 2001 (90 days after October 24, 2000, the date the Florida Supreme Court denied rehearing), not November 29, 2000, the date relied upon by Respondents.   Of note, Respondents calculate that the tolling of the statute of limitations ended on April 13, 2006 when the mandate issued upon the Florida Supreme Court's affirmance of the denial of an amended Rule 3.851 motion, then began to run and expired on June 15, 2006.   Response at 12 (Statute of Limitations Timing). This Court held, after the mandate issued on April 13, 2006, the limitation period began to run and expired 112 days later, on Thursday, August 3, 2006.   See Order (Doc. 35) at 8. Nothing presented at the evidentiary hearing or otherwise convinces the Court that it has made a miscalculation or erred in its Order (Doc. 35).

[5]  Petitioner is represented by counsel.

Nara v. Frank, 264 F.3d 310, 320 (3d Cir. 2001), overruled in part on other grounds, Carey v. Saffold, 536 U.S. 214 (2002); Fisher v. Johnson, 174 F.3d 710 (5th Cir. 1999), cert. denied, 531 U.S. 1164 (2001); Laws v. Lamarque, 351 F.3d 919, 923 (9th Cir. 2013); and Hunter v. Ferrell, 587 F.3d 1304, 1308 (11th Cir. 2009) (per curiam).   Petition at 11.

Petitioner also relies on a contention that he should be entitled to equitable tolling based on serious deficiencies in state post-conviction representation.   Id.   Although not fleshed out in the Petition, he suggests there may be some sort of abandonment or attorney misconduct that may be uncovered which would "qualify as a basis for equitable tolling."   Id. at 11.

In his Memorandum, Petitioner claims he suffers from "severe schizophrenia and other mental health conditions that rendered him incompetent and unable to communicate with his attorneys or make rational decisions regarding his legal rights."   Memorandum at 14.   He contends mental illness can form the basis for equitable tolling, referencing cases he mentioned in the Petition and adding McSwain v. Davis, 287 F. App'x 450, 456 (6th Cir. 2008), cert. denied, 557 U.S. 919 (2009), for additional support. Memorandum at 14.   He also claims counsel inexplicably failed to file a timely federal habeas petition due to egregious failures on counsel's part to do any work on Petitioner's case after the Florida Supreme Court affirmed the denial

of post-conviction relief.   Id. at 14-15.   See Reply at 9-10 ("Miller's AEDPA limitations deadline lapsed in 2006, under the watch of his state-appointed counsel.").

In their Response at 25, Respondents contend Robert Norgard, Esquire, Petitioner's post-conviction counsel, "intentionally missed the federal habeas deadline in this case and others in order to avoid his clients' inclusion on the list of defendants eligible for a death warrant."   Respondents explain that, in Florida, before the Governor signs a warrant of execution, a defendant has to undergo executive clemency, and, generally, this review does not take place until after a federal petition for writ of habeas corpus has been denied in the federal district court and relief has been denied by the Eleventh Circuit Court of Appeals.   Id.

Petitioner submits, his "incompetence justifies equitable tolling[,]" Reply at 7, relying on previously cited cases and citing Ata v. Scutt, 662 F.3d 736, 741 (6th Cir. 2011); Calderon v. United States District Court, 163 F.3d 530, 541 (9th Cir. 1998), abrogated on other grounds, Woodford v. Garceau, 538 U.S. 202 (2003), cert. denied, 526 U.S. 1060 (1999); Ryan v. Gonzales, 568 U.S. 57, 67-68 (2013); Smith v. Kelly, 301 F. App'x 375, 378 (5th Cir. 2008) (per curiam); and Trapp v. Spencer, 479 F.3d 53, 62 (1st Cir. 2007).   Reply at 7-8.   He contends his mental illness satisfies both the diligence and extraordinary

circumstances prongs.   Id. at 9.   Alternatively, Petitioner says his incompetence coupled with the "apparent abandonment by prior counsel" justifies equitable tolling and requires fact-finding by the Court, citing Schmid v. McCauley, 825 F.3d 348, 350 (7th Cir. 2016).   Reply at 9.   See Downs v. McNeil, 520 F.3d 1311, 1325 (11th Cir. 2008) (finding need for evidentiary hearing); Ata, 662 F.3d at 741 (same).

The Court, in its Order (Doc. 35), found numerous questions were raised by Respondents' contention that Mr. Norgard intentionally missed the federal habeas deadline, including but not limited to: (1) did Mr. Norgard intentionally miss the federal habeas deadline; (2) if Mr. Norgard intentionally missed the deadline, did Mr. Norgard discuss his strategy with Petitioner and did Petitioner agree with the strategy to attempt to delay the scheduling of his execution date by failing to timely file a federal petition or agree to some other strategy not yet revealed; (3) did Mr. Norgard negligently miss the deadline; (4) did Mr. Norgard's conduct amount to abandonment of the attorney-client relationship; (5) was there severance of the agency relationship; (6) did Mr. Norgard purposely act adversely to Petitioner's interests by acting or failing to act for the purpose of advancing Mr. Norgard's own interests or those of a third party; and (7) did Mr. Norgard take actions that were contrary to Petitioner's instructions and adverse to his interests.   Order (Doc. 35 at 10-11).

Since Mr. Norgard represented Petitioner on the appeal of the denial of the Rule 3.851 motion, and since the federal one-year limitation period expired on August 3, 2006, under Mr. Norgard's watch, the Court scheduled an evidentiary hearing to address the conduct of Mr. Norgard and the related conduct of Petitioner.   Order (Doc. 47).   The Court expressed its concern as to whether Petitioner was informed of Mr. Norgard's strategy (if one existed) and agreed with an intentional strategy of not filing a timely federal petition or acquiesced in counsel's decision or some similar strategy as yet unrevealed. Order (Doc. 35 at 11-12).

The Court will first explore the cases cited by Petitioner in support of his contention that his mental illness satisfies both the diligence and extraordinary circumstances prongs.   Petitioner relies on Bolarinwa, 593 F.3d at 231, which held, under the appropriate circumstances, mental illness can justify equitable tolling of the AEDPA's limitation period.   The Second Circuit opined that sister circuits have held the same, citing McSwain, Laws, Nara, and Fisher.   Respondents counter Petitioner's argument, pointing out that in Bolarinwa, the Second Circuit remanded the case to allow the petitioner to present evidence in support of her contention.   Response at 21.   Of importance, on remand, the United States Magistrate Judge reviewed the medical records concerning the petitioner's mental health care and treatment,

found that she undeniably suffers from a mental illness, but also found that she functioned, for the most part, in prison population, and "failed to carry her burden of establishing a basis to invoke equitable tolling" in order to resuscitate her untimely petition.   Bolarinwa v. Kaplan, No. 9:07-CV-1113 (LEK-DEP), 2012 WL 2394819, at *1 (N.D.N.Y. May 8, 2012) (not reported in F.Supp.2d), report and recommendation adopted by 2012 WL 2402889 (N.D.N.Y. June 25, 2012).

Notably, in Bolarinwa, the petitioner had been adjudicated to be an incapacitated person, received treatment, was then found rehabilitated and fit to proceed to trial.   Id.   The medical records showed she suffered from episodes of depression, anxiety, and psychosis.   Id. at *7.   The Court determined an evidentiary hearing was unnecessary in light of the comprehensive nature of the records received by the court concerning the petitioner's mental health treatment, the extreme length of time involved, and the fact that the record fails to reflect evidence to support the claim for equitable tolling.   Id. at *9 n.6.   Ultimately, the court found she was not subjected to extraordinary circumstances that prevented her, despite due diligence, from filing a habeas petition.   Id. at *10.   In adopting the Magistrate Judge's report and recommendation, the District Judge found the petitioner had been pursuing her legal rights by filing and researching other

8

legal claims before filing her federal petition and she was engaged in various legal endeavors.   Bolarinwa, 2012 WL 2402889, at *3.   The Court found neither an exceptional circumstance nor due diligence.   Id. at *4.

In Nara, 264 F.3d at 320, the Third Circuit acknowledged that mental incompetence is not a *per se* reason for tolling a statute of limitations. Instead, the court found that there must be a showing that mental incompetence prevented the petitioner from asserting his rights.   Id.   The court concluded that because the habeas petition was filed pro se and the petitioner had exhibited periods of mental incompetency, an evidentiary hearing was warranted.   The court also found troubling allegations of abandonment by previous counsel, leading the court to find an evidentiary hearing in order to determine whether extraordinary circumstances would justify equitable tolling.   Id.   See Wallace v. Mahanoy, 2 F.4th 133, 145 (3rd Cir. 2021) (asking whether it was impossible for the petitioner to pursue post-conviction remedies during the entire relevant time).

Similarly, the Sixth Circuit found mental incompetence is not a *per se* reason to toll, but it may warrant equitable tolling.   McSwain, 287 F. App'x at 456.   Significantly, in McSwain, although the court found the petitioner suffered from a mental illness, the court still found no evidence to support a causal connection between her mental illness and her ability to file a timely

petition, noting that she was able to pursue her state court remedies notwithstanding her mental illness.   Id. at 457.   Of import, the court noted that the petitioner was represented by counsel in state court and at the time she filed her federal habeas petition.   Id.   In Ata v. Scutt, 662 F.3d 736, 741-42 (6th Cir. 2011), the Sixth Circuit, finding the reasoning of McSwain persuasive, held a petitioner's mental incompetence, which prevents the timely filing of a petition, constitutes an extraordinary circumstance that may warrant equitably tolling.

In Fisher, 174 F.3d at 711, the petitioner filed a pro se habeas petition in the federal court.   He asked for equitable tolling for a period of seventeen days he spent in a psychiatric ward, confined, medicated, separated from his glasses and legally blind as a result, and denied any access to the courts.   Id. at 715.   Although recognizing: "**the possibility** that mental incompetency might support equitable tolling[,]" the court declined to require tolling under the circumstances.   Id. at 716 (emphasis added).   See Smith, 301 F. App'x at 378 (affirming the denial of equitable tolling, noting conclusory assertions of mental illness combined with a lack of due diligence).

The Ninth Circuit remanded a case to the district court to order discovery, expansion of the record, or an evidentiary hearing as is necessary to determine if the period should be equitably tolled by virtue of mental

incompetence.   <u>Laws</u>, 351 F.3d at 924-95.   The petitioner had proceeded pro se, with the help of a jailhouse lawyer, in filing his federal and state petitions. <u>Id</u>. at 922.   The court found "a *pro se* inmate's actual mental incompetence may be at least as much of an external bar to his meeting AEDPA's strict deadlines as is a represented capital inmate's inability to rationally communicate a bar to his receiving effective representation."   <u>Id</u>. at 923.   <u>See Calderon</u>, 163 F.3d at 541 (finding mental incompetency justifies equitable tolling and noting the statutory right to counsel contemplates effective communication between lawyer and client),

Although Petitioner references <u>Trapp</u>, in <u>Holmes v. Spencer</u>, 822 F.3d 609, 611 n.1 (1st Cir. 2016), the First Circuit noted that <u>Trapp</u> had been overtaken by <u>Holland v. Fla.</u>, 560 U.S. 631, 649 (2010) (professional misconduct could amount to egregious behavior and create an extraordinary circumstance), as underscored by <u>Menominee Indian Tribe of Wis. v. United States</u>, 577 U.S. 250, 257 (2016) (the diligence prong covers those affairs within the litigant's control, "the extraordinary-circumstances prong, by contrast, is meant to cover matters outside its control").   Thus, a petitioner must show that an extraordinary circumstance stood in his way; therefore, the second prong is met, "only where the circumstances that caused a litigant's delay are both extraordinary *and* beyond its control."   <u>Id</u>. at 257 (footnote omitted).

Petitioner did not mention a significant, post <u>Holland</u> First Circuit decision, <u>Riva v. Ficco</u>, 615 F.3d 35, 40 (1st Cir. 2010), which held, "mental illness can constitute an extraordinary circumstance, which may prevent a habeas petitioner from understanding and acting upon his legal rights and thereby equitably toll the AEDPA limitations period" but it does not *per se* toll the limitations period.   Indeed, the court concluded that a petitioner must show "some causal link between a petitioner's mental illness and his ability seasonably to file for habeas relief."   <u>Id</u>.   In short, the court found the causation requirement would be satisfied if a petitioner shows that, during the relevant time frame, he both suffered from a mental illness or impairment that severely impaired his ability "either effectively to pursue legal relief to his own behoof or, if represented, effectively to assist and communicate with counsel." <u>Id</u>.

In <u>Riva</u>, the record confirmed "debilitating mental illness," with the petitioner being committed to a facility for seventeen years, suffering from paranoid schizophrenia and exhibiting bizarre delusions of a persecutory nature, paranoid ideation, auditory hallucinations, and somatic terrors.   <u>Id</u>. at 41.   The petitioner suffered from an extremely delusional and bizarre system accompanied by violent paranoid ideation.   <u>Id</u>.   Even with medication, the petitioner's psychosis continued, until he was finally placed on

a new medication.  Id. at 42.  Although at one point counsel was hired by the petitioner's father, counsel did not communicate with petitioner and filed a petition without petitioner's consent.  Id. at 43.  As such, the counseled filing did not enjoy "the petitioner's effective participation."  Id.  The court noted, the petitioner's obvious insanity at critical times discounted petitioner's pro se filings.  Id.  The First Circuit vacated and remanded for further proceedings.  Id. at 44.

Ultimately, the district court found that the petitioner "had not shown that his mental illness prevented him from following through in litigation in a sustained way."  Riva v. Ficco, 803 F.3d 77, 81 (1st Cir. 2015), cert. denied, 136 S. Ct. 1536 (2016).  At times, Riva was not represented by counsel and made missteps.  Id. at 82.  However, the court found the petitioner failed to prove, "his illness prevented him from cooperating with counsel during that time period" as he communicated with counsel and exhibited his engagement in the litigation and his understanding of the proceedings.  Id.  Finally, the district court found the record supported the conclusion that petitioner cooperated with his counsel.  Id. at 83.  Thus, the First Circuit concluded the district court did not err in finding the petitioner "failed to demonstrate that his mental illness prevented him from cooperating with counsel."  Id.

Petitioner referenced both <u>Hunter</u> and <u>Gonzales</u> in his pleadings and briefs.   In <u>Hunter</u> the petitioner was without counsel; in <u>Gonzales</u>, the United States Supreme Court found no statutory right to competence.

### III.   Equitable Tolling

The AEDPA is applicable to Petitioner's case as his conviction became final after April 24, 1996, the effective date of AEDPA.   <u>Smith v. Jones</u>, 256 F.3d 1135, 1143 (11th Cir. 2001) (by its terms, the state of limitations provision in AEDPA bars any petition filed more than a year after the conviction became final at the conclusion of direct appeal, absent exceptions and qualified tolling periods), <u>cert. denied</u>, 534 U.S. 1136 (2002).   The AEDPA one-year limitation period is subject to equitable tolling.   <u>Holland</u>, 560 U.S. at 651-52.

Petitioner contends he can establish that equitable tolling of the statute of limitations is warranted, claiming extraordinary circumstances beyond his control.   Petitioner carries the burden of persuasion.   He must satisfy a two-pronged test; he must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing."   <u>Id</u>. at 649 (quotation marks omitted).   <u>See</u> <u>Christmas v. Judd</u>, No. 20-14431, 2021 WL 4860927, at *1 (11th Cir. Oct. 19, 2021) (per curiam) (not reported in Fed. Rptr.) (same).   Petitioner contends his mental illness satisfies both prongs, the diligence prong, and the

14

extraordinary circumstances prong.   Apparently, if the Court is not convinced by this argument, Petitioner contends that his mental illness satisfies the diligence prong and "apparent abandonment" of counsel or the serious deficiencies of his post-conviction counsel satisfy the extraordinary circumstances prong.

Equitable tolling is an extraordinary remedy, only employed in "rare and exceptional circumstances and typically applied sparingly." Cadet v. Fla. Dep't of Corr., 853 F.3d 1216, 1221 (11th Cir. 2017) (quotations and citation omitted), cert. denied, 138 S. Ct. 1042 (2018). See Downs, 520 F.3d at 1318 (equitable tolling "is a remedy that must be used sparingly"). This heavy burden is not easily surmounted.

Concerning this Court's review for equitable tolling purposes, any failures of counsel that occurred after counsel missed the filing deadline are of no consequence because they did not cause unseasonable filing or prohibit timely filing. Ryder v. Sec'y, Dep't of Corr., No. 8:09-CV-2019-T-27MAP, 2012 WL 12895353, at *4 (M.D. Fla. June 6, 2012) (not reported in F. Supp.). "To obtain equitable tolling, . . . Petitioner must show extraordinary circumstances and demonstrate that those circumstances **caused him to miss the filing deadline.**" Id. (citations omitted). Following the expiration of the one-year

limitation period, any failures of counsel did not prohibit Petitioner from timely filing his federal habeas petition.

As such, this Court's focus will be on a very precise period of time: that period after the mandate issued on April 13, 2006 and the one-year limitation period expiring 112 days later, on Thursday, August 3, 2006.   To prevail on his contention that he is entitled to equitable tolling, Petitioner must show there is a causal connection between the alleged extraordinary circumstances and the late filing of his federal petition.

In Hunter, 587 F.3d at 1309-1310, the Eleventh Circuit found the petitioner presented evidence sufficient to raise a factual issue as to whether a causal connection existed between the petitioner's mental impairment and his ability to file a timely petition, but the petitioner did not have an attorney to assist him.   The Eleventh Circuit looked to its previous decision in Lawrence v. Fla., 421 F.3d 1221, 1226-27 (11th Cir. 2005), in which the court determined that the petitioner's claim of long-term mental impairments combined with a full-scale IQ of 81 were insufficient to justify equitable tolling because they did not establish a causal connection between the alleged mental incapacity and the ability to file a timely petition.   Hunter, 421 F.3d at 1308. The Eleventh Circuit, while noting that "mental impairment is not *per se* a reason to toll a statute of limitations[,]" Hunter, 587 F.3d at 1308, concluded

the petitioner had presented sufficient evidence to warrant further inquiry based on record evidence of severe, irreversible mental retardation.   <u>Id</u>. at 1309-10.

Similarly, in <u>Rabette v. Sec'y, Dep't of Corr.</u>, No. 5:14-cv-101, 2015 WL 6704418, at *4 - *5 (M.D. Fla. Nov. 2, 2015) (not reported in Fed. Supp.), the petitioner complained of his mental incapacity and reliance upon prison law clerks, but this Court found the petitioner's attempt to shoehorn the facts of his case to resemble those in <u>Hunter</u> unconvincing and insufficient to warrant equitable tolling.

More recently, in <u>O'Connor v. Inch</u>, No. 17-60234-CV-COHN/REID, 2019 WL 11029408, at *2 (S.D. Fla. Sept. 24, 2019), the petitioner argued equitable tolling was appropriate because he suffers from mental illness, he was effectively abandoned by counsel, and he was deprived of personal property and legal materials during transfers between facilities.   In pertinent part, the court held: "[m]ental impairment, without a showing of how such impairment affects a petitioner's ability to file a timely petition, is insufficient reason to equitably toll the limitations period under the AEDPA."   <u>Id</u>. at *3 (citing <u>Lawrence</u> (contention that individual suffered from mental illness all his life is not sufficient reason to justify equitable tolling) and <u>Hunter</u>).

17

The record demonstrates, in Petitioner's case, he was not relying on his own skills or that of prison law clerks or inmates to assist him in filing a federal habeas petition. Petitioner had experienced capital registry counsel: Mr. Robert Norgard. Mr. Norgard had extensive criminal law experience as both an assistant public defender and in private practice. EH at 25-27. He had extensive experience handling capital cases. Id. at 26. He also handled federal death-penalty cases. Id. at 28. He had been involved in handling post-conviction cases since approximately 1996. Id. Mr. Norgard confirmed that as appointed registry counsel, an attorney under the registry contract is obliged to handle subsequent litigation. Id. at 29.

Mr. Norgard received an appointment as registry co-counsel. Id. at 29-30. He was well aware that he was responsible throughout all postconviction capital proceedings, including federal habeas corpus proceedings. Id. at 29. Although Petitioner had been represented by Capital Collateral Representatives North, the agency was disbanded and Heidi Brewer, who had been representing Mr. Miller leading up to his post-conviction evidentiary hearing, contacted Mr. Norgard to assist with the evidentiary hearing. Id. at 30-31. Mr. Norgard explained he was brought in because he had both post-conviction and appellate experience. Id. at 31. Mr. Norgard filed a notice of appearance that was filed with the clerk on October 6, 2003. Id. at 32. Ms.

18

Brewer eventually withdrew, and Mr. Norgard took over the case.   Id.   Mr. Norgard eventually withdrew in 2013 after a meeting on August 9, 2013, in which Petitioner was "unequivocal in his request that I pursue him being a death volunteer."   Id. at 35.   Mr. Norgard explained that his law firm of Norgard & Norgard was Petitioner's sole representation from June 2004 through August 2013.[6]   Id. at 36.

Under oath, Mr. Norgard stated he did not file a federal habeas petition on Petitioner's behalf because, "Mr. Miller specifically did not authorize me to file a federal habeas, and he indicated if I did, that he would seek to have it dismissed and make the Court aware of his wish to be a death volunteer."   Id. Mr. Norgard explained that mental health issues affected Mr. Miller throughout most of his life, and there were extensive mental health records from North Carolina, including evidence that Mr. Miller's capacity to appreciate criminality had been impaired at the time of the North Carolina offense, and his mental illness "impacted on his prior criminal behavior."   Id. at 37.

Petitioner was present for part of the state court evidentiary hearing. Id.   Mr. Norgard attested Petitioner was competent to proceed with the court

_____

[6]  Mr. Norgard's wife and legal partner, worked with Mr. Norgard and provided some legal assistance.

matters, even though he had mental health issues.   Id.   Mr. Norgard believed Petitioner "would be competent to be executed under the legal standards related to that."   Id.   Mr. Norgard also felt Petitioner was competent to waive matters that he could waive in his case.   Id. at 38.   Nevertheless, Mr. Norgard felt that Petitioner's desires to take certain actions, like volunteer for death and waive his appeal, were because of his mental health issues.   Id.

Although Mr. Norgard attested if Petitioner had insisted on becoming a volunteer for death or in waiving the appeal of the denial of the Rule 3.851 motion, Mr. Norgard would have requested a mental health evaluation, he was "very pessimistic about an expert finding him not to be competent to waive those matters."   Id.   Mr. Norgard explained that his opinion was based on the low threshold of what is considered to be competent to appear at trial or to waive matters.   Id.   He noted, a defendant can be a paranoid schizophrenic but still be found competent to proceed to trial.   Id.   Although concerned about Petitioner's mental health, Mr. Norgard firmly believed Mr. Miller would be found competent.   Id. at 40.

Mr. Norgard conducted the state evidentiary hearing on November 4th and November 5th of 2003 and did the examination of witnesses.   Id. at 40-41.   Under the registry, Mr. Norgard was co-counsel for Petitioner.   Id. at 41.   Mr. Norgard was aware of Petitioner's significant mental health issues, id. at

49, including that he had reported an auditory hallucination back on September 6, 1983.   <u>See</u> Petitioner's Exhibit Limited Evidentiary Hearing October 21, 2021, [7] Petitioner's Exhibit 6, Tab 3 at 121.   Mr. Norgard reiterated, he felt Petitioner was competent, but at the same time, he felt that if Petitioner did not have his mental health issues, he would not move towards being a death volunteer.   <u>Id</u>. at 60.

Mr. Norgard believed Petitioner met the competency factors to waive rights.   <u>Id</u>. at 61.   Mr. Norgard elaborated:

> I guess the simplest way of putting it, we have somebody with a history of suicide and the fact that he wanted to kill himself and had trouble living with his mental illness doesn't surprise me.
>
> I mean, it's almost like state-assisted suicide in this case, and he'd certainly tried to do it on his own before.

<u>Id</u>.

---

[7] The Court will refer to these Exhibits as "Petitioner's Exhibit" and also reference the particular tab, if applicable.   The Court will refer to the page numbers found on the lower right-hand corner of the exhibits.   Of note, Petitioner's Exhibits 6, 7, and 8 are filed under seal.   <u>See</u> Order (Doc. 62).   However, the Court finds it necessary to reference the content of these exhibits in order to explain its decision as to whether Petitioner has satisfied the test to qualify for equitable tolling.   Of note, Petitioner's mental disorder and the manifestations of that disorder have already been extensively revealed through the Petition (Doc. 15), the Appendix Record of State Proceedings (Doc. 32), and in published decisions, <u>Miller v. State</u>, 770 So. 2d 1144 (Fla. 2000) (per curiam) and <u>Miller v. State</u>, 926 So. 2d 1243 (2006) (per curiam).

With regard to specific conversations about filing a federal habeas petition, Mr. Norgard related that the initial conversation concerning this topic occurred at the state-court evidentiary hearing.  Id.  The court allowed counsel to talk to Petitioner privately, and the issue was discussed.  Id. at 62. Mr. Norgard stated he kept track of when the federal petition would be due in the summer of 2006.  Id.  The first day of the evidentiary hearing, the discussion took place, and Petitioner agreed to "at least waive his appearance at the evidentiary hearing and not pursue the other matters he had indicated to us and waived his appearance and I believe he was taken back that same day."  Id.

Of import, Mr. Norgard attested that he spoke to Mr. Miller after the mandate issued on April 13, 2006, specifically through a phone call made on April 26, 2006, to see if Mr. Miller had changed his mind about whether to file a federal petition.[8]  Id. at 85.  Mr. Norgard said he had also talked to Petitioner previously, prior to the mandate being issued, asking that same question, to confirm Petitioner had a continuing desire not to pursue his federal remedies.  Id.

---

[8]  Mr. Norgard testified that he believed the Florida Department of Corrections' records were inaccurate as they failed to show a number of phone calls counsel made to Petitioner noted in Mr. Norgard's office records, including the April 26, 2006 phone call.

Mr. Norgard did not have any question as to Petitioner's competency. Id. at 86.   Mr. Norgard stated he tried to get his client to submit himself to a mental health examination, but he refused.   Id.   As far as being prepared to file a federal petition, Mr. Norgard attested that he had identified the issues and would have been prepared to move forward in a timely manner.   Id.   But, "from the time of the evidentiary hearing through that last call, [Petitioner] would not hear anything about any further appeals[.]" Id.   Mr. Norgard said Petitioner repeatedly talked about wanting to be a death volunteer, but after speaking with Mr. Norgard on each occasion, Petitioner would, "at least be equivocal and end the call."   Id.   As for billing, Mr. Norgard explained that anything he did in preparation for the federal habeas he would not have billed to the state; therefore, he did not submit any bills for his work post mandate. Id. at 87-88.   Notably, he would have been paid more for federal work than state work.   Id. at 87.

At the evidentiary hearing, the following question was asked: "[d]id you intentionally miss the deadline in either Mr. Miller or Mr. Jones' [another death-sentenced inmate] case to keep them off of a warrant-eligible list?"   Id. at 109.   Mr. Norgard responded no.   Id.   Finally, on direct, Mr. Norgard said he did not have federal habeas experience in 2006.   Id. at 118.

On cross-examination, Mr. Norgard attested that Petitioner made the decision to forgo the filing of a 2254 petition.   Id. at 119.   Petitioner first told Mr. Norgard of his decision at the evidentiary hearing in November 2003.   Id. at 119-20.   After the mandate on the denial of his Rule 3.851 motion, Mr. Norgard reached out to Petitioner again and Petitioner confirmed his desire to forgo filing a 2254 petition.   Id. at 120.   At no time did Petitioner ask Mr. Norgard to file a federal petition.   Id.   Petitioner never communicated with Mr. Norgard any desire to file a federal petition.   Id. at 122.

Mr. Norgard believed Petitioner to be competent at the evidentiary hearing.   Id. at 120.   During the state-court evidentiary hearing, Petitioner wanted to abort the hearing.   Id. at 120-21.   Apparently, he had been reluctant to file the post-conviction motion.   In a pause in the proceedings, during a private conversation, the following transpired:

> We were allowed to have a private conversation with him.   He told us that he didn't even want to file the motion.   He didn't want the hearing to continue. We talked him out of that by getting him to agree we could just send him back to the prison, and we'd just do what we needed to do.

Id. at 121.

During his tenure working on Petitioner's case, Mr. Norgard testified that he never saw anything in any mental health reports or through the

communication with any mental health experts that Petitioner was incompetent to proceed.   Id. at 123-24.   At the capital phase of the trial, Petitioner apologized to the family of the victim, apologized to the surviving victim, and expressed remorse for his actions.   Id. at 124.

On re-direct, Mr. Norgard explained his conviction that Petitioner was competent, noting that Ms. Brewer was having issues with Petitioner being reluctant to sign and submit a Rule 3.851 motion, and during this particular time period, Petitioner was seen by a mental health expert three times.   Id. at 125.   After the evidentiary hearing, Mr. Norgard made three phone calls to Petitioner, one of which was refused, and visited Petitioner once.   Id. at 126. Mr. Norgard specified he had two particular reasons for maintaining contact with Petitioner: "to keep a lid on his wish to be a death volunteer, and to assess whether he still wanted to waive his appeals[.]" Id.

Mr. Norgard described Petitioner as lucid and able to understand his counsel.   Id.   Petitioner reiterated that he did not want to continue the litigation and wanted to be a death volunteer.   Id.   Mr. Norgard said Petitioner "would express very lucid reasons as to why he wanted to just die and finish it up and get it over with."   Id.   Petitioner even wrote the state court about his desire to be a death volunteer.   Id. at 127.   Mr. Norgard wanted to keep a lid on Petitioner's desire to be a death volunteer.   Id.

When asked if, when Mr. Norgard stated he wanted to avoid initiation of the process, he was referring to clemency review, Mr. Norgard responded no. Id. at 129.   He explained he was trying to keep Petitioner from revealing he wanted to be a death volunteer, like when he contacted the state court.   Id. Mr. Norgard agreed that Petitioner's case "flew under the radar[.]" Id. at 130.

In closing argument, Petitioner's current counsel, Mr. Gregory Brown, asked the Court to not credit Mr. Norgard's testimony about "additional phone calls" because various records and billing statements do not reflect these calls. Id. at 131-32.   Mr. Brown argued, the evidence shows Mr. Norgard did not communicate with his client at all regarding the filing of a federal habeas petition.   Id. at 133.   Further, Mr. Brown claims there was constructive abandonment based on Mr. Norgard's failure to visit or speak with his client in a meaningful way.   Id.   Mr. Brown submits that no mental health expert evaluated Mr. Miller to determine if he was competent to make the decision to waive his federal habeas petition.   Id. at 134.   Finally, Mr. Brown asked for an additional evidentiary hearing to establish that Petitioner's "mental health is an extraordinary circumstance and affects his diligence in filing the federal habeas petition."   Id. at 135.

In closing, Respondents' counsel, Mr. Michael Kennett, said Mr. Norgard testified Petitioner was the one who decided to forgo filing a 2254 petition,

Petitioner failed to rebut that testimony with any direct evidence, and Petitioner failed to meet his burden to establish equitable tolling.   Id.

## IV.   Findings and Conclusions

The Court credits the testimony of Mr. Norgard.   He is an officer of the Court.   He testified under oath he was very experienced counsel at the time of Petitioner's state court evidentiary hearing.   See Hardwick v. Benton, 318 F. App'x 844, 846 n. 2 (11th Cir. 2009) (per curiam) ("When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger.") (quoting Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000)).   Petitioner did not take the stand to discredit counsel's testimony as to what occurred during Mr. Norgard's representation of Petitioner.   As such, Mr. Norgard's testimony that Petitioner decided to forego his federal remedies and reported his decision to Mr. Norgard at the state court evidentiary hearing and during a post-mandate phone conversation before the limitation period expired essentially went unrebutted.[9]   Mr. Norgard abided by his client's directive to not file a federal

---

[9]  The Court is not convinced that the absence of any reference to telephone calls in the Florida Department of Corrections' records means telephone conversations did not occur as Mr. Norgard attested otherwise, based on his office records.   Even if this Court were to discount some or all of these telephone conversations, at the state court evidentiary hearing, Petitioner told Mr. Norgard he did not want to pursue federal remedies.

habeas petition.   As such, there was no abandonment by counsel or constructive abandonment by counsel.

As for Respondents' unsupported theory that Mr. Norgard adopted a strategy to avoid clemency review and decided to forego federal habeas proceedings in order to implement this strategy, that theory is unsupported by the record.[10]   Mr. Norgard testified his strategy did not include efforts to avoid

---

[10]  Based on the state of Florida clemency law as of December 9, 2004, Respondents' contention that Mr. Norgard developed some scheme to avoid clemency review by intentionally failing to file a federal petition is non-sensical.   Mr. Norgard began his representation of Petitioner in 2003.   Mr. Norgard represented Petitioner at the state court evidentiary hearing on the Rule 3.851 motion.   The mandate issued on April 13, 2006.   The one-year limitation period expired on August 3, 2006.   During that time, the Florida Rules of Executive Clemency, effective December 9, 2004, included the following provision:

> The investigation by the Parole Commission shall begin at such time as designated by the Governor.   If the Governor has made no such designation, the investigation shall begin immediately after the defendant's initial petition for writ of habeas corpus, filed in the appropriate federal district court, has been denied by the 11th Circuit Court of Appeals, so long as all post-conviction pleadings, both state and federal, have been filed in a timely manner as determined by the Governor.   **An investigation shall commence immediately upon any failure to timely file the initial motion for post-conviction relief in state court, and any appeal therefrom, or the initial petition for writ of habeas corpus in federal court, and any appeal therefrom. . . . The Parole Commission's Capital Punishment Research Specialist shall routinely monitor and track death penalty cases beyond direct appeal for this purpose.**

Id. Rule 15(C) (emphasis added).   See Petitioner's Notice of Supplemental Authority (Doc. 66), Attachment A (December 9, 2004 Florida Rules of Executive Clemency) (Doc. 66-1). These rules remained effective until April 5, 2007, but the April 5, 2007 Rules also contain a comparable provision.   Petitioner's Exhibit 22 (April 5, 2007 Florida Rules of Executive Clemency) (Doc. 63-1).   Thus, the initiation of a clemency investigation by the Governor was due to commence immediately upon Petitioner's failure to file a timely initial petition in

clemency review.   He stated he did not intentionally miss the deadline to keep Petitioner off a warrant-eligible list.   In response to questioning as to whether Mr. Norgard was prepared to file a federal petition, he stated he had identified the issues and would have been prepared to move forward in a timely manner and would have timely filed a federal petition but for his client's adamant disapproval of counsel seeking any further appeals.

Mr. Norgard's focus was on two things:   to attempt to keep a lid on Petitioner's desire to be death volunteer and to assess whether Petitioner wanted to waive his federal appeals.   Although Petitioner managed to write and inform the state court of his desire to be a death volunteer, Mr. Norgard re-confirmed with Petitioner that he still wanted to forego further review of his judgment and sentence after completion of state post-conviction review.   As a consequence of Petitioner not pursuing federal habeas relief, Petitioner's case may have fallen off of the Governor's and others' radar concerning the implementation of clemency proceedings or, just as a matter of circumstance or other reasons, these proceedings were not initiated.   <u>See</u> Notice to Court Regarding Clemency (Doc. 64).

---

federal court.  As such, Respondents' assertion that Mr. Norgard intentionally missed the deadline as part of a litigation strategy to avoid consideration for a warrant by not completing one round of federal litigation is without merit and contrary to the state of the law at the time Mr. Norgard represented Petitioner during the one-year limitation period.

In sum, the Court finds Mr. Norgard did not intentionally miss the federal habeas deadline in order to implement a strategy to avoid or delay the scheduling of an execution date.   Also, Mr. Norgard did not negligently miss the deadline.   Mr. Norgard's conduct did not amount to abandonment of the attorney-client relationship.   There was no severance of the agency relationship.   Mr. Norgard did not purposely act adversely to Petitioner's interests by acting or failing to act for the purpose of advancing Mr. Norgard's own interests or those of a third party.   Finally, and of great import, Mr. Norgard did not take actions that were contrary to Petitioner's instructions and adverse to his interests.   Petitioner instructed Mr. Norgard not to file a federal petition and further appeal his judgment and sentence.   Mr. Norgard abided by his client's wishes.   Mr. Norgard neither abandoned nor "constructively" abandoned Petitioner.   In short, the Court finds there was no attorney misconduct or egregious failures of counsel to pursue further appeals.

On the record of the state court evidentiary hearing on November 4 and 5, 2003, Petitioner stated on the record, "I want to cancel these proceedings and go back to prison.   I want to drop all my appeals."   Ex. 29 at 949.   The court declined to entertain Petitioner's request at that time but allowed that Petitioner could discuss the matter with counsel at lunch break.   Id.   After conferring with their client, Ms. Brewer, co-counsel for Petitioner, announced

Petitioner's presence at the proceeding was waived with Petitioner's consent. Id. at 979.   After some discussion, the court granted Petitioner's request to leave the proceeding.   Id. at 987-88.

To establish that he is entitled to equitable tolling during the period of Attorney Norgard's representation, Petitioner must demonstrate both that he diligently pursued his federal habeas rights and extraordinary circumstances prevented his timely filing of a federal habeas petition.   In order to get to the heart of the matter, the Court assumes without deciding that Petitioner has diligently pursued his rights.   See O'Connor, 2019 WL 11029408, at *2 (assuming same).   The question remains whether Petitioner has shown an extraordinary circumstance warranting equitable tolling.   In order to obtain equitable tolling for the period following the issuance of the mandate on April 13, 2006 through the expiration of the one-year limitation period on August 3, 2006, not only must Petitioner show extraordinary circumstances he must also demonstrate those circumstances caused him to miss the filing deadline.

The record demonstrates the following.   Petitioner has depression and has been diagnosed with alcohol abuse.   Miller, 926 So. 2d at 1250.   He suffers from a personality disorder, but not a major mental illness like psychosis or schizophrenia.   Id.   Since at least 1983, he has exhibited this mixed personality disorder, involving features of being avoidant, schizoid, and

paranoid.  Id.  He performs well on intelligence tests but has an impairment of frontal lobe functions.   Id.   Dr. Krop found Petitioner to be mentally competent when he committed the murder and mentally competent to participate in the trial proceedings.  Id.  at 1251.  In brief, Petitioner has been diagnosed with "alcohol and drug abuse, frontal lobe defects, and schizoid personality traits."  Miller, 770 So. 2d at 1147.

The record shows Petitioner has suffered from long-term mental health and emotional illness and drug and alcohol dependencies.   Although Petitioner was found to have mental problems reducing his culpability for a 1986 murder in North Carolina, that was not the case for the 1997 murder of Albert Floyd.  Of note, Petitioner was convicted of both murders and served time for both.

Debra Lee, a social worker and substance abuse counselor, testified at the state court evidentiary hearing that Petitioner had been diagnosed with schizoid personality disorder on November 22, 1996.  Id. at 1004.  Dr. Joseph Chong Sang Wu, the clinical director for the University of California Irvine Brain Imaging Center, agreed Petitioner had frontal lobe deficit.  Id. at 1053-54.  He attested the PET scan provides additional corroborative evidence of frontal lobe deficit.  Id. at 1057.

Dr. Harry Krop, a licensed psychologist, attested that he had reviewed the records, including records from various psychiatric facilities, the file related to the 1986 murder case, prison record, VA psychiatric records, and others, before giving his opinion to trial counsel.   <u>Id</u>. at 1098-99, 1112.   He specifically stated he would have reviewed the records of the 1983 involuntary hospitalization.   <u>Id</u>. at 1112.   Dr. Krop testified Dr. Wu's findings from the PET scan were consistent with Dr. Krop's findings of his "neurpsyche."   <u>Id</u>. at 1099.   In response to the question as to whether Dr. Krop had found Petitioner had schizoid personality traits, Dr. Krop responded affirmatively.   <u>Id</u>. at 1100. He explained:

> Yes, one of my diagnoses was – and I don't recall when the DSM switched over.   It may have been referred to back then as a mixed personality disorder or now it would be a personality disorder not otherwise specified, in my opinion, with – I diagnosed him with **avoidance, schizoid and paranoid features and pretty much he's been diagnosed with somewhat of a similar diagnosis by the various facilities and doctors he's seen over the years.**

<u>Id</u>. (emphasis added).

Dr. Krop found his evaluation was generally inconsistent with any major mental illness, but he found Petitioner to be suspicious with paranoid tendencies.   <u>Id</u>. at 1102.   After the neuropsychological test and evaluation, Dr. Krop found cognitive deficits in the frontal lobe.   <u>Id</u>. at 1103.   He also

found Petitioner of a "decent intellectual level," with some adjustment disorders.  <u>Id</u>. at 1106.  Dr. Krop described Petitioner as leading a "schizoid lifestyle."  <u>Id</u>. at 1113.  Dr. Krop stated that there was no record that Petitioner was "psychotic," leading to Dr. Krop's conclusion that he was not psychotic at the time of the offense.  <u>Id</u>. at 1114.  Again, Dr. Krop said Petitioner was diagnosed with adjustment disorder, alcohol abuse, and mixed personality disorder with avoidance, schizoid and borderline features.  <u>Id</u>.

Of import, at the state-court evidentiary hearing, Dr. Krop testified his opinion had not changed from when he testified in 1997 or 1998 to date.  <u>Id</u>. at 119.  He opined that Dr. Wu's PET scan and findings strengthened Dr. Krop's original findings of frontal lobe deficits but did not alter or change his original opinion.  <u>Id</u>.  Dr. Krop reconfirmed that Petitioner does not suffer from any major mental illness, like psychoses, a debilitating mood disorder, or severe depressive mental illness.  <u>Id</u>. at 1125-26.

There is an abundance of mental and psychological records in the record before the Court, including those submitted by Petitioner at the federal evidentiary hearing on November 21, 2021.  There is evidence of a petition for involuntary commitment in 1983 requesting commitment based on the individual being mentally ill or inebriated who is dangerous to himself or others.  Ex. 26 at 646.  A commitment order followed.  <u>Id</u>. at 647.  The

North Carolina Division of Mental Health, Mental Retardation and Substance Abuse Services document of admission, dated September 3, 1983, shows Petitioner reported he was drunk and had a black out experience. Id. at 649. Petitioner became aggressive and threatening, he drank again, and attempted to cut himself. Id. On July 16, 1986, in his second mental health center admission in North Carolina, he reported he had been found competent to proceed to trial. Id. at 656. Records from November 1996 show the assessment of alcohol and drug abuse as well as an Axis II schizoid personality disorder. Id. at 497, 501.

Dr. Krop's letter of October 30, 1997, to Alan Chipperfield, contains Dr. Krop's conclusion that Petitioner "is viewed as Competent to Proceed" after Dr. Krop's clinical interview, the administration of a battery of psychological testing, and a review of the records. Id. at 662. He found: "[t]here is also no evidence to suggest that he would have been unable to appreciate the nature, quality, and wrongfulness of his actions. However, Mr. Miller is an intelligent individual with an extensive history of alcohol and substance abuse." Id. Dr. Krop further stated, the evaluation is generally inconsistent with any major mental illness, although he found Petitioner a suspicious individual with paranoid tendencies. Id. He found the evaluation inconsistent with an Antisocial Personality Disorder. Id. Extensive notes are attached, including

notations as to the documents Dr. Krop reviewed and the interviews he

undertook.   Id. at 664-71.

The record shows Dr. Krop testified at the penalty phase of the trial.

Ex. 13 at 893.   In a nutshell, he testified to the following:

> The type of personality disorder which he was diagnosed in '83 and later in '85, and also my own evaluation are very consistent with that, is a personality disorder which we call mixed or mixed personality disorder, which means it has features from different types of personality traits.

> And the most consistent personality traits that he has been diagnosed as having are avoidant, schitzoid [sic] and paranoid.   Schitzoid [sic] and paranoid are the type of personality traits that really cause a person problems.

> I think paranoia is a pretty commonly used term and it's when a person is overly suspicious, thinks people are out to get him, et cetera, et cetera, not to the point where he is not in touch with reality, but to a point where it causes problems with that person adjusting in society.

> Schitzoid [sic], again, is like schitzophrenia [sic], but not to the point where the person is out of contact with reality.   Schitzoid [sic] individuals typically are very aloof.   They try and distance themselves and sort of view themselves as different and others view them as different, and they don't fit in with society.

> So those kinds of traits have been constantly assigned to Mr. Miller from '83, and my psychological testing was very consistent.   So that would be his

36

> diagnosis, that personality disorder plus alcohol abuse
> both from '83 on, as well as my current evaluation.

Id. at 900-901.

Dr. Krop found Petitioner sane at the time of the offense, noting he clearly knew right from wrong.  Id. at 903.  Dr. Krop also found Petitioner competent to proceed.  Id.  Dr. Krop did not find that Petitioner had an anti-social personality disorder, nor has he been diagnosed as such in the past.  Id. Dr. Krop found Petitioner to be of average intellectual ability but he did not do well on tests measuring frontal lobe functions.  Id. at 906.  Dr. Krop explained that part of the brain controls behavior or inhibition.  Id.  Upon being interviewed, Petitioner expressed to Dr. Krop that he felt guilty, remorseful, and responsible, said he deserved to be punished, and accepted responsibility for his actions.  Id. at 910.  Dr. Krop said Petitioner expressed the same in the taped confession he provided in Louisiana.  Id.  Dr. Krop testified that he believed, at the time Petitioner committed the murder he was mentally competent, and he believed Petitioner was competent to participate in his trial ("Yes, very much.").  Id. at 919.  Dr. Krop testified Petitioner was lucid, was not delusional, and was oriented in time, place, and situation.  Id. at 919-20.  Of note, Dr. Krop recorded that Petitioner was not hallucinating and not suffering from any major mental illness.  Id.

At trial, Petitioner took the stand and apologized to the surviving victim, Ms. Linda Fullwood (aggravated battery), and apologized to the family of the deceased, Mr. Albert Floyd.   Id. at 937.

Although Petitioner submits that several other doctors should have been called at the state post-conviction evidentiary hearing, Petitioner has not provided the Court with any evidence that Petitioner was, at the time of the state post-conviction evidentiary hearing or during the time Mr. Norgard represented Petitioner, incompetent, insane, or suffering from a major mental illness.   See Petition at 87-89.   Petitioner mentions Dr. Herkov but makes no mention how his testimony would have differed from the experts that were called to testify.   Id. at 87-88.   Certainly, post-conviction counsel called the expert witnesses who best supported Petitioner's contention of serious mental impairment.

Petitioner asserts Dr. Satterfield said had he been aware of additional information, "he **would likely** have diagnosed Miller with full-blown schizophrenia[,]" not that he did diagnose Petitioner as suffering from schizophrenia.   Id. at 88 (emphasis added).   Finally, Petitioner mentions a Dr. Eddy Regnier, and contends, "**his findings are consistent with other evidence in Miller's case** demonstrating that Miller suffers from schizophrenia."   Id. (emphasis added).   If his findings are consistent with

38

other evidence, that evidence, based on the testimony and reports of numerous experts, shows Petitioner has a personality disorder identified as mixed or mixed personality disorder with avoidant, schizoid and paranoid personality traits, or something comparable to that diagnosis, along with frontal lobe impairment.

As noted in repeated orders of the Court, the conduct of Mr. Norgard and the related conduct of Petitioner were to be the focus of the evidentiary hearing.   (Docs. 44, 46, 47).   For purposes of equitable tolling, this Court looks to the period and the actions of the attorney "who represented petitioner at the time when [Petitioner's] federal habeas petition was due to be filed." Christeson v. Roper, 574 U.S. 373, 382 (2015) (per curiam) (Alito, J., dissenting).

Although given the opportunity, Petitioner did not take the stand at the evidentiary hearing.   He sat silent and did not dispute Mr. Norgard's testimony that Petitioner, in a lucid and forthright manner, told counsel not to file a federal habeas petition and continued in this vein through the expiration of the one-year limitation period.   The Court observed Petitioner's behavior in the courtroom.   He appeared to be lucid, engaged, and oriented.   He communicated with his counsel and observed all courtroom decorum.   He

never disrupted the proceedings or acted inappropriately in the courtroom. As such, Mr. Norgard's testimony remains unrebutted and will be credited.

Petitioner makes an unsupported allegation that effective communication was virtually impossible between Petitioner and his counsel. Petition at 11.   Based on Mr. Norgard's testimony, there were no barriers to communication.   Petitioner lucidly expressed his desires to Mr. Norgard at both the state court evidentiary hearing and afterwards.   Petitioner did not want Mr. Norgard to file a federal habeas petition and Petitioner expressed his wishes to counsel.   Mr. Norgard abided by Petitioner's decision and directives. Mr. Norgard reached out to Petitioner to make sure Petitioner had not changed his mind after the state-court evidentiary hearing, and Petitioner reiterated his decision and directive not to file anything further.   Mr. Norgard did not observe or describe any active delusions or hallucinations during the evidentiary hearing or during post-hearing communications.   Further, he did not describe any behavior suggestive or indicative of active psychosis on Petitioner's part.   Based on Mr. Norgard's testimony, the Court concludes there were no barriers to effective communication between Petitioner and his counsel.

As such, Petitioner has failed to show Mr. Norgard engaged in any serious attorney misconduct qualifying as an extraordinary circumstance.

Petitioner has not shown bad faith, dishonesty, divided loyalty, or mental impairment on the part of his counsel.   Cadet, 853 F.3d at 1236. Additionally, this record "does not suggest abandonment or any other form of serious misconduct rising to the level of an 'extraordinary circumstance.'" Robinson v. Jones, No. 1:17cv198-MW-CJK, 2018 WL 6920351, at *4 (N.D. Fla. Nov. 6, 2018), report and recommendation adopted by 2019 WL 77508 (N.D. Fla. Jan. 2, 2019), affirmed by 808 F. App'x 894 (11th Cir. 2020), cert. denied, 141 S. Ct. 2764 (2021) (per curiam).

Unlike counsel in Thomas v. Attorney General, 992 F.3d 1162, 1167 (11th Cir. 2021), petition for cert. filed, (U.S. Oct. 20, 2021), Mr. Norgard did not abdicate his duty of loyalty to Petitioner so he could promote his own interests or the interests of others.   Crediting Mr. Norgard's uncontroverted testimony, Mr. Norgard did not misinterpret the one-year deadline, he did not fail to conduct research and contemplate the issues to be raised in a federal petition, and he did not walk away from the attorney-client relationship.   See id. at 1183; Cadet, 853 F.3d at 1234 ("Abandonment denotes renunciation or withdrawal, or a rejection or desertion of one's responsibilities, a walking away from a relationship.").   Furthermore, there is no evidence that Mr. Norgard acted in bad faith.   Thomas, 992 F.3d at 1184.   In sum, there has not been a showing of "professional misconduct" or some other extraordinary

circumstance for equitable tolling purposes.   <u>Walters v. Fla. Dep't of Corr.</u>, No. 3:18-cv-1088-TJC-PDB, 2021 WL 3172120, at * 3 (M.D. Fla. July 7, 2021).   <u>See</u> <u>Holland</u>, 560 U.S. at 651 ("professional misconduct . . . could nonetheless amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling").

This does not mean Mr. Norgard's representation was flawless. <u>Robinson v. State Att'y for Fla.</u>, 808 F. App'x 894, 898 (11th Cir. 2020) (per curiam), <u>cert. denied</u>, 141 S. Ct. 2764 (2021).   But negligence, even gross or egregious negligence, does not, by itself, rise to the level of abandonment.   <u>Id</u>. Mr. Norgard's overall conduct, "is not of the kind that would indicate attorney abandonment."   <u>Id</u>. at 899.   Petitioner continued to have a functioning attorney of record, even though Petitioner had told counsel to stand down as far as pursuing federal remedies and further appeals.   <u>Cadet</u>, 853 F.3d at 1235.   Here, counsel followed Petitioner's express wishes; Mr. Norgard consulted with his client, making "a reasonable effort to discover the defendant's wishes."   <u>Roe v. Flores-Ortega</u>, 528 U.S. 470, 478 (2000).   Thus, he performed in a professionally reasonable manner.   <u>Id</u>

Since Petitioner has failed to prove an alleged extraordinary circumstance of abandonment, it is unnecessary for this Court to consider whether Petitioner was "adequately diligent or not."   <u>Robinson</u>, 808 F. App'x

at 899.   Indeed, for equitable tolling purposes, this Court need not address one element when Petitioner has failed to satisfy the other.   Menominee Indian Tribe of Wis., 577 U.S. at 256.

Next, this Court will inquire as to whether Petitioner has shown some other extraordinary circumstance, an external obstacle to timely filing.   Id. This extraordinary circumstance must have stood in Petitioner's way.   Id. (citation omitted).   Of note, equitable tolling is unavailable if a litigant "was responsible for its *own* delay."   Id. at 257.   As such, if the matter was within the petitioner's control, the extraordinary-circumstances prong cannot be met. Id.   Again, the second prong is met only where the circumstances that caused the delay are both extraordinary *and* beyond its control.   Id.

A conclusory assertion of mental illness will not suffice.   Smith, 301 F. App'x at 378.   Moreover, simply because a petitioner is not mentally competent does not "eviscerate the statutory right to counsel in federal habeas proceedings."   Gonzales, 568 U.S. at 68 (internal quotation marks omitted). As the Supreme Court found, "[g]iven the backward-looking, record-based nature of most federal habeas proceedings, counsel can generally provide effective representation to a habeas petitioner regardless of the petitioner's competence."   Id.   This is borne out by the fact that the federal court's review pursuant to 28 U.S.C. § 2254(d)(1) is limited to the record before the state court

that adjudicated the claim on the merits.   Id. (quoting Cullen v. Pinholster, 563 U.S. 170, 181 (2011)).   As found in Gonzales, "[a]ttorneys are quite capable of reviewing the state-court record, identifying legal errors, and marshaling relevant arguments, even without their clients' assistance."   Id. at 68.

Here, Mr. Norgard attested that he had identified the issues and was prepared to initiate a federal habeas case if Petitioner so desired.   Mr. Norgard was in a position to undertake this review as Petitioner's state habeas registry counsel.   He was well-versed in the post-conviction issues.   However, based on Petitioner's express wishes, Mr. Norgard did not file a federal petition.

Petitioner has not shown that his mental impairment constrained Petitioner's ability to file a timely petition.   Petitioner communicated with his counsel.   Mr. Norgard spoke with Petitioner after the mandate issued to confirm that he did not want to pursue his federal remedies.   In no uncertain terms, Petitioner told his attorney he did not want to pursue his federal remedies.   Any failure of counsel to stay in touch after the missed federal deadline is of no import as any failures at that point did not cause Petitioner to miss the filing deadline.   Ryder, 2012 WL 12895353, at *4.

The petitioner in Bolarinwa, upon which Petitioner relies, was found to be incapacitated at one point in her life, then rehabilitated and fit to proceed to trial. Bolarinwa suffered from depression, anxiety, and psychosis, but the court still found she was not subjected to extraordinary circumstances that prevented her from filing a federal habeas petition in a timely fashion. Nara, Laws, and Hunter are distinguishable because the petitioners either initially filed pro se or with just the help of jailhouse clerks, not attorneys. Similarly, the court in McSwain, rejected a claim for equitable tolling because the petitioner was able to pursue her state court remedies notwithstanding her mental illness and she was represented by counsel for the federal proceeding. And, in Fisher, the Fifth Circuit agreed that there is a possibility that mental incompetency might support equitable tolling, but the court still declined to apply equitable tolling.

Here, the Court must look for the causal link between Petitioner's mental illness and his ability to seasonably file a petition. The record shows Petitioner was not expected to pursue legal relief on his own. He was appointed registry counsel, versed in the deadlines and procedures. There is no evidence that Petitioner was unable to communicate with Mr. Norgard. Mr. Norgard spoke with Petitioner in person and through telephone conversations. Even in Riva, 803 F.3d at 83, where there was a record that

the petitioner had been committed to a facility for seventeen years, suffered from diagnosed paranoid schizophrenia, exhibited bizarre delusions of a persecutory nature, paranoid ideation, auditory hallucinations, and somatic terrors, the court still found that the petitioner had not shown that his mental illness prevented him from following through with his litigation.

Here too there is no evidence that Petitioner's mental impairment prevented him from conferring with counsel and making litigation decisions. There is no evidence that Petitioner refused all communication with counsel. Indeed, counsel explained that Petitioner made his position clear, both in person and on the telephone; he did not want to pursue further appeals. Under these circumstances, the Court is not convinced that Petitioner has shown that his mental illness prevented him from communicating with counsel and pursuing his litigation if he were so inclined.   The record demonstrates Petitioner had an attorney to assist and educate him.   See Hunter, 587 F.3d at 1309 (no counsel to assist and educate the petitioner).   Petitioner is of average intelligence.   See id. (due to severe irreversible mental retardation, Hunter was not able to understand and comply with filing requirements on his own, or even if he had counsel, he would have had a very difficult time assisting others).   Although Petitioner may have impulse issues due to frontal lobe

damage, he scored well on intelligence tests and was able to converse with counsel, express his opinions and concerns, and assist counsel.

There is no evidence that Petitioner was unable to understand his legal rights or act upon them.   This is evidenced by the fact that he was found to be competent to proceed in both North Carolina and Florida.   Simply suffering from mental impairments, as Petitioner admittedly does, is insufficient to establish that there is a causal connection between his alleged mental deficiencies or disorder and his ability to relate to counsel that he desires to pursue his federal remedies.   See Lawrence, 421 F.3d at 1227.

Petitioner needs to show that his mental illness was so profound and debilitating, he was unable to file a timely habeas petition, given his mental limitations, even with the assistance of knowledgeable counsel.   See Lewis v. Howerton, No. 1:07-cv-2803-JEC-WEJ, 2012 WL 4514044, at *16 (N.D. Ga. Sept. 30, 2012) (not reported in F.Supp.2d) (must show inability to file based on debilitating mental condition), cert. denied, 137 S. Ct. 132 (2016). Petitioner has not shown that he has an inability to understand and appreciate federal law and procedure due to a mental disorder.   Indeed, it is quite apparent on this record that Petitioner fully understood that there was a timeline and there were avenues open to him to pursue federal remedies, but he elected not to pursue those remedies and chose not to meet the

requirements, and purposefully declined to take further action by telling his counsel not to act, first at the evidentiary hearing, and later on during the one-year limitation period.   There was no extraordinary circumstance that stood in Petitioner's way.   Petitioner was given the opportunity, with the assistance of counsel, to pursue his federal remedies in a timely fashion.   Petitioner chose not to pursue those remedies.

Although Petitioner was advised that the hearing would concern "the conduct of Mr. Robert Norgard, Esquire, and the related conduct of Petitioner[,]" Order (Doc. 47), Petitioner did not take the stand at the evidentiary hearing.   Instead, he chose to submit exhibits, all admitted at the hearing without objection.[11]   See Petitioner's Exhibit Limited Evidentiary Hearing October 21, 2021.   Petitioner's Exhibit 2 shows Mr. Norgard became sole registry counsel for Petitioner effective June 15, 2004.   Petitioner's Exhibit 6 contains an extensive Background Packet of confidential attorney-client materials.   These documents show Petitioner, although honorably discharged from military service, exhibited substandard performance during

---

[11]   The Court has reviewed the entirety of Petitioner's Exhibits and the other exhibits contained in the record before the Court.   Upon review, there is an abundance of evidence concerning Petitioner's mental disorder and condition.   These exhibits include multiple experts' assessments of Petitioner's mental state over the years, and particularly of interest to the Court, assessments made closer to the time period at issue.   These expert evaluations and assessments resulted in strikingly similar diagnoses.

his tenure of service in the Navy from 1978-81. Id., Tab 2. His 1983 discharge summary from his September 3, 1983 admission to Forsyth-Stokes Mental Health Center, dated September 19, 1983, shows Petitioner diagnosed with Axis I "Adjustment Disorder with Depressed Mood," placed on no medication, diagnosed with no Axis III diagnosis, and encouraged to seek out outpatient services for therapeutic issues. Id., Tab 3 at 80-81. He had been admitted on petition when he became both violent and suicidal, explaining he had been drinking and had a blackout experience. Id. at 80. Notes by the psychiatrist reflect, "no indication of psychotic thinking" but patient exhibited depression. Id. at 116. The psychiatrist's initial impression was "[d]ysthymic disorder with suicidal intent. Possible alcohol dependence." Id. at 117. On September 6, 1983, Petitioner reported an auditory hallucination, depression, crying spells, a suicide attempt, and the use of marijuana. Id. at 121.

For his second admission to the Forsyth-Stokes Mental Health Center in North Carolina, dated July 16, 1986, it was noted that Petitioner was awaiting trial for murder. Id. at 137. He reported, "not experiencing any psychiatric symptoms." Id. He admitted to drinking heavily and exhibiting violent impulses when drinking. Id. He denied "any hallucinations, delusions or unusual thoughts." Id. at 138. The social worker found, "intact mental

status" and said Petitioner "admits to no real psychiatric or behavioral disordering except when he is drinking." Id.   The diagnosis on the discharge summary of October 2, 1986 is as follows:   Axis I 305.03 Alcohol Abuse in remission; Axis I 312.34 Intermittent explosive disorder; Axis II None; Axis III None.   Id. at 141.   He was found to be well oriented with no unusual thought content.   Id. at 141.   Petitioner was again discharged without medication. Id. at 142.   Generally, Petitioner was found to be of average intelligence with good verbal and social skills while suffering from alcohol and cocaine dependence.   Id. at 143.

Petitioner's Exhibit 6, Tab 4, the records for Dorothea Dix Hospital, Raleigh, North Carolina, dated March 28, 1986, refer to the charge of murder with the following diagnosis:   Axis I 309.40 Adjustment disorder with mixed disturbance of emotions and conduct; Axis I 305.03 alcohol abuse by history; Axis II 301.89 personality disorder, mixed, with avoidant, schizoid, paranoid and borderline features; Axis III No diagnosis.   As far as Petitioner's mental status, it was noted that Petitioner was sad, apathetic, and asthenic, with no evidence of hallucinations or delusions.   Id. at 150.   He presented no evidence of hallucinations or delusions.   Id.   His Slosson Intelligence score was 101, placing him in the average range of intelligence.   Id. at 151.   Although there is a notation, "[d]iagnosis of schizoid personality and schizophrenia are the

most commonly found [sic] with this described profile[,]" the actual diagnosis by the forensic psychiatrist, Patricio P. Lara, M.D., is:  Aix I Adjustment disorder with mixed disturbance of emotions and conduct; Axis I Alcohol abuse by history; Axis II Personality disorder, mixed, with avoidant schizoid paranoid and borderline features; Axis III None.   Id. at 153.   Again, Petitioner was discharged on no medication.   Id.   Finally, and of significance, the psychiatrist found Petitioner competent to stand trial.   Id.

In 1996, Veteran's Administration (VA) Medical Center (admission date October 31, 1996; discharge date November 27, 1996) recorded the following diagnosis, in relevant part:  Axis I Alcohol dependence, cocaine, and nicotine dependence with physiological dependence and cannabis abuse; Axis II Schizoid personality disorder.   Petitioner's Exhibit 6, Tab 6 at 262. Petitioner denied hallucinations, Delirium Tremens (DT's) or seizures.   Id. The doctor, J. Dasari, M.D., found no evidence of psychosis or delusions.   Id. at 263.   Dr. Dasari referred Petitioner to a psychologist for "continued assessment of his depressed mood, his anger, and his schizoid personality disorder."   Id. at 264.

Of import, on October 30, 1997, Dr. Krop wrote Petitioner's defense counsel, Alan Chipperfield, Assistant Public Defender, that Dr. Krop's evaluation, after a battery of psychological testing, "is generally inconsistent

with any major mental illness, although Mr. Miller appears to be a suspicious individual with paranoid tendencies.   The evaluation is inconsistent with an Antisocial Personality Disorder[.]" Petitioner's Exhibit 6, Tab 8 at 393.   Dr. Krop found, "Mr. Miller understands his legal options and is viewed as Competent to Proceed." Id.   Dr. Krop reviewed extensive records.   Id. at 395-402.

At trial, the defense called Dr. Krop as an expert witness in forensic psychology.   Petitioner's Exhibit 6, Tab 9 at 405.   He attested he reviewed multiple records prior to his evaluation.   Id. at 406-407 (school records, military records, psychiatric records from various facilities, prison records, VA psychiatric records, reports from Louisiana, Petitioner's taped confession, and depositions of relevant witnesses).   Dr. Krop also interviewed family members and Petitioner.   Id. at 407.   Dr. Krop said Petitioner's past psychiatric records "have been pretty consistent as far as their diagnosis and their recommendations." Id. at 409.   Over the years, Petitioner has been diagnosed with depression and alcohol abuse with violence related to drinking. Id. at 409-410.   Historically, Petitioner has been diagnosed with some form of a personality disorder; however, "it's not considered a major mental illness, such as psychosis or schizophrenia[.]" Id. at 410.   In short, Dr. Krop opined Petitioner has a "mental disorder" not a major mental illness.   Id.

More specifically, Dr. Krop diagnosed: a mixed or mixed personality disorder, with the most consistent diagnosis of personality traits of "avoidant, schitzoid [sic] and paranoid." <u>Id</u>. at 411.   To clarify, Dr. Krop explained that schizoid is like schizophrenia, "but not to the point where the person is out of contact with reality." <u>Id</u>.   Dr. Krop did not diagnose Petitioner with an anti-social personality disorder. <u>Id</u>. at 414.   Dr. Krop found Petitioner "competent to proceed." <u>Id</u>.

Dr. Krop said Petitioner was sane at the time of the offense, clearly knowing right from wrong. <u>Id</u>.   Once again, Petitioner was found to be of average intellectual ability, but his frontal lobe functions were found to be diminished, that is, those functions involving inhibition and impulse control. <u>Id</u>. at 417-18.   Dr. Krop opined Petitioner's impaired frontal lobe functions coupled with alcohol abuse, further reduced Petitioner's inhibition and impulse control. <u>Id</u>. at 419-20.   This combined with Petitioner's "schitzoid [sic] traits and paranoid traits" resulted in Petitioner being seriously disturbed and engaging in impulsive behavior. <u>Id</u>. at 420.   Dr. Krop described Petitioner as leading a schizoid type of existence, where Petitioner neither followed-up with treatment for his personality disorder or for alcohol abuse. <u>Id</u>. at 419.

Dr. Krop pointed out that Petitioner turned himself in, accepted responsibility for his actions, and apparently felt guilt and remorse. <u>Id</u>. at

421.   Petitioner chose to turn himself in, after deciding to rob the deceased and to hit him in the head to disable him.   Id. at 423-24, 429.   Dr. Krop said Petitioner admitted he made a choice [to rob the victim], "and psychologically I believe that he did, yes."   Id. at 423.   Dr. Krop opined that Petitioner's actions were influenced by alcohol but Petitioner knew the difference between right and wrong.   Id. at 425-26.

Ultimately, Dr. Krop found Petitioner was mentally competent at the time of the murder and at the time of the trial.   Id. at 430.   Upon examination, Petitioner was found to be lucid, not suffering from hallucinations and not delusional.   Id. at 430-31.   He was well oriented as to time, place, and situation.   Id. at 431.   Dr. Krop said he found no evidence of "any major mental illness" and Petitioner had the ability to conform his behavior and make the decision to kill.   Id. at 431-32.

Petitioner's Exhibit 7 is the report of the PET-scan of Petitioner by Dr. Joseph C. Wu, dated October 10, 2002.   Dr. Wu reports an abnormal scan with "metabolic decreases in orbitofrontal cortex," exhibiting a pattern consistent with encephalopathy.   Id. at 1.   He related, "[t]he most probable cause of the PET scan abnormalities is schizophrenia spectrum disorder."   Id. at 2.

Dr. Charles Golden, a licensed psychologist conducted a neuropsychological assessment of Petitioner and provided a report dated

54

March 20, 2003.   Petitioner's Exhibit 8.   After conducting an Rorschach Inkblot Test, Dr. Golden found the results consistent with individuals with anterior brain dysfunction or schizoid/schizophrenic disorders.   Id. at 3-4. Dr. Golden noted the PET scan was consistent and supportive of the analysis of anterior brain dysfunction.   Id. at 7.   Of importance, Dr. Golden provided the following diagnosis:   Axis I Cognitive Disorder NOS, Multiple drug abuse (by history), Intermittent explosive disorder secondary to drug use (by history), Personality Disorder NOS.   Id.

Yes, Petitioner suffers from a mental disorder, but Petitioner's own expert at trial, Dr. Krop, said Petitioner was not suffering from a major mental illness, nor did he loose contact with reality.   Although Petitioner has been diagnosed with some form of a personality disorder, he has not been diagnosed with psychosis or full-blown schizophrenia.   Although there has been some conjecture that Petitioner suffers from a schizophrenia spectrum disorder, the overwhelming evidence contained in the record shows Petitioner's frontal lobe functions are diminished and he has a personality disorder with avoidant, schizoid, paranoid, and borderline features, not a major mental illness, such as schizophrenia.

On the contrary, over the years, the diagnoses have been very consistent. The record is replete with documentation that Petitioner is living a schizoid

55

type of existence, described as Axis II schizoid, paranoid and borderline features; personality disorder, mixed, with avoidant, schizoid, paranoid and borderline features; personality disorder, mixed, with avoidant schizoid paranoid and borderline features; schizoid personality disorder; a mixed or mixed personality disorder, with personality traits that are avoidant, schizoid and paranoid; and Axis I Cognitive Disorder NOS, Multiple drug abuse (by history), Intermittent explosive disorder secondary to drug use (by history), Personality Disorder NOS.

Notably, experts have found Petitioner competent, both when he committed crimes and to stand trial.   Experts have also found Petitioner sane. Petitioner has not provided the Court with any evidence that Petitioner was, at the time of the state post-conviction evidentiary hearing and during the period immediately following the hearing up until the one-year period expired, incompetent, insane, or suffering from a major mental illness rendering him incapable of communicating with counsel.   Repeatedly, after examination and assessment, experts have opined that Petitioner was not delusional or experiencing hallucinations.   Additionally, Mr. Norgard testified he found Petitioner both lucid and oriented.

The Court recognizes Petitioner's frontal lobe functions are diminished, resulting in a lack of impulse control, exacerbated by the abuse of alcohol.

Admittedly, Petitioner is both paranoid and depressed and readily exhibits his depression and that paranoia.   The record also shows Petitioner has expressed suicidal ideation, both verbally and outwardly. Of import, Petitioner has been found to be of average intelligence and does not suffer from an intellectual disability.   Both Dr. Krop and Mr. Norgard describe Petitioner as lucid and well able to consult with counsel.   In fact, Mr. Norgard said that Petitioner told him, in no uncertain terms, he did not want Mr. Norgard to prepare and file a habeas petition for the federal court.   Petitioner repeated this directive when Mr. Norgard made an additional inquiry after the mandate came down. No evidence has been presented that Petitioner changed his mind during the one-year limitation period or that he contacted Mr. Norgard and told him to seasonably file a petition in the federal court.

Based on all of the above, the Court finds Petitioner is not entitled to equitable tolling of the period from the date mandate issued, on April 13, 2006, until the one-year period expired 112 days later, on August 3, 2006.   Petitioner was not diagnosed as suffering from schizophrenia or any other major mental illness.   He was not rendered incompetent or insane during the relevant period.   He was certainly able to communicate with counsel, as evidenced by Mr. Norgard's testimony and the assessment of medical professionals who found Petitioner sane, competent, lucid, and able to assist counsel.   Although

Petitioner seeks an additional evidentiary hearing, EH at 130, an additional evidentiary hearing is unnecessary in light of the comprehensive nature of the records received by the Court concerning Petitioner's mental health assessment and treatment, the extreme length of time that has passed, and the fact that the record before the Court fails to exhibit evidence supporting the claim for equitable tolling.

No exceptional circumstances have been shown. The Court acknowledges that Petitioner has long-standing mental health issues, but he has failed to show a causal connection between his mental condition and his ability to timely file, particularly in light of the fact that Petitioner was provided with experienced counsel to educate and assist him. Counsel was well-versed in the case and ready to assist Petitioner in the filing of a federal petition. In addition, the record is clear that Petitioner did not suffer from a mental illness that severely impaired Petitioner's ability to effectively assist and communicate with his counsel. Petitioner has failed to show his mental condition prevented communication with counsel or prevented Petitioner from understanding the process and the proceedings. Petitioner's showing of mental deficiencies or impairments throughout most of his life is not sufficient to justify equitable tolling. Petitioner's "mixed personality disorder" with avoidant, schizoid, paranoid and borderline features or "schizoid personality

disorder," combined with impaired frontal lobe functions did not render Petitioner incapable of communicating with Mr. Norgard or in understanding the proceedings and the consequences of Petitioner's choices.   Indeed, even though Petitioner decided not to pursue additional post-conviction remedies, counsel enjoyed Petitioner's "effective participation" as demonstrated by Petitioner's communications with counsel.

In conclusion, Petitioner has not presented any justifiable reason why the dictates of the one-year limitation period should not be imposed upon him. Petitioner has failed to show Mr. Norgard engaged in any serious attorney misconduct qualifying as an extraordinary circumstance.   There was no attorney abandonment during the relevant period and no scheme adopted by Mr. Norgard to avoid clemency review or a unilateral decision on his part to forego federal habeas relief.

The record shows, during the relevant period, Petitioner was not suffering from any major mental illness, like psychosis or schizophrenia, that caused him to miss the filing deadline.   His diagnosed mental impairment was not so profound and debilitating that he was unable to communicate with his counsel or unable to understand and appreciate the law and proceedings. Indeed, the record demonstrates Petitioner understood his legal options and

he had the lucidity necessary to effectively pursue legal redress with the aid of counsel.   The record also shows he was not insane at critical times.

In sum, the record demonstrates Petitioner was not mentally incapable of filing a federal habeas corpus petition in a timely manner during the pertinent time period, until the limitation period expired, particularly in light of the fact that he had the assistance of counsel.   In sum, the mental illness Petitioner suffered was not so profound and debilitating that he would have been unable to file a timely habeas petition, given his limitations.

For purposes of this opinion, the Court assumes due diligence, but the Court finds Petitioner has not shown he is entitled to extraordinary relief. Indeed, the Court finds Petitioner has not shown extraordinary circumstances stood in his way and prevented him from timely filing a federal petition. Equitable tolling is a remedy that should be used sparingly, and Petitioner has failed to show an extraordinary circumstance and he has not met the burden of showing that equitable tolling is warranted.

This is not to say that the Court is not disturbed by this result, but this is the state of the law.   Petitioner is sentenced to death and is barred from seeking federal relief due to the AEDPA one-year limitation period. Petitioner had qualified counsel for the purpose of investigating, preparing, and timely filing a federal habeas corpus petition.   This is not a case where

the petitioner's attorney simply failed to meet the deadlines due to negligence, miscalculation, abandonment, professional misconduct, or otherwise.   Here, Petitioner directed his attorney not to file a federal petition and the attorney was certain Petitioner would be found competent, as he had been found in the past.   At the time, Petitioner was not delusional or hallucinating.   Nothing external to Petitioner, something that cannot be fairly attributed to him, was at play.   Thomas, 992 F.3d at 1181.   As such, Petitioner does not qualify for equitable tolling as he has failed to satisfy one of the two-pronged requirements, the extraordinary circumstances prong.

Finally, Petitioner does not assert or demonstrate that he has new evidence establishing actual innocence.   He has not pointed to any evidence demonstrating it is more likely than not that no juror, acting reasonably, would have found him guilty beyond a reasonable doubt in light of new evidence.   See McQuiggan v. Perkins, 569 U.S. 383, 395 (2013) (restricting the miscarriage of justice exception to a severely confined category of cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted the petitioner).[12]

---

[12]  To the extent this Court should broadly construe the Petition as claiming legal innocence, not factual innocence, that will not save the day.   Although Petitioner claims mental illness and frontal lobe impairment, Petitioner is required to show factual innocence, not mere legal insufficiency.   Bousley v. United States, 523 U.S. 614, 623 (1998).   See Rozzelle v. Sec'y Fla. Dep't of Corr., 672 F.3d 1000, 1012-13 (11th Cir. 2012) (per curiam) (factual innocence

Focusing its inquiry on the circumstances surrounding Petitioner's late filing of the Petition, Petitioner is not excused from complying with the time constraints for filing a federal petition. He has not presented any justifiable reason why the dictates of the one-year limitation period should not be imposed upon him and he has failed to demonstrate he is entitled to equitable tolling. Furthermore, he has made no attempt to make a credible showing of actual innocence by offering new evidence that is directly probative of his innocence. Because Petitioner has not shown an adequate reason why the dictates of the one-year limitation period should not be imposed upon him, the Court will dismiss the Petition (Doc. 15) and the case with prejudice pursuant to 28 U.S.C. § 2244(d) as untimely.

## V.   Motion for Protective Order

Petitioner's Notice of Intent to Request Redaction of October 21, 2021 Evidentiary Hearing Transcript and Opposed Motion for Protective Order (Motion) (Doc. 69) is pending before the Court. Petitioner seeks redaction of some of the transcript and further requests a protective order that an unredacted version of the transcript be filed under seal, accessible to the parties and this Court. Motion at 1. He argues that allowing the evidentiary

---

required). Petitioner has not made a credible showing of actual innocence.

hearing transcript extensively discussing the content of the Exhibits 6, 7, and 8, currently under seal, to be placed on the record without redaction, would submit Petitioner to an invasion of privacy, embarrassment, and mental anguish.  Id. at 2.  The Court has carefully reviewed the content of the portions of the transcript Petitioner's seeks to have redacted.  See id. at 2-3. The Court finds the Motion is due to be denied.   An explanation follows.

The law is clear, "a protective order may be issued for good cause to protect a person from annoyance, embarrassment, [and] oppression[.]" Thomas v. Seminole Electric Coop. Inc., No. 8:16-CV-3404-T-35JSS, 2017 WL 2447722, at *2 (M.D. Fla. June 6, 2017) (not reported in F. Supp.).   In this case, however, Petitioner placed his mental health at issue by alleging that he is entitled to equitable tolling of the AEDPA limitation period because his mental illness satisfies the diligence and extraordinary circumstances prongs of the two-pronged test.   Therefore, Petitioner has waived any privilege in any confidential materials related to his mental health as these matters are relevant to Petitioner's contention that he is entitled to equitable tolling because he allegedly suffers from a major mental illness.

Also of note, the portions of the October 21, 2021 evidentiary hearing transcript Petitioner requests to be redacted concern matters revealed and discussed at length in the Petition (Doc. 15), the Appendix Record of State

Proceedings (Doc. 32), and in published decisions.    In fact, Petitioner publicly articulated most, if not all of his claimed mental deficits in his Petition.

As previously noted, the Court found it necessary to reference some of the content of Petitioner's exhibits placed under seal to adequately address and explain its decision as to whether Petitioner satisfied the test to qualify for equitable tolling.    Indeed,

> "'[c]ourts have routinely held that, by putting one's medical condition at issue in a lawsuit, a plaintiff waives any privilege to which he may have otherwise been entitled as to his privacy interests in his medical records.'" Lozman v. City of Riviera Beach, No. 08-80134-Civ-Hurley/Hopkins, 2014 WL 12692766, at *1, 2014 U.S. Dist. LEXIS 195855, at *3-4 (S.D. Fla. May 2, 2014) (quoting Stogner v. Sturdivant, 2011 U.S. Dist. LEXIS 107571, 2011 WL 4435254, *5 (M.D. La. Sept. 22, 2011)); Barlow v. Dupree Logistics, LLC, No. 1:14-BE-1808-E, 2015 WL 4646812, at *8, 2015 U.S. Dist. LEXIS 102371, at *24 (N.D. Ala. July 5, 2015)[.]

Oldaker v. Giles, No. 7:20-CV-00224 (WLS), 2021 WL 3412551, at *3 (M.D. Ga. Aug. 4, 2021), reconsideration denied, 2021 WL 3779837 (M.D. Ga. Aug. 25, 2021).

It may be argued that this case is different because it is a criminal case, not a civil case for damages.    But, in this instance, the medical records are directly relevant to the issue at bar and Petitioner put the matter at issue through the filing of his Petition.    Furthermore, almost all of the sensitive and

64

private information in play is already a matter of public record.   See United States v. Bradley, No. 405CR059, 2007 WL 1703232, at *5 (S.D. Ga. June 11, 2007) (not reported in F.Supp.2d) (discussing privacy interests after a criminal trial).

Ordinarily, in criminal cases, there is a "presumption of openness[.]" Id. The Court finds, however, **Petitioner's Exhibits 6, 7, and 8 shall remain under seal**.   As many of the additional details contained in Exhibits 6, 7, and 8, are not relevant to the parties' contentions, the Court finds it is unnecessary to reveal the underlying details of Petitioner's mental health assessment and treatment contained in those exhibits, except those which have already been found to be relevant and necessary for purposes of rendering this Court's decision.   See Order (Doc. 62).

In conclusion, the Court denies the request for proposed redactions of the October 21, 2021 evidentiary hearing transcript and denies the request for a protective order.

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1.     Petitioner's Motion (Doc. 69) is **DENIED**.

2.     The **Clerk** is directed to maintain **Petitioner's Exhibits 6, 7, and 8 under seal.**

3.     The Petition for Writ of Habeas Corpus (Doc. 15) and the case are

**DISMISSED with prejudice**.

4.     The **Clerk** shall enter judgment dismissing the Petition (Doc. 15)

with prejudice and dismissing the case with prejudice.

5.     The **Clerk** shall close the case.

6.     If Petitioner appeals the dismissal of the Petition for Writ of

Habeas Corpus (Doc. 15),[13] the Court denies a certificate of appealability.

Because this Court has determined that a certificate of appealability is not

warranted, the Clerk shall terminate from the pending motions report any

motion to proceed on appeal as a pauper that may be filed in this case.   Such

termination shall serve as a denial of the motion.

**DONE AND ORDERED** at Jacksonville, Florida, this 17th day of

November, 2021.

_____
BRIAN J. DAVIS
United States District Judge

---

[13]  This Court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).   To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).   Upon due consideration, this Court will deny a certificate of appealability.

sa 11/8
c:
Counsel of Record